UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. Sealed 10-80748 CIV COHN

MAGISTRATE JUDGE SELTZER

UNDER SEAL

FILED by _AS_ D.C.
JUN 23 2010
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

CAROL MCKEOWN, DANIEL F. RYAN,
MEADOW VISTA FINANCIAL CORP.,
AND DOWNSHIRE CAPITAL INC.,

    Defendants.

## EMERGENCY COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges:

### I. INTRODUCTION

1. The Commission brings this emergency action to enjoin two Canadian residents from using a website they control to tout United States microcap companies, while at the same time clandestinely selling millions of shares of the same companies to profit from the demand they help create through their touting.

2. Starting no later than April 2009, Carol McKeown and Daniel F. Ryan, who hold themselves out as husband and wife, have used the website www.PennyStockChaser.com, to tout dozens of U.S. companies. At the same time, McKeown and Ryan have liquidated millions of shares of the same companies through their two corporations, Downshire Capital Inc., and Meadow Vista Financial Corp.

3. To compensate McKeown and Ryan for the PennyStockChaser website's touting, affiliates of the touted companies ("issuers") or third parties give shares to Downshire and



Meadow Vista. Those companies then sell the shares on the open market while PennyStockChaser simultaneously predicts massive price increases for the issuers, a practice known as "scalping."

4. Furthermore, on at least two occasions, McKeown and Ryan have failed to fully disclose on PennyStockChaser the full amount of the stock they and their companies have received in exchange for the touting.

5. The Defendants have realized at least $2.4 million in net proceeds from their scalping scheme.

6. Through their conduct, McKeown, Ryan, Downshire, and Meadow Vista have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a) and 15 U.S.C. § 77(q)(b)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 [15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5]. McKeown, Ryan, and Meadow Vista have also violated Section 17(b) of the Securities Act. Unless the Court enjoins them, they are reasonably likely to continue to violate these provisions.

## II. DEFENDANTS

7. McKeown, 44, is a Canadian citizen residing in Montreal, Canada. She is the owner and sole officer and director of Downshire and the president and owner of Meadow Vista. She also owns the trade mark "PennyStockChaser" in the United States and Canada. She licensed the trade mark "PennyStockChaser" to Downshire. She and Ryan control PennyStockChaser.

8. Ryan also resides in Montreal. Ryan has entered into agreements on behalf of Downshire as its managing director, and has conducted trading on behalf of Downshire and Meadow Vista. He also helps control PennyStockChaser.

9. Downshire is a Quebec, Canada corporation headquartered in Montreal. It purports to be a private investment banking group. It holds the license to use the trade mark "PennyStockChaser" in the United States and Canada, whose stated services include providing a website featuring stock market information.

10. Meadow Vista is a Wyoming corporation which purports to be an investment bank headquartered in Cheyenne, Wyoming.

### III. JURISDICTION AND VENUE

11. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

12. The Court has personal jurisdiction over the Defendants, and venue is appropriate in the Southern District of Florida. As described below, many of the transactions, acts, practices and courses of business constituting violations of the Securities Act and Exchange Act occurred in the Southern District of Florida as well as in the United States.

13. For example, Meadow Vista maintains brokerage accounts at a firm in Boca Raton, Florida, where the Defendants receive, purchase, and sell shares of the companies touted on PennyStockChaser. McKeown signed the account opening forms for these accounts, and is listed as corporation owner on them. McKeown and Ryan control and manage these brokerage accounts, including by regularly sending e-mails to brokers at the Boca Raton firm directing trading in these accounts. Downshire and Meadow Vista also maintain accounts at no fewer than three other brokerage firms in the United States, where McKeown has also signed account opening forms.

14. In addition, PennyStockChaser has touted in the last year or currently is touting the stock of Biocentric Energy Holdings, Inc. a Florida corporation; MSE Enviro-Tech Corp., a company headquartered in Miami; and Bluewave Group, Inc. a company headquartered in Fort Lauderdale. McKeown and Ryan additionally have directed PennyStockChaser's touting of at least 65 United States companies in the past year.

15. Furthermore, as described in more detail below, Ryan in 2009 entered into a written agreement with a Boca Raton-based stock broker to provide consulting services to PennyStockChaser, and solicited stock recommendations from a second Florida-based broker.

16. In connection with the conduct alleged in the Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV. THE FRAUDULENT SCHEME

### A. The Defendants' Purported Business

17. Since no later than April 1, 2009, McKeown, Ryan, and Downshire have owned and operated PennyStockChaser.

18. The PennyStockChaser website states it is a team of research analysts, stock brokers, investment bankers, and traders that conducts thorough research on stocks and companies to recommend stock purchases to the investing public.

19. Through the website, McKeown, Ryan, and Downshire tout penny stocks and invite the investing public to subscribe to receive daily stock alerts through e-mail, text messages, Facebook, and Twitter.

20. In 2009 alone, McKeown, Ryan, and Downshire used the website to alert the investing public to more than 65 penny stock recommendations, and they are currently using the website to tout nine issuers.

### B. The Defendants' Control Over PennyStockChaser

21. McKeown owns the PennyStockChaser website and the trade mark PENNYSTOCKCHASER. Since no later than April 14, 2009, McKeown has issued press releases concerning the stock recommendations she has had the website make. McKeown also has posted messages on Twitter concerning the stock recommendations published on PennyStockChaser.

22. Ryan controls the content of the website and has negotiated and entered into contracts on its behalf. For example, in 2009, Ryan entered into the aforementioned contract with the Boca Raton stock broker for the broker to provide consulting services to PennyStockChaser. The contract called for the broker to, among other things, provide content, stock recommendations, and market information to the website. Ryan also solicited and paid a second Florida-based broker-dealer to provide stock recommendations to publish on the website.

23. Downshire holds the license to use the trade mark PENNYSTOCKCHASER in the United States and Canada pursuant to a license agreement entered into between McKeown and Downshire.

### C. The Defendants' Fraudulent Misrepresentations And Omissions

24. Directly, or by virtue of controlling PennyStockChaser, McKeown, Ryan, and Downshire have made material misrepresentations and omissions concerning their activity on PennyStockChaser.

### 1. The Defendants' Failure To Adequately Disclose Their Sale Of Stocks They Tout

25. As compensation for McKeown and Ryan's touting the issuers' stock, Downshire and Meadow Vista receive shares of the issuers from issuers' affiliates or third parties, then sell them on the open market. The Defendants also purchase shares of the stock they tout on PennyStockChaser and sell them for profits after their promotional campaigns increase the stock prices. McKeown and Ryan direct and control trading in the Downshire and Meadow Vista accounts.

26. The Defendants fail to adequately disclose they are simultaneously selling shares of the stocks they tout. The PennyStockChaser website states only that it "may be selling shares of stock at the same time the profile is being disseminated to potential investors; this should be viewed as a definite conflict of interest and as such, the reader should take this into consideration." In truth, the Defendants have regularly been selling massive quantities of the stock they tout on the website.

### i. Converge Global, Inc.

27. From no later than May 11, 2009 until at least June 1, 2009, McKeown, Ryan, and Downshire used PennyStockChaser to promote the stock of Converge Global, Inc., a Utah corporation purportedly in the business of acquiring and developing properties whose stock is quoted on Pink OTC Markets Inc. (the "Pink Sheets") under ticker symbol "CVRG."

28. Specifically, during this time period, the website touted Converge's stock to the investing public at least four times:

    a) On May 11, 2009, the website published, "[Converge] – Last @ .022 – Up 16% on Friday – Ready to Move Higher.... [Converge] has the potential to jump 500%."

6

b) On May 14, 2009, the website stated, "[Converge] shares rose over 400% since our last alert. We recommended [Converge] to our members at $.022 and [Converge] closed yesterday at $.13. This was up 490%."

c) On June 1, 2009, the website published, "[Converge] shares moved from our recommendation at $.02 to a high of $.044 that is a 2100% increase."

d) Later, on June 13, 2009 The website touted "[Converge] IS WAY TO LOW [sic]... [Converge] IS ON NEWS WATCH !!! [Converge] is on our watch list for a 100% - 300% move."

29. Converge's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. For example, the week before the campaign began, Converge's average price per share ranged from 1.9 to 2.2 cents a share and the highest average trading volume was 311,160 shares. However, between May 11 and 29, 2009, Converge's stock price was quoted as high as almost 4 cents a share, while its volume averaged up to 16,098,530 shares per day – more than 50 times the previous volume.

30. Between May 11, 2009 and July 6, 2009 – during and after touting Converge's stock on the website – McKeown and Ryan had Downshire sell almost 6.3 million shares of Converge stock for approximately $602,000 in net proceeds.

ii. Biocentric Energy Holdings, Inc.

31. In July 2009, McKeown, Ryan, and Downshire used PennyStockChaser to promote Biocentric Energy Holdings, Inc., a Florida corporation purportedly in the business of developing green energy technology whose stock is quoted on the Pink Sheets under ticker symbol "BEHL."

32. Specifically, during this time period, the website touted Biocentric's stock to the investing public at least four times:

    a) On July 4, 2009, the website touted, "[Biocentric] is the real deal.... This stock already has HUGE VOLUME and it will only get better."

    b) On July 10, 2009, the website exclaimed, "[Biocentric] is building a solid base @ .03 for lift off;" "News is coming on [Biocentric] and when it does, WATCH OUT, .10+ IS NEAR; and "[T]he last PR shows us that revenue is around the corner for [Biocentric]. Once revenue starts these guys could gross $30 million + per calendar year."

    c) On July 12, 2009, the website touted, "We think [Biocentric] could move past .10 and then .20.... Members should be buying this stock @.029 and socking the stock away... THIS WILL BE A HUGE WINNER."

    d) On July 19, 2009, the website published, "[Biocentric] should move to the .10 level on strong news."

33. Biocentric's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. During the week before the campaign began, Biocentric's stock price was quoted at less than a penny per share, and the trading volume peaked at 4.3 million shares per day. During the two weeks following the promotional campaign, Biocentric's stock price was quoted as high as 3 cents a share, and trading volume ranged from 10 million to 30 million shares per day.

34. Between July 13, 2009 and July 21, 2009, Ryan and McKeown had Downshire sell almost 24 million shares of Biocentric stock for net proceeds of $569,000.

8

### iii. Bluewave Group, Inc.

35. From no later than April 7, 2010 through the present, the PennyStockChaser website has been touting the stock of Bluewave Group, Inc., a Nevada corporation headquartered in Fort Lauderdale, Florida, purportedly in the business of multi-media digital distribution whose securities are registered with the Commission and quoted on the Pink Sheets under ticker symbol "BLEW."

36. Specifically, during this time, the website has touted Bluewave to the investing public at least four times, and continues to do so:

    a) On April 19, 2010, the website touted, "[Bluewave], This story is going viral, [Bluewave] is on everyones lips [sic], Monday morning is going to be amazing for [Bluewave]…WE are looking for a double or triple…"

    b) On April 20, 2010, the website touted, "[Bluewave], THE SHORTS ARE PILING IT ON, WHEN THEY COVER THIS STOCK WILL SOAR." "This short is creating an in built [sic] catalyst for a move higher."

    c) From May 3, 2010 until now, the website has touted, "PSC knows how to pick a winner, VIVK, BLEW, and AVOE are set to rake in the big bucks next week;" and "VIVK, BLEW, and AVOE are where you want to be this week. The stage is set to make big money."

    d) From May 4, 2010 through the present, the website has said, "PSC wants you to make money, We are looking for hard bounces in VIVK and [BLUEWAVE]…BUYING STOCKS BEFORE THEY BOUNCE CAN MAKE YOU QUICK TRADING PROFITS;" and "[Bluewave] closed @ .30 on Monday. We think [Bluewave] should be @ the least triple the stock price we are @ right

9

now. PSC is still long a ton of stock and we are waiting for big news from the company."

37. Bluewave's trading volume increased significantly as a result of the Defendants' promotional campaign. Between January 1, 2010 and April 15, 2010, immediately prior to the campaign, trading was almost non-existent with a total of only 57,100 shares traded.

38. By contrast, in the days following the promotional campaign, trading volume was almost two millions shares *per day*.

39. On March 19, 2010, a month prior to the promotional campaign, Meadow Vista received 1,000,000 shares of Bluewave. As the touting started, Meadow Vista sold 400,000 shares between April 16, 2010 and April 19, 2010 for net proceeds of approximately $184,000.

### iv. Avro Energy, Inc.

40. From no later than April 20, 2010 through the present, PennyStockChaser has touted the stock of Avro Energy, Inc., a Nevada Corporation purportedly in the business of acquiring and developing oil and natural gas properties whose stock is registered with the Commission and are quoted on the Pink Sheets under ticker symbol "AVOE".

41. Specifically, the website has touted Avro at least four times and continues to do so:

> a) On April 20, 2010, the website exclaimed, "PSC was a buyer today on [Avro] and we will continue to add tomorrow. PSC is looking for a short term target of .30 and a longer term (3 month)[*sic*] of $1.00 or more."
>
> b) From May 3, 2010 until now, the website has touted, "PSC knows how to pick a winner, VIVK, BLEW, and AVOE are set to rake in the big bucks next week;"

and "VIVK, BLEW, and AVOE are where you want to be this week. The stage is set to make big money."

c) From May 27, 2010 until now, the website has touted, "Our April alert on [Avro] came in @ .07. Two days ago we focused our attention to [Avro] @ 0.16 and today it closed @ .26 up 3.92% on 1,069,440 in volume beating out its ten day average of 129,908;" "Members who followed our April alert on [Avro] are up on triple digit gains of 271.43%;" and "The sentiment on [Avro] is positive with the chart headed further north. Avro is up 36.84% from its 50 day moving average with a bullish intermediate outlook."

d) From June 2, 2010 on, the website has stated, "[Avro], PSC just keeps nibbling. We bought 50,000 more shares [of Avro] today and we are up to 228.47% since mid April – looking for $1.00;" and "PSC kept adding shares of [Avro] today. As it stands now, PSC has over 2.2 million shares of [Avro] on the books. We like the company for continued traction to the upside."

42. Avro's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. In the two weeks prior to the campaign, Avro's highest closing price was just under a penny a share, and its highest trading volume was 42,300 shares per day. In contrast, from April 19 to 29, 2010, Avro's average daily stock price ranged from 1.5 to 3.2 cents per share, and its average trading volume reached more than 3 million shares per day.

43. On April 19, 2010, the day before PennyStockChaser began touting Avro stock, Meadow Vista bought 220,000 shares of Avro stock at prices of nine-tenths of a cent to 1.2 cents

11

per share. The following day, while PennyStockChaser touted it was buying Avro stock, Meadow Vista sold the shares for almost 2 cents a share, making a profit of $16,000.

### v. Atlantic Wind & Solar, Inc.

44. From no later than October 2009 through at least January 2010, the PennyStockChaser website promoted Atlantic Wind & Solar, Inc., a West Virginia corporation headquartered in Toronto, Canada purportedly in the business of developing solar energy products whose securities are quoted on the Pink Sheets under the ticker symbol "AWSL."

45. Specifically, during this time period the website touted Atlantic stock at least four times:

> a) On October 14, 2009, the website trumpeted, "[Atlantic] closed at $2.10 yesterday and it is poised to go into break out mode, THIS PICK IS HEADED TO $10.00."
>
> b) On October 21, 2009, the website touted, "[Atlantic] ON TOP OF MOUNT OF PROFIT (*sic*) [Atlantic] is making loads of cash for members who are in the game...." "PSC spoke to the company today and they tell us that members should buckle in. Big news is coming at the end of this week."
>
> c) On December 2, 2009, the website said, "2010 could be the year for [Atlantic]. A move past $10 (pre-split) on news could be just around the corner" and "We think [Atlantic] is headed to $8-$10 pre-split."
>
> d) On January 5, 2010, the PSC website touted, "You cannot own too much of a good thing...THE ONLY ADVICE WE HAVE IS TO BUY [Atlantic] BEFORE THE CROWDS."

46. Atlantic's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. Atlantic's closing stock price went from 70 cents per share on July 22, 2009 to $4.84 per share on October 22, 2009. Days later, Atlantic's closing stock price decreased to $2.70 per share. Atlantic's daily trading volume also increased, ranging from 13,812 shares on July 22, 2009 to more than 1 million shares on October 22, 2009.

47. Between September 1, 2009 and January 27, 2010, Meadow Vista received 430,000 shares of Atlantic. It sold 360,000 shares for between $1.49 and $3.37 per share for approximately $780,600 in net proceeds.

### vi. MSE Enviro-Tech Corp.

48. In October 2009, PennyStockChaser website touted MSE Enviro-Tech Corp., a Delaware corporation headquartered in Miami, Florida and purportedly in the business of developing fire suppressant technology whose securities are quoted on the Pink Sheets under the ticker symbol "MEVT."

49. Specifically, on October 22, 2009, the website touted, "[MSE] is on watch @ .50.... [MSE] had an initial breakout today and we think the move higher is underway;" "We think [MSE] will move 400% to 900%. Our long term target is $5.00;" and "The stock could see a move to the $5.00 and make members big money if they move fast."

50. On October 23, 2009, the website said, "[W]e like the upside on [MSE] and we think the stock will put some serious cash in your pocket. Now is the time to buy the stock and wait for the move we expect. **The team @ PSC can see momentum carrying this stock to the $5.00 level.**" [emphasis in original].

51. MSE's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. The week before the touting, MSE's stock closed at prices

13

between 35 and 38 cents per share, and the average daily trading volume was 26,600 shares per day. The same day the website began touting MSE's stock, the share price increased to a high of $1.30 and closed at 99 cents per share, with a volume of more than 1.5 million shares traded. After the touting ended, MSE's share price decreased and closed at 30 cents per share on November 3, 2009.

52. From October 22, 2009 until November 12, 2009, Meadow Vista sold 533,334 shares of MSE stock for approximately $240,000.

### 2. Failure To Disclose Compensation For Touting Shares

53. The Defendants have also failed to disclose in some cases the full amount of the compensation they receive for touting stocks on PennyStockChaser.

54. For example, from September 2009 until January 2010, the website said PennyStockChaser had received 140,000 shares of Atlantic's stock from a third party. In reality, an Atlantic affiliate had transferred 430,000 shares of Atlantic stock to Meadow Vista in exchange for touting Atlantic's stock on the website.

55. Furthermore, the PennyStockChaser website states it received 350,000 shares of MSE's stock from a third party. In truth, an MSE affiliate transferred 483,334 shares of MSE's stock to Meadow Vista on October 21, 2009 in exchange for touting MSE's stock on the website.

### V. CLAIMS FOR RELIEF

### COUNT I

### THE DEFENDANTS VIOLATED SECTION 17(A)(1) OF THE SECURITIES ACT

56. The Commission repeats and realleges paragraphs 1 through 55 of its Complaint.

57. Since no later than April 2009, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use

of the mails, in the offer or sale of securities, as described in this Complaint, have been knowingly, willfully or recklessly employing devices, schemes or artifices to defraud.

58. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

### THE DEFENDANTS VIOLATED SECTIONS 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT

59. The Commission repeats and realleges paragraphs 1 through 55 of its Complaint.

60. Since no later than April 2009, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, have been: (a) obtaining money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaging in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

61. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

### THE DEFENDANTS VIOLATED SECTION 17(b) OF THE SECURITIES ACT
### As to McKeown, Ryan, and Meadow Vista

62. The Commission repeats and realleges paragraphs 1 through 55 of its Complaint.

63. Since no later than April 2009, the Defendants, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, published, gave publicity to, or circulated communications that, though not purporting to offer securities for sale, described certain securities.

64. The Defendants received and were to receive consideration for such activities from or on behalf of the issuer of these securities and did not fully disclose the past or future receipt of such consideration and the amounts.

65. By reason of the foregoing, the Defendants, directly or indirectly, have violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## COUNT IV

### THE DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND EXCHANGE ACT RULE 10b-5

66. The Commission repeats and realleges paragraphs 1 through 55 of its Complaint.

67. Since no later than April 2009, the Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, have been knowingly, willfully or recklessly: (a) employing devices, schemes or artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaging in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

68. By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged herein.

### II.

### Temporary Restraining Order, Preliminary Injunction and Permanent Injunction

Issue a Temporary Restraining Order, a Preliminary Injunction and a Permanent Injunction, restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a) and 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

### III.

### Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### IV.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

V.

**Penny Stock Bar**

Issue an order barring McKeown and Ryan from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] for the violations alleged herein.

VI.

**Repatriation of Proceeds**

Issue an Order requiring the Defendants to take such steps as necessary to repatriate to the territory of the United States all funds and assets described in the Commission's Complaint in this action which are held by them or are under their direct or indirect control, and deposit such funds into the registry of the United States District Court for the Southern District of Florida, and provide the Commission and the Court a written description of the funds and assets repatriated.

VII.

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

VIII.

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

June 23, 2010                                    Respectfully submitted,

                                           By:  _____
                                                Amie Riggle Berlin
                                                Senior Trial Counsel
                                                Florida Bar No. 630020
                                                Direct Dial: (305)982-6322
                                                E-mail: berlina@sec.gov

                                                Christine Nestor
                                                Senior Trial Counsel
                                                Florida Bar No. 597211
                                                Direct Dial: (305) 982-6367
                                                E-mail: nestorc@sec.gov

                                                Michael L. Riedlinger[1]
                                                Senior Counsel
                                                Florida Bar No. 0864331
                                                Direct Dial: (305) 982-3616
                                                Email: riedlingerm@sec.gov

                                                Attorneys for Plaintiff
                                                **SECURITIES AND EXCHANGE COMMISSION**
                                                801 Brickell Avenue, Suite 1800
                                                Miami, Florida 33131
                                                Telephone: (305) 982-6300
                                                Facsimile:  (305) 536-4154

---

[1] Mr. Riedlinger, a member of the Florida bar, is admitted in the Southern District of Florida and has registered for CM-ECF training on June 28, 2010. We will notify the Court upon his CM-ECF registration.

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

Sealed

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

10-80748
CIV-COHN
MAGISTRATE JUDGE
SELTZER

### I. (a) PLAINTIFFS
Securities and Exchange Commission

### DEFENDANTS
Carol McKeown, Daniel F. Ryan, Meadow Vista Financial Corp., and Downshire Capital Inc.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Canada
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Amie Riggle Berlin, Esq. (305) 982-6322 and Christine Nestor, Esq. (305) 982-6367, Securities and Exchange Commission
801 Brickell Ave., Suite 1800, Miami, FL 33131

10-80748-CV-Cohn/Seltzer

Attorneys (If Known)

FILED by AJS D.C.
JUN 23 2010
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAMI

**(d)** Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☑ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☑ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

### V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO
JUDGE _____    DOCKET NUMBER _____

### VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §§ 77q(a) and (b); 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5. Violations of the federal securities laws.
LENGTH OF TRIAL via 7 days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ TRO, Prel. Inj., Perm. Inj., Disg. & Penalties and Asset Freeze
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD [signature]
DATE June 23, 2010

FOR OFFICE USE ONLY
AMOUNT 350 Waived    RECEIPT # N/A    IFP N/A