UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. ~Sealed~

10-80748

SECURITIES AND EXCHANGE COMMISSION, )
)
Plaintiff, )
) MAGISTRATE JUDGE
) SELTZER
v. )
) UNDER SEAL
CAROL MCKEOWN, DANIEL F. RYAN, )
MEADOW VISTA FINANCIAL CORP., )
AND DOWNSHIRE CAPITAL INC., )
)
Defendants. )
)

CIV-COHN

FILED by _AJS_ D.C.

JUN 2 3 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**PLAINTIFF'S EMERGENCY EX PARTE MOTION FOR TEMPORARY
RESTRAINING ORDER AND OTHER RELIEF
AND MEMORANDUM OF LAW IN SUPPORT**

## I. INTRODUCTION

The Securities and Exchange Commission requests a temporary restraining order and other

emergency relief pursuant to Rule 65 of the Federal Rules of Civil Procedure and Southern District

of Florida Local Rule 7.1 to prevent Defendants Carol McKeown and Daniel Ryan and their two

companies from continuing to defraud investors. McKeown and Ryan are using a website they

control to tout small company stocks to drive up the price while secretly selling shares of the

same companies they are touting. McKeown and Ryan have made at least $2.4 million in sales

proceeds in the last year from their scheme.

The Commission requests the following relief:

(1) a Temporary Restraining Order;

(2) an Order to Show Cause why the Court Should not Grant a Preliminary Injunction;

(3) an Order Freezing Assets of the Defendants;



(4)  an Order Requiring Sworn Accountings;

(5)  an Order Temporarily Expediting Discovery;

(6)  an Order Prohibiting the Destruction of Records; and

(7)  a Repatriation of Assets Order.

A proposed Order encompassing all of the requested relief is attached.

## II.  OVERVIEW OF THE SCHEME AND NEED FOR EMERGENCY RELIEF

Starting no later than April 2009, McKeown and Ryan, who hold themselves out as husband and wife, have used the website www.PennyStockChaser.com  to tout dozens of microcap companies ("issuers") located in the United States.  The website typically predicts massive price increases of the featured issuers, urging investors to buy immediately based on purported news about the issuers or their expected strong performance that causes the stock price to spike to two to four times the current price.

At the same time they are urging investors to buy, buy, buy, McKeown and Ryan are receiving shares of the issuers from affiliates or third parties as compensation for their touting, and selling those shares to profit from the price and volume increase their promoting is helping to cause. McKeown and Ryan use two corporations they own, Downshire Capital, Inc., and Meadow Vista Financial Corp., to either receive or sell the shares, or both.  They fail to fully disclose on the PennyStockChaser website that they are selling massive quantities of the same shares they are touting, as well as in some cases the complete compensation they are receiving.

McKeown and Ryan, Canadian citizens residing in Montreal, Quebec, have promoted at least 65 U.S. issuers on PennyStockChaser in the last year, and their fraudulent touting scheme continues unabated today.  The website is currently touting nine issuers.  The couple has promoted no fewer than three Florida companies, including two in South Florida, and has directed their selling

2

through four U.S. brokerage accounts, including one in Boca Raton, Florida. While McKeown and Ryan reap millions in sales proceeds, unsuspecting investors who buy shares are left holding the bag when, invariably, the price of the issuers declines after PennyStockChaser stops promoting one set and moves on to the next.

Accordingly, the emergency relief the Commission is requesting is necessary to immediately stop the couple before they harm more investors. We ask for a temporary restraining order to stop McKeown and Ryan from continuing to violate the securities laws by touting issuers on PennyStockChaser[1] without fully disclosing their massive selling and the full compensation they are receiving.

We also seek a freeze on the assets not only of McKeown and Ryan, but of Downshire and Meadow Vista, which McKeown and Ryan are using to receive, buy, and sell shares. Those companies have a number of bank and brokerage accounts, both in the U.S. and Canada, which have received proceeds of the fraudulent scheme. We are seeking a freeze on those accounts and others to stop McKeown and Ryan from dissipating fraudulently-obtained assets as well as to satisfy a potential disgorgement judgment.

As we describe in more detail below and in our motion to temporarily seal these pleadings, we are working closely with Quebec financial regulators to bring an emergency action in Canada. This will ensure any freeze orders this Court enters are effectuated in that country. Preliminary findings from the Quebec regulators indicate accounts belonging to the Defendants in Montreal contain at least $3 million. We explain more fully in the memorandum of law below the basis of and need for the remainder of the emergency relief we request.

---

[1] We are not seeking emergency relief directly against the website because, as we explain more fully below, it is not an actual entity but a trademark McKeown and Downshire own, license, and control. Accordingly, we are directing our request at the owner and operators of the website, McKeown and Ryan.

## III. FACTS

### A. Defendants

A.       McKeown, 44, is a Canadian citizen residing in Montreal, Canada. [Meadow Vista's Account Application at Oppenheimer, attached as Exhibit 1; Downshire's Account Application at Wilson Davis, attached as Exhibit 2, at WDCO 00006]. She is the owner and sole officer and director of Downshire and the president and owner of Meadow Vista. [Exhibit 1; Exhibit 2 at WDCO 00003; Downshire's Account Application at Wilson Davis, attached as Exhibit 3, at WDCO 00009, 00013; Corporate records from Wyoming Secretary of State website, attached as Exhibit 4; Meadow Vista's Account Application at Wilson Davis, attached as Exhibit 5, at WDCO 00022, 00027]. She also owns the trade mark "PennyStockChaser" in the United States and Canada. [May 12, 2010 letter from Spiegel Sohmer, attached as Exhibit 6]. She licensed the trade mark "PennyStockChaser" to Downshire. [*Id.*]. She and Ryan control PennyStockChaser. [*Id.*; April 14, 2009 Press Release, attached as Exhibit 7; Declaration of Michael Jacobs, attached as Exhibit 8; Declaration of Andrew Garbarini, attached as Exhibit 9].

B.       Ryan also resides in Montreal. [Certified Copy of Ryan's Canada Passport Application, attached as Exhibit 10]. Ryan has entered into agreements on behalf of Downshire as its managing director, and has conducted trading on behalf of Downshire and Meadow Vista. [Downshire Term Sheet, attached as Exhibit 11; Meadow Vista's Account Application at SMH Capital, attached as Exhibit 12; Composite of Meadow Vista and Downshire trading instructions, attached as Exhibit 13]. He also helps control PennyStockChaser. [Exhibits 8 & 9].

C.       Downshire is a Quebec, Canada corporation headquartered in Montreal. [Exhibit 3 at WDCO 00009, 00013]. It purports to be a private investment banking group. [Printout Of

4

www.downshirecapital.com Website, attached as Exhibit 14]. It holds the license to use the trade mark "PennyStockChaser" in the United States and Canada, whose stated services include providing a website featuring stock market information. [Exhibit 6].

D.     Meadow Vista is a Wyoming corporation which purports to be an investment bank headquartered in Cheyenne, Wyoming. [Exhibit 1 & Exhibit 4].

## B.  THE FRAUDULENT SCHEME

### 1.  The Defendants' Purported Business

Since no later than April 1, 2009, McKeown, Ryan, and Downshire have owned and operated PennyStockChaser. [Exhibits 6 – 9]. The PennyStockChaser website states it is a team of research analysts, stock brokers, investment bankers, and traders that conducts thorough research on stocks and companies to recommend stock purchases to the investing public. ["About Us" page from www.pennystockchaser.com website, attached as Exhibit 15]. Through the website, McKeown, Ryan, and Downshire tout penny stocks and invite the investing public to subscribe to receive daily stock alerts through e-mail, text messages, Facebook, and Twitter. [*Id.*; Stock Recommendations Published On www.pennystockchaser.com, attached as Exhibits 16, 18-21]. In 2009 alone, McKeown, Ryan, and Downshire used the website to alert the investing public to more than 65 penny stock recommendations and are currently using the website to tout nine issuers. [Exhibit 15].

### 2.  The Defendants' Control Over PennyStockChaser

McKeown owns the PennyStockChaser website and the trade mark PENNYSTOCKCHASER. [Exhibits 6 & 7]. Since no later than April 14, 2009, McKeown has issued press releases concerning the stock recommendations she has had the website make. [Exhibit 7].   McKeown also has posted messages on Twitter concerning the stock

recommendations published on PennyStockChaser.   [May 3, 2010 e-mail message from McKeown to Scott Eisler, attached as Exhibit 22].

Ryan controls the content of the website and has negotiated and entered into contracts on its behalf.  [Exhibits 8 & 9].  For example, in 2009, Ryan entered into a contract with a Boca Raton stock broker for the broker to provide consulting services to PennyStockChaser.  [Exhibit 9].   The contract called for the broker to, among other things, provide content, stock recommendations, and market information to the website.  Ryan also solicited and paid a second Florida-based broker-dealer to provide stock recommendations to publish on the website. [Exhibit 8].

Downshire holds the license to use the trade mark PENNYSTOCKCHASER in the United States and Canada pursuant to a license agreement entered into between McKeown and Downshire.  [Exhibit 6].

### 3.  The Defendants' Fraudulent Misrepresentations And Omissions

Directly, or by virtue of controlling PennyStockChaser, McKeown, Ryan, and Downshire have made material misrepresentations and omissions concerning their activity on PennyStockChaser.

#### a.  The Defendants' Failure To Adequately Disclose Their Sale Of Stocks They Tout

As compensation for McKeown and Ryan's touting the issuers' stock, Downshire and Meadow Vista receive shares of the issuers from issuers' affiliates or third parties, then sell them on the open market.  [Exhibits 23 & 25].  The Defendants also purchase shares of the stock they tout on PennyStockChaser and sell them for profits after their promotional campaigns increase the stock prices.  [Exhibits 23 & 24].  McKeown and Ryan direct and control trading in the Downshire and Meadow Vista accounts.  [Exhibits 1-3, 5, 12-13, 32].

6

The Defendants fail to adequately disclose they are simultaneously selling shares of the stocks they tout. The PennyStockChaser website states only that it "may be selling shares of stock at the same time the profile is being disseminated to potential investors; this should be viewed as a definite conflict of interest and as such, the reader should take this into consideration." [Exhibit 25]. In truth, the Defendants have regularly been selling massive quantities of the stock they tout on the website. [Exhibits 16-21 & 23].

i. Converge Global, Inc.

From no later than May 11, 2009 until at least June 1, 2009, McKeown, Ryan, and Downshire used PennyStockChaser to promote the stock of Converge Global, Inc., a Utah corporation purportedly in the business of acquiring and developing properties whose stock is quoted on Pink OTC Markets Inc. (the "Pink Sheets") under ticker symbol "CVRG." [Exhibit 16; Utah Secretary of State corporate record print-out, attached as Exhibit 26; Converge business description, attached as Exhibit 33 at Ex. A].

Specifically, during this time period, the website touted Converge's stock to the investing public at least four times:

a) On May 11, 2009, the website published, "[Converge] – Last @ .022 – Up 16% on Friday – Ready to Move Higher…. [Converge] has the potential to jump 500%." [Exhibit 16 at Ex. B].

b) On May 14, 2009, the website stated, "[Converge] shares rose over 400% since our last alert. We recommended [Converge] to our members at $.022 and [Converge] closed yesterday at $.13. This was up 490%." [*Id.* at Ex. C].

c) On June 1, 2009, the website published, "[Converge] shares moved from our recommendation at \$.02 to a high of \$.044 that is a 2100% increase." [*Id.* at Ex. D].

d) Later, on June 13, 2009 The website touted "[Converge] IS WAY TO LOW [*sic*]... [Converge] IS ON NEWS WATCH !!! [Converge] is on our watch list for a 100% - 300% move." [*Id.* at E].

Converge's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. For example, the week before the campaign began, Converge's average price per share ranged from 1.9 to 2.2 cents a share and the highest average trading volume was 311,160 shares. [Exhibit 24 at Ex. A]. However, between May 11 and 29, 2009, Converge's stock price was quoted as high as almost 4 cents a share, while its volume averaged up to 16,098,530 shares per day – more than 50 times the previous volume. [*Id.*].

Between May 11, 2009 and July 6, 2009 – during and after touting Converge's stock on the website – McKeown and Ryan had Downshire sell almost 6.3 million shares of Converge stock for approximately \$602,000 in net proceeds. [Exhibit 23 at Ex. B].

### ii. Biocentric Energy Holdings, Inc.

In July 2009, McKeown, Ryan, and Downshire used PennyStockChaser to promote Biocentric Energy Holdings, Inc., a Florida corporation purportedly in the business of developing green energy technology whose stock is quoted on the Pink Sheets under ticker symbol "BEHL." [Exhibit 17; Corporate records from Florida Secretary of State website, attached as Exhibit 27; Biocentric business description, attached as Exhibit 33 at Ex. B].

Specifically, during this time period, the website touted Biocentric's stock to the investing public at least four times:

8

a) On July 4, 2009, the website touted, "[Biocentric] is the real deal…. This stock already has HUGE VOLUME and it will only get better." [Exhibit 17 at Ex. A].

b) On July 10, 2009, the website exclaimed, "[Biocentric] is building a solid base @ .03 for lift off;" "News is coming on [Biocentric] and when it does, WATCH OUT, .10+ IS NEAR; and "[T]he last PR shows us that revenue is around the corner for [Biocentric]. Once revenue starts these guys could gross $30 million + per calendar year." [Exhibit 16 at Ex. A].

c) On July 12, 2009, the website touted, "We think [Biocentric] could move past .10 and then .20…. Members should be buying this stock @.029 and socking the stock away… THIS WILL BE A HUGE WINNER." [Exhibit 17 at Ex. B].

d) On July 19, 2009, the website published, "[Biocentric] should move to the .10 level on strong news." [*Id.* at Ex. C].

Biocentric's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. During the week before the campaign began, Biocentric's stock price was quoted at less than a penny per share, and the trading volume peaked at 4.3 million shares per day. [Exhibit 24 at Ex. B]. During the two weeks following the promotional campaign, Biocentric's stock price was quoted as high as 3 cents a share, and trading volume ranged from 10 million to 30 million shares per day. [*Id.*]. Between July 13, 2009 and July 21, 2009, Ryan and McKeown had Downshire sell almost 24 million shares of Biocentric stock for net proceeds of $569,000. [Exhibit 23 at Ex. B].

### iii. Bluewave Group, Inc.

From no later than April 7, 2010 through the present, the PennyStockChaser website has been touting the stock of Bluewave Group, Inc., a Nevada corporation headquartered in Fort

Lauderdale, Florida, purportedly in the business of multi-media digital distribution whose securities are registered with the Commission and quoted on the Pink Sheets under ticker symbol "BLEW." [Exhibit 18; Corporate documents from Nevada Secretary of State website, attached as Exhibit 28; Bluewave business description, attached as Exhibit 33 at Ex. C].

Specifically, during this time, the website has touted Bluewave to the investing public at least four times, and continues to do so:

a) On April 19, 2010, the website touted, "[Bluewave], This story is going viral, [Bluewave] is on everyones lips [*sic*], Monday morning is going to be amazing for [Bluewave]…WE are looking for a double or triple…" [Exhibit 18 at Ex. A].

b) On April 20, 2010, the website touted, "[Bluewave], THE SHORTS ARE PILING IT ON, WHEN THEY COVER THIS STOCK WILL SOAR." "This short is creating an in built [*sic*] catalyst for a move higher." [*Id.*]

c) From May 3, 2010 until now, the website has touted, "PSC knows how to pick a winner, VIVK, BLEW, and AVOE are set to rake in the big bucks next week;" and "VIVK, BLEW, and AVOE are where you want to be this week. The stage is set to make big money." [*Id.* at Ex. B].

d) From May 4, 2010 through the present, the website has said, " PSC wants you to make money, We are looking for hard bounces in VIVK and [BLUEWAVE]…BUYING STOCKS BEFORE THEY BOUNCE CAN MAKE YOU QUICK TRADING PROFITS;" and "[Bluewave] closed @ .30 on Monday. We think [Bluewave] should be @ the least triple the stock price we are @ right now. PSC is still long a ton of stock and we are waiting for big news from the company." [*Id.* at Ex. C].

Bluewave's trading volume increased significantly as a result of the Defendants' promotional campaign. Between January 1, 2010 and April 15, 2010, immediately prior to the campaign, trading was almost non-existent with a total of only 57,100 shares traded. [Exhibit 24 at Ex. C]. By contrast, in the days following the promotional campaign, trading volume was almost two millions shares *per day*. [*Id.*].

On March 19, 2010, a month prior to the promotional campaign, Meadow Vista received 1,000,000 shares of Bluewave. [Exhibit 23 at Ex. A]. As the touting started, Meadow Vista sold 468,000 shares between April 16, 2010 and April 19, 2010 for net proceeds of approximately $185,000. [*Id.*].

### iv. Avro Energy, Inc.

From no later than April 20, 2010 through the present, PennyStockChaser has touted the stock of Avro Energy, Inc., a Nevada Corporation purportedly in the business of acquiring and developing oil and natural gas properties whose stock is registered with the Commission and are quoted on the Pink Sheets under ticker symbol "AVOE". [Exhibit 19; Corporate records from Nevada Secretary of State website, attached as Exhibit 29; Avro business description, attached as Exhibit 33 at Ex. D].

Specifically, the website has touted Avro at least four times and continues to do so:

a) On April 20, 2010, the website exclaimed, "PSC was a buyer today on [Avro] and we will continue to add tomorrow. PSC is looking for a short term target of .30 and a longer term (3 month)[*sic*] of $1.00 or more." [Exhibit 19 at Ex. A].

b) From May 3, 2010 until now, the website has touted, "PSC knows how to pick a winner, VIVK, BLEW, and AVOE are set to rake in the big bucks next week;"

11

and "VIVK, BLEW, and AVOE are where you want to be this week. The stage is set to make big money." [*Id.* at Ex. B].

c) From May 27, 2010 until now, the website has touted, "Our April alert on [Avro] came in @ .07. Two days ago we focused our attention to [Avro] @ 0.16 and today it closed @ .26 up 3.92% on 1,069,440 in volume beating out its ten day average of 129,908;" "Members who followed our April alert on [Avro] are up on triple digit gains of 271.43%;" and "The sentiment on [Avro] is positive with the chart headed further north. Avro is up 36.84% from its 50 day moving average with a bullish intermediate outlook." [*Id.* at Ex. C].

d) From June 2, 2010 on, the website has stated, "[Avro], PSC just keeps nibbling. We bought 50,000 more shares [of Avro] today and we are up to 228.47% since mid April – looking for $1.00;" and "PSC kept adding shares of [Avro] today. As it stands now, PSC has over 2.2 million shares of [Avro] on the books. We like the company for continued traction to the upside." [*Id.* at Ex. D].

Avro's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. In the two weeks prior to the campaign, Avro's highest closing price was just under a penny a share, and its highest trading volume was 42,300 shares per day. [Exhibit 24 at Ex. D]. In contrast, from April 19 to 29, 2010, Avro's average daily stock price ranged from 1.5 to 3.2 cents per share, and its average trading volume reached more than 3 million shares per day. [*Id.*].

On April 19, 2010, the day before PennyStockChaser began touting Avro stock, Meadow Vista bought 220,000 shares of Avro stock at prices of nine-tenths of a cent to 1.2 cents per share. [Exhibit 23 at Ex. A]. The following day, while PennyStockChaser touted it was buying

Avro stock, Meadow Vista sold the shares for almost 2 cents a share, making net proceeds of approximately $16,000. [*Id.*].

### v.  Atlantic Wind & Solar, Inc.

From no later than October 2009 through at least January 2010, the PennyStockChaser website promoted Atlantic Wind & Solar, Inc., a West Virginia corporation headquartered in Toronto, Canada purportedly in the business of developing solar energy products whose securities are quoted on the Pink Sheets under the ticker symbol "AWSL." [Exhibit 20; corporate records from West Virginia Secretary of State website, attached as Exhibit 30; Atlantic business description, attached as Exhibit 33 at E].

Specifically, during this time period the website touted Atlantic stock at least four times:

a)  On October 14, 2009, the website trumpeted, "[Atlantic] closed at $2.10 yesterday and it is poised to go into break out mode, THIS PICK IS HEADED TO $10.00." [Exhibit 20 at Ex. A, p.1].

b)  On October 21, 2009, the website touted, "[Atlantic] ON TOP OF MOUNT OF PROFIT (*sic*) [Atlantic] is making loads of cash for members who are in the game...." "PSC spoke to the company today and they tell us that members should buckle in.  Big news is coming at the end of this week." [*Id.* at Ex. B].

c)  On December 2, 2009, the website said, "2010 could be the year for [Atlantic]. A move past $10 (pre-split) on news could be just around the corner" and "We think [Atlantic] is headed to $8-$10 pre-split." [*Id.* at Ex. C].

d)  On January 5, 2010, the PSC website touted, "You cannot own too much of a good thing...THE ONLY ADVICE WE HAVE IS TO BUY [Atlantic] BEFORE THE CROWDS." [*Id.* at Ex. D].

13

Atlantic's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. Atlantic's closing stock price went from 70 cents per share on July 22, 2009 to $4.84 per share on October 22, 2009. [Exhibit 24 at Ex. E]. Days later, Atlantic's closing stock price decreased to $2.70 per share. [*Id.*]. Atlantic's daily trading volume also increased, ranging from 13,812 shares on July 22, 2009 to more than 1 million shares on October 22, 2009. [*Id.*].

Between September 1, 2009 and January 27, 2010, Meadow Vista received 430,000 shares of Atlantic. It sold 360,000 shares for between $1.49 and $3.37 per share for approximately $780,600 in net proceeds. [Exhibit 23 at Ex. A].

### vi.  MSE Enviro-Tech Corp.

In October 2009, PennyStockChaser website touted MSE Enviro-Tech Corp., a Delaware corporation headquartered in Miami, Florida and purportedly in the business of developing fire suppressant technology whose securities are quoted on the Pink Sheets under the ticker symbol "MEVT." [Exhibit 21; corporate records from Delaware Secretary of State website, attached as Exhibit 31; MSE business description, attached as Exhibit 33 at Ex. F].

Specifically, on October 22, 2009, the website touted, "[MSE] is on watch @ .50.... [MSE] had an initial breakout today and we think the move higher is underway;" "We think [MSE] will move 400% to 900%. Our long term target is $5.00;" and "The stock could see a move to the $5.00 and make members big money if they move fast." [Exhibit 21 at Ex. A and Ex. B at p.4]. On October 23, 2009, the website said, "[W]e like the upside on [MSE] and we think the stock will put some serious cash in your pocket. Now is the time to buy the stock and wait for the move we expect. **The team @ PSC can see momentum carrying this stock to the $5.00 level.**" [emphasis in original]. [*Id.* at Ex. C].

14

MSE's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. The week before the touting, MSE's stock closed at prices between 35 and 38 cents per share, and the average daily trading volume was 26,600 shares per day. [Exhibit 24 at Ex. F]. The same day the website began touting MSE's stock, the share price increased to a high of $1.30 and closed at 99 cents per share, with a volume of more than 1.5 million shares traded. [*Id.*]. After the touting ended, MSE's share price decreased and closed at 30 cents per share on November 3, 2009. [*Id.*]. From October 22, 2009 until November 12, 2009, Meadow Vista sold 533,334 shares of MSE stock for approximately $240,000 of net proceeds. [Exhibit 23 at Ex.A].

### b. Failure To Disclose Compensation For Touting Shares

The Defendants have also failed in some cases to disclose the full amount of the compensation they receive for touting stocks on PennyStockChaser. For example, from September 2009 until January 2010, the website said PennyStockChaser had received 140,000 shares of Atlantic's stock from a third party. [Disclaimer Page from www.pennystockchaser.com, attached as Exhibit 25]. In reality, an Atlantic affiliate had transferred 430,000 shares of Atlantic stock to Meadow Vista in exchange for touting Atlantic's stock on the website. [Exhibit 23 at Ex. A].

Additionally, the PennyStockChaser website states it received 350,000 shares of MSE's stock from a third party. [Exhibit 25]. In truth, an MSE affiliate transferred 483,334 shares of MSE's stock to Meadow Vista on October 21, 2009 in exchange for touting MSE's stock on the website. [Exhibit 23 at Ex. A].

15

## IV.  MEMORANDUM OF LAW

### A.  Standard for Obtaining a Temporary Restraining Order

Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t, and

Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d),

provide that in Commission actions the Court shall grant injunctive relief upon a proper showing.

*SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2nd Cir. 1990); *SEC v. Lybrand*, No. 00 Civ.1387,

2000 WL 913894 *1, *9 (S.D.N.Y. July 6, 2000); *SEC v. Unique Fin. Concepts, Inc.*, 119 F.

Supp. 2d 1332, 1338 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999).  This "proper

showing" has been described as "a justifiable basis for believing, derived from reasonable

inquiry or other credible information, that such a state of facts probably existed as reasonably

would lead the SEC to believe that the defendants were engaged in violations of the statutes

involved." *SEC v. Gen. Refractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C. 1975).

The Commission is entitled to a temporary restraining order if it establishes (1) a *prima

facie* case showing the Defendants have violated the securities laws, and (2) a reasonable

likelihood they will repeat the wrong.  *Unique Financial*, 119 F. Supp. 2d at 1338; *SEC v.

Management Dynamics, Inc.*, 515 F.2d 801, 807 (2nd Cir. 1975).

The Commission appears "not as an ordinary litigant, but as a statutory guardian charged

with safeguarding the public interest in enforcing the securities laws." *Management Dynamics*,

515 F.2d at 808. The Commission therefore faces a lower burden than a private litigant when

seeking an injunction, and need not meet the requirements for an injunction imposed by

traditional equity jurisprudence. *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944); accord *SEC v.

International Loan Network, Inc.*, 770 F. Supp. 678, 688 (D.D.C. 1991), *aff'd*, 968 F.2d 1304

(D.C. Cir. 1992).  Unlike private litigants, the Commission need not demonstrate irreparable

harm or the unavailability of an adequate remedy at law. *Unique Financial*, 119 F. Supp. 2d at 1338; *Lybrand*, 2000 WL 913894 at *9. Nor is it required to show a balance of equities in its favor. *Unifund SAL*, 910 F.2d at 1036; *SEC v. Musella*, 578 F. Supp. 425, 434 (S.D.N.Y. 1984).

The Commission's evidence in this case warrants entry of the requested injunctive relief on all applicable grounds. The declarations, account records, and other exhibits attached to this motion demonstrate McKeown, Ryan, and their companies are violating the anti-fraud provisions of the federal securities laws, and will continue to violate them through their fraudulent touting if the Court does not immediately restrain and enjoin them.

### B. The Commission has Established *Prima Facie* Violations of the Securities Laws

The Commission has met its burden of establishing a *prima facie* showing of violations of the securities laws as alleged in the Complaint.

### 1. The Offered Investments are Securities

The stocks the Defendants are touting are "securities" as defined by Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. §78c(a)(10):[2]

> The term "security" means any note, *stock*, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, . . . investment contract, voting-trust certificate, certificate of deposit for a security, . . . any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities . . . or, in general, any interest or instrument commonly known as a "security" . . . .

Section 3(a)(10) of the Exchange Act (emphasis added). Accordingly, the stocks the Defendants are touting qualify as securities subject to the jurisdiction of this Court and the Commission.

---

[2] These sections are substantially identical and lead to the same result for the purposes of this analysis.

## 2. The Defendants Are Violating Section 17(a) of the Securities Act
## and Section 10(b) and Rule 10b-5 of the Exchange Act

Section 17(a) of the Securities Act, which proscribes fraudulent conduct in the offer or sale

of securities, and Section 10(b) of the Exchange Act and Rule 10b-5, which proscribe fraudulent

conduct in connection with the purchase or sale of securities, prohibit essentially the same type of

conduct. *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *Unique Financial*, 119 F. Supp. 2d at

1339. To establish a violation, the Commission must show: (1) a misrepresentation or omission (2)

that is material (3) in the offer of or in connection with the purchase or sale of a security (4) made

with scienter (5) in interstate commerce. *SEC v. Chemical Trust,* 2000 WL 33231600 at *9 (S.D.

Fla. Dec. 19, 2000); *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).[3]

### *a.  The Defendants' Misrepresentations and Omissions*

The Defendants are making material misrepresentations and omissions to investors through

PennyStockChaser in two ways. First, they are not disclosing their almost simultaneous sales of

issuers the website is promoting. Second, they are not disclosing in some cases the full amount of

compensation they are receiving for their touting.

### *i. Failure To Disclose Sales*

It is well established that the practice of scalping – recommending the purchase of a stock

while immediately selling the stock without adequately disclosing the sales or the intent to sell –

constitutes fraud and violates Section 17(a) of the Securities Act and Section 10(b) of the Exchange

Act. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 181 (1963); *SEC v. Blavin,* 760

F.2d 706, 711-12 (6th Cir. 1985); *SEC v. Huttoe*, 1998 WL 34078092 at *4 (D.D.C. Sept. 14, 1998).

The fraud lies not in the practice of selling stocks contrary to recommendations, but in the failure to

---

[3]    Scienter is only required for Exchange Act Section 10(b) and Securities Act Section 17(a)(1).
Violations of Sections 17(a)(2) and (3) of the Securities Act do not require a finding of scienter. *Aaron v.
SEC*, 446 U.S. 680, 697 (1980). Violations of these sections may be established by showing negligence.
*SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3rd Cir. 1997).

disclose the sales to potential investors. *SEC v. Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at \*29 (M.D. Fla. March 28, 2003).

As described above, McKeown and Ryan are using the PennyStockChaser website to hype dozens of microcap issuers to drive up the stock price, while simultaneously dumping their shares to take advantage of the price increase without disclosing their sales. The PennyStockChaser website states that it "*may* be selling shares of stock at the same time the profile is being disseminated to potential investors" (emphasis added). However, courts have held that disclosing only *potential* sales in this fashion is not sufficient to avoid liability for scalping under Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5. *Blavin*, 760 F.2d at 709-11 (newsletter publisher liable under Section 10(b) and Rule 10b-5 for scalping even though he disclosed he "may trade for his own account" in the recommended securities); *SEC v. Gane*, 2005 WL 90154 at \*8, \*16 (S.D. Fla. Jan. 4, 2005) (holding scalper liable under Exchange Act Section 10(b) and Rule 10b-5 despite disclaimers "affiliates, and/or officers, directors and employees *may* have stock positions in [the recommended company] and that they *may* buy or sell shares") (emphasis in original).

McKeown and Ryan are doing far more than "may" sell(ing) shares. They are consistently dumping most or all of their shares of the issuers featured on their website, often at prices far below the target price their website sets for the issuers. They are often selling shares the same day or within a few days of touting the issuers. Their disclosure that they "may" sell shares constitutes a misrepresentation in violation of Sections 17(a) and 10(b).

*ii. Failure to Fully Disclose Compensation*

The Defendants have also failed to fully disclose all the compensation they received for touting stocks on the PennyStockChaser website. As described above, they disclosed receipt of only 140,000 shares of Atlantic stock between September 2009 and January 2010. In reality, an

19

Atlantic affiliate transferred more than 430,000 shares to Meadow Vista in exchange for the touting. Similarly, the Defendants disclosed the receipt of 350,000 shares of MSE stock from a third party, when, in reality they received more than 480,000 shares from an Atlantic affiliate.

Failing to accurately and fully disclose all compensation received for touting stock constitutes fraud in violation of Sections 17(a) and 10(b). *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *25-26 (failure of defendants to reveal to brokers and investors they were paid for promotional articles was material omitted fact); *Huttoe*, 1998 WL 34078092 at *4 (failure to reveal "paid promotional nature" of newsletter articles was a material omitted fact). Accordingly, because McKeown and Ryan did not reveal their full compensation on the PennyStockChaser website, they made a second type of misrepresentation and omission.

### *b. The Defendants' Misrepresentations and Omissions are Material*

The test for materiality in the securities fraud context is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1327 (11th Cir. 1982). Under that standard, the Defendants' false statements and omissions are material. Certainly a reasonable investor would want to know the person telling him or her to buy a stock in fact holds millions of shares of the same stock and intends to sell the minute other investors start buying. *Huttoe*, 1998 34078092 WL at *4 ("there is a substantial likelihood that a reasonable investor would consider the motivation of the person recommending the purchase of a stock a significant factor in making an investment decision"). *See also Blavin*, 760 F.2d at 711 (investment advisory service's failure to state it was expressly trading in recommended stocks was material).

### c. The "In Connection With" Requirement

Because the Defendants are making their misrepresentations and omissions in connection with the offer, purchase, and sale of the stocks they are touting, buying and selling, their acts meet the "in connection with" requirement of Section 10(b) and Rule 10b-5. *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (courts should interpret the "in connection with" requirement broadly to effectuate the remedial purpose of the federal securities laws); *Hasho*, 784 F. Supp. at 1106 ("any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5").

### d. The Defendants are Acting With Scienter

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Section 17(a) and 10(b) by showing that defendants made representations to investors "without basis and in reckless disregard for their truth or falsity." *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10 (D.D.C. 1998). The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness. *Carriba Air*, 681 F.2d at 1324.

The evidence establishes the Defendants are acting with a high degree of scienter. McKeown and Ryan have PennyStockChaser disclose they "may" sell shares, yet they are fully aware they are doing far more than that. They know they are actually selling large quantities of the issuers' shares they are promoting, often at the same time they are urging investors to buy the shares. Thus, they have displayed scienter under the securities laws. *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *31-32 (defendants' repeated pattern of buying the stock of 14 client companies over two years, promoting the companies, and selling the stock at a profit was, at a

21

minimum, severely reckless and showed they acted with scienter); *Blavin*, 760 F.2d at 712 ("at a minimum, Blavin recklessly failed to disclose that he was trading in stocks his newsletter recommended" and thus acted with scienter).

### *e. Interstate Commerce*

The Defendants are using interstate commerce to buy and sell the shares of stocks they own. They e-mail brokers throughout the country to transact in U.S. stocks, and their e-mails result in the use of commerce to trade. They furthermore use the Internet, Facebook, and Twitter to contact investors throughout the country.

For all the foregoing reasons, the Commission has established a *prima facie* case that the Defendants are violating Section 17(a) of the Securities Act and Exchange Act Section 10(b) and Rule 10b-5.

### 3. Meadow Vista, McKeown and Ryan are Violating Section 17(b) of the Securities Act

Section 17(b) of the Securities Act makes it unlawful for any person:

> To publish ... or circulate any notice, circular, advertisement, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly from an issuer ... without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

In short, Section 17(b) requires stock promoters to completely and accurately disclose their compensation. *SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001). This includes any type of compensation and the amount. *Id.*; *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *34-35; *Huttoe*, 1998 WL 34078092 at *9. Scienter is not required to establish a violation of the statute. *SEC v. Liberty Capital Group*, 75 F. Supp. 2d 1160, 1163 (W.D. Wash. 1999); *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *35.

Meadow Vista, McKeown and Ryan received stock-based compensation from affiliates of Atlantic and MSE for promoting those companies' stock. This type of promotion falls within the ambit of Section 17(b). *U.S. v. Wenger*, 292 F. Supp. 2d 1296 (D. Utah 2003) (upholding verdict against stock promoter on Section 17(b) charges in connection with failure to disclose compensation during radio programs touting various stocks). Because McKeown and Ryan did not disclose the full amount of the compensation they received for touting Atlantic and MSE, they violated Section 17(b) of the Securities Act.

### C. The Defendants Are Likely to Continue to Violate the Securities Laws

By making a *prima facie* showing the Defendants are violating the securities laws, we have met the first prong of the two-prong test to determine whether the Court should issue a temporary restraining order. To meet the second prong, the Commission need only show a "reasonable likelihood" of future violations. *Manor Nursing Centers*, 458 F.2d at 1100.

In assessing whether there is a "reasonable likelihood" of future violations, courts look to the following factors: (1) the egregiousness of defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of a defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of the conduct: and (6) likelihood of opportunities for future violations. *Carriba Air*, 681 F.2d at 1322; *Unique Financial*, 119 F. Supp. 2d at 1340. Past illegal conduct is highly suggestive of the likelihood of future violations. *CFTC v. Matrix Trading Group*, 2002 WL 31936799 at *12 (S.D. Fla. Oct. 3, 2002).

In this case, each of the factors set forth above weighs in favor of the Court entering a temporary restraining order. First, the conduct of McKeown and Ryan and their companies is egregious. They are hyping the stock of microcap U.S. companies with questionable projections

and statements so they can persuade unsuspecting investors to buy the stock, all so they can make a profit at the expense of investors who later suffer losses when the stocks of the issuers they promote crash. Second, the conduct is hardly isolated; it is recurrent and has been going on for more than a year. During that time, McKeown and Ryan have promoted at least 65 stocks.

Third, McKeown and Ryan have demonstrated a high degree of scienter. They are knowingly failing to disclose that they are selling large amount of issuers' stocks for huge profits while at the same time urging investors to buy the stock. It is hard to imagine someone displaying a higher degree of scienter than someone who knowingly profits at the expense of others' losses. As to the fourth and fifth factors, the Defendants have not offered any assurances against future misconduct and plainly do not believe their conduct is wrong. Finally, unless this Court restrains and enjoins McKeown and Ryan, they will have the opportunity to continue exactly as they have been for the past 14 months.

### D. Relief Requested

#### 1. An *Ex Parte* Temporary Restraining Order is Necessary

Through the facts and legal arguments set forth above, the Commission has met its burden of showing (1) there is *prima facie* evidence the Defendants are violating the securities laws and (2) there is a reasonable likelihood they will continue to violate the law unless the Court immediately issues an *ex parte* temporary restraining order. We have attached a proposed order granting this temporary restraining order, and asking the Court to set a show cause hearing at which time the Defendants can be heard and argue why the Court should not enter a preliminary injunction.

#### 2. A Freeze of Assets Is Necessary

Pursuant to their general equity powers, federal courts may order ancillary relief to effectuate the purposes of the federal securities laws, both to preserve defendants' assets and

ensure that wrongdoers do not profit from their unlawful conduct. *See, e.g., Unifund SAL*, 910 F.2d at 1041; *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *Manor Nursing Centers,* 458 F.2d at 1103-04. An asset freeze "facilitate[s] enforcement of any disgorgement remedy that might be ordered" and may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *Unifund SAL*, 910 F.2d at 1041. It is well recognized an asset freeze is sometimes necessary to ensure a future disgorgement order will not be rendered meaningless. *Manor Nursing Centers,* 458 F.2d at 1106; *United States v. Cannistraro*, 694 F. Supp. 62, 71-72 (D.N.J. 1988), *aff'd in part, vacated in part*, 871 F.2d 1210 (3d Cir. 1989); *SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987).

When there are concerns that defendants might dissipate assets, or transfer or secret assets beyond the jurisdiction of the Court, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze. *Unifund SAL*, 910 F.2d at 1041-42; *SEC v. Tyler*, 2002 U.S. Dist. Lexis 2952 (N.D. Tex. February 22, 2002); *SEC v. Comcoa*, Ltd., 887 F. Supp. 1521, 1524 (S.D. Fla. 1995); *SEC v. Margolin*, 1992 U.S. Dist. Lexis 14872 at 19-20 (S.D.N.Y. Sept. 30, 1992); *SEC v. Grossman*, 1987 U.S. Dist. Lexis 1666 at *35-36 (S.D.N.Y. Feb 17, 1987).

Here, the evidence shows the Defendants have reaped at least $2.4 million in fraudulent proceeds from their touting scheme. The evidence further shows the Defendants have brokerage accounts in the United States containing both shares of issuers they could sell, and proceeds from stock they already have sold. A freeze over those accounts, as well as any other assets the Defendants might possess in this country, is necessary both to prevent the Defendants from dumping more shares on the unsuspecting public and to stop them from transferring proceeds out of the Court's jurisdiction and into accounts in Canada. A freeze is further necessary to preserve

those funds for a potential disgorgement judgment, which the evidence shows could reach into the millions of dollars.

A freeze is further necessary over the Defendants' accounts and assets in Canada to prevent McKeown and Ryan from dissipating those assets, and to preserve them for a future disgorgement judgment. As we indicated above, we are working closely with Quebec financial regulators to ensure Canadian courts respect this Court's orders and impose a freeze over the Defendants' Canadian assets before McKeown and Ryan can dissipate them.

Accordingly, the Commission requests that this Court enter an Order granting an immediate asset freeze over any and all of the assets of Defendants and, thereafter, enter a preliminary injunction freezing assets through the conclusion of this action.

### 3. Sworn Accountings

In its Complaint the Commission seeks disgorgement orders against all of the Defendants. Sworn accountings are necessary to enable the Commission and the Court to determine the amounts the Defendants have raised and spent in perpetration of their fraud, and to enable the Court to determine the proper amount of disgorgement. Federal courts have frequently applied their broad powers in the context of Commission actions to prevent securities violators from enjoying the fruits of their misconduct. *Manor Nursing Centers*, 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of a Commission enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.").

Here, an accounting is needed to determine: (1) the amount of the Defendants' unjust enrichment; (2) the disposition of the proceeds of the stock sales; and (3) the assets available for disgorgement.

26

## 4. Orders Prohibiting Destruction of Records And Expediting Discovery

Orders prohibiting the destruction of records and expediting discovery are both appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available. *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 881 (S.D. Fla. 1974). The Court should order expedited discovery so that the Commission may take meaningful discovery in the fourteen-day period between entry of the temporary restraining order and any hearing on the show-cause order why the Court should not grant a preliminary injunction. Consequently, we ask the Court to enter an order allowing the parties to take depositions on two days notice and to serve written discovery requiring a response within two days. In addition, to preserve the Commission's ability to take effective discovery, the Court should order the Defendants not to alter or destroy relevant documents.

## 5. Repatriation Orders

This Court has the power to order the Defendants to cause funds over which they have control to be transferred from foreign accounts to the United States. *Bank of Crete v. Koskotas*, No. 88 Civ. 8412, 1989 U.S. Dist. Lexis 4289 (S.D.N.Y. April 14, 1989) (court held it had the authority to compel the transfer of assets in a case where the defendants were likely to circumvent a judgment against them by dissipating or concealing funds they controlled); *SEC v. American Financial Group of Aventura,* Case No. 02-22198-Civ-Martinez, Order of Contempt (S.D. Fla. 2004) (holding defendant in contempt for failing to repatriate assets to the United States). Here, the Defendants' extensive business dealings in the United States and Canada justify an order that they repatriate any funds transferred outside of the United States. Because it may be

27

impossible to preserve these funds unless they are repatriated, an order seeking repatriation of the funds the Defendants realized as a result of their fraudulent activity is appropriate.

## V.  TIMING OF THE EMERGENCY RELIEF

The emergency relief the Commission is requesting is necessary to immediately stop the Defendants before they harm more investors.  As indicated above, we are working closely with Quebec financial regulators, who are preparing their own emergency action to ensure any emergency asset freeze orders this Court enters can be given effect in Canada, where, according to the Quebec regulators, the Defendants' accounts have close to $3 million in them.  The Quebec regulators are prepared to file an *ex parte* emergency action as soon as this Court enters any emergency orders, including an asset freeze.  However, the regulatory tribunal in Quebec is not operating on Thursday, June 24, 2010 due to a public holiday, and under Quebec law, it likely will take 48 to 72 hours for the regulatory tribunal to issue any freeze orders and to have those orders put in place so the Defendants will not be able to dissipate fraudulently obtained assets.

Based upon the foregoing, the Commission asks that the Court set the show cause hearing for no earlier than July 6, 2010, to give the Defendants adequate time to respond and to give the Parties adequate time to take discovery.  This is within the fourteen days the Rules provide.

## VI.  CONCLUSION

For the foregoing reasons, the Court should grant the Commission's Motion for Temporary Restraining Order and Other Emergency Relief and issue the accompanying proposed Order.

June 23, 2010

Respectfully submitted,

By: _____

Amie Riggle Berlin
Senior Trial Counsel
Florida Bar No. 630020
Direct Dial: (305) 982-6322
Direct email: berlina@sec.gov

Christine Nestor
Senior Trial Counsel
Florida Bar No. 597211
Direct Dial: (305) 982-6367
Direct email: nestorc@sec.gov

Robert K. Levenson
Regional Trial Counsel
Florida Bar No. 0089771
Direct Dial:  (305) 982-6341
E-mail: levensonr@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. Sealed

## 10-80748

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, CIV-COHN   MAGISTRATE JUDGE
SELTZER

v.

UNDER SEAL

CAROL MCKEOWN, DANIEL F. RYAN,
MEADOW VISTA FINANCIAL CORP.,
AND DOWNSHIRE CAPITAL INC.,

Defendants.

FILED by _____ D.C.

JUN 23 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

## TEMPORARY RESTRAINING ORDER
## AND OTHER EMERGENCY RELIEF

This cause comes before the Court upon the emergency motion by Plaintiff Securities and

Exchange Commission for the following orders with respect to Defendants Carol McKeown, Daniel

F. Ryan, Meadow Vista Financial Corp., and Downshire Capital Inc.:

    (1) a Temporary Restraining Order;

    (2) an Order to Show Cause why the Court Should not Grant a Preliminary Injunction;

    (3) an Order Freezing Assets of the Defendants;

    (4) an Order Requiring Sworn Accountings;

    (5) an Order Temporarily Expediting Discovery;

    (6) an Order Prohibiting the Destruction of Records; and

    (7) a Repatriation of Assets Order.

The Court has considered the Commission's Complaint, its Emergency *Ex Parte* Motion for

a Temporary Restraining Order and Other Relief and Memorandum of Law in Support, and the

declarations and exhibits filed in support of that motion. The Court finds the Commission has made

a sufficient and proper showing in support of the relief granted herein by: (1) presenting a *prima facie* case of securities laws violations by the Defendants; and (2) showing a reasonable likelihood the Defendants will harm the investing public by continuing to violate the federal securities laws unless they are immediately restrained.  The Court also finds good cause to believe that unless immediately restrained and enjoined by Order of this Court, the Defendants will continue to dissipate, conceal or transfer from the jurisdiction of this Court assets which could be subject to an Order of Disgorgement.

Accordingly, the motion is **GRANTED**, and the Court hereby orders as follows:

## I.

### SHOW CAUSE HEARING

**IT IS HEREBY ORDERED** that the Defendants show cause, if any, before the Honorable

_____ of this Court, at _____ o'clock ___.m., on the _____ day of _____, 2010,   in   Courtroom   _____   of   the   United   States   Courthouse, _____, Florida, or as soon thereafter as the matter can be heard, why a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure should not be granted against the Defendants, as requested by the Commission.

## II.

### TEMPORARY RESTRAINING ORDER

**IT IS FURTHER ORDERED** that, pending determination of the Commission's request for a Preliminary Injunction, the Defendants and their directors, officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, are hereby restrained and enjoined from:

### Section 17(a)(1) of the Securities Act of 1933

A.      Directly or indirectly, by use of any means or instruments of transportation or communication in interstate commerce, or by the use of the mails, in the offer or sale of securities, knowingly or recklessly employing devices, schemes or artifices to defraud, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77q(a)(1);

### Section 17(a)(2) & (3) of the Securities Act of 1933

B.      Directly or indirectly, by use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, (i) obtaining money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (ii) engaging in acts, practices and courses of business which have operated and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities, in violation of Sections 17(a)(2) & (3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) & (3); and

### Section 17(b) of the Securities Act of 1933

### Against McKeown, Ryan, And Meadow Vista

C.      Directly or indirectly, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, publishing, giving publicity to, or circulating any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof, in violation of Section 17(b) of the Securities Act, 15 U.S.C. §§ 77q(b).

3

**Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**

D.       Directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any securities, knowingly or recklessly:  (i) employing devices, schemes or artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaging in acts, practices and courses of business which have operated, are now operating or will operate as a fraud upon the purchasers of such securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

### III.

### ASSET FREEZE

**IT IS FURTHER ORDERED AND ADJUDGED** that, pending determination of the Commission's request for a Preliminary Injunction:

A.       The Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this order by personal service, mail, facsimile transmission or otherwise, be and hereby are, restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property, including but not limited to cash, free credit balances, fully paid for securities, and/or property pledged or hypothecated as collateral for loans, or charging upon or drawing from any lines of credit, owned by, controlled by, or in the possession of:

4

       1.     Downshire Capital Inc.,

       2.     Meadow Vista Financial Corp.,

       3.     Carol McKeown; and

       4.     Daniel F. Ryan.

B.     Any financial or brokerage institution or other person or entity holding any such funds or other assets, in the name, for the benefit or under the control of the Defendants, directly or indirectly, held jointly or singly, and wherever located, and which receives actual notice of this order by personal service, facsimile, or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds or other assets, including, but not limited to, the following presently known bank accounts:

     (a)     Meadow Vista Financial Corp.
               TD Canada Trust Bank
               Account numbers ending in 7730 and 5416

     (b)     Downshire Capital Inc.
               TD Canada Trust Bank
               Account numbers ending in 5479 and 1666

     (c)     Meadow Vista Financial Corp.
               Oppenheimer & Co. Inc.
               Account number ending in 0916

     (d)     Downshire Capital Inc.
               Pershing LLC
               Account number ending in 1447

     (e)     Meadow Vista Financial Corp.
               Pershing LLC
               Account numbers ending in 0908 and 8057

     (f)     Meadow Vista Financial Corp.
               Penson Financial
               Account numbers ending in 0223, 5277, 5791, 0791, 0647

(g)     Downshire Capital Inc.
        Alpine Securities
        Account numbers ending in 9580, 9599

(h)     Meadow Vista Financial Corp.
        Alpine Securities
        Account number ending in 6850

(i)     Newbridge Securities
        Account name and numbers unknown

(j)     Carol McKeown
        TD Canada Trust Bank
        Account numbers ending 0815, 4520, 7278

(k)     Carol McKeown
        Valeurs mobilieres Dundee
        Account numbers ending 391 AN and 391 BN

(l)     Downshire Capital Inc.
        Valeurs mobilieres Dundee
        Account numbers ending VCAN and VCBN

## IV.

## ACCOUNTINGS

**A.     Accounting and Identification of Accounts by Carol McKeown and Daniel F. Ryan**

**IT IS FURTHER ORDERED AND ADJUDGED** that within five days of the issuance of this Order, McKeown and Ryan shall each:

(a)     make a sworn accounting to this Court and the Commission of all funds, whether in the form of compensation, commissions, income (including payments for assets, shares or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature) received by McKeown and Ryan directly or indirectly from Downshire Capital and Meadow Vista;

6

(b)      make a sworn accounting to this Court and the Commission of all assets, funds, or other properties held by McKeown and Ryan, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

(c)      provide to the Court and the Commission a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposits of any kind) in which they (whether solely or jointly), directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or right to exercise control.

### B.      Accountings and Identification of Accounts by Downshire Capital and Meadow Vista

**IT IS HEREBY FURTHER ORDERED** that Downshire Capital and Meadow Vista shall each make a sworn accounting within five days of the issuance of this Order to the Commission and this Court of:

(a)      all funds received from any source, including, but not limited to, funds received directly or indirectly from sales of Converge Global, Inc., Biocentric Energy Holdings, Inc., Bluewave Group, Inc., Avro Energy, Inc., Atlantic Wind & Solar, Inc., and MSE Enviro-Tech Corp. securities;

(b)      all compensation, income (including payment for assets, shares or property of any kind), other benefits (including the provision of services of a personal or mixed business and personal nature) they have paid directly or indirectly to McKeown and Ryan; and

(c)      all assets, funds, or other properties held in their names, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property.

7

## V.

### **RECORDS PRESERVATION**

**IT IS FURTHER ORDERED AND ADJUDGED** that, pending determination of the Commission's request for a Preliminary Injunction, the Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to the Defendants wherever located and in whatever form, electronic or otherwise, until further Order of this Court.

## VI.

### **EXPEDITED DISCOVERY**

**IT IS FURTHER ORDERED AND ADJUDGED** that:

(a)     Immediately upon entry of this Order, and while the Commission's request for a preliminary injunction is pending, the parties may take depositions upon oral examination of parties and non-parties subject to two days notice.  Should any Defendant fail to appear for a properly noticed deposition, that party may be prohibited from introducing evidence at the hearing on the Commission's request for a preliminary injunction;

(b)     Immediately upon entry of this Order, and while the Commission's request for a preliminary injunction is pending, the parties shall be entitled to serve interrogatories, requests for the production of documents and requests for admissions. The parties shall respond to such discovery requests within two days of service;

8

(c)     All responses to the Commission's discovery requests shall be delivered to Christine Nestor, Esq. at 801 Brickell Avenue, Suite 1800, Miami, Florida 33131 by the most expeditious means available; and

(d)     Service of discovery requests shall be sufficient if made upon the parties by facsimile or overnight courier, and depositions may be taken by telephone or other remote electronic means.

## VII.

### REPATRIATION ORDER

**IT IS FURTHER ORDERED AND ADJUDGED** that, pending determination of the Commission's request for a Preliminary Injunction, the Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, shall:

(a)     take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the Registry of the United States District Court, Southern District of Florida; and

(b)     provide the Commission and the Court a written description of the funds and assets so repatriated.

9

## VIII.

### <u>RETENTION OF JURISDICTION</u>

**IT IS HEREBY FURTHER ORDERED** that this Court shall retain jurisdiction over this matter and the Defendants in order to implement and carry out the terms of all Orders and Decrees that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court, and will order other relief that this Court deems appropriate under the circumstances.

**DONE AND ORDERED** in Chambers in _____, Florida, this ____ day of _____, 2010.

_____
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record

10

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| CAROL MCKEOWN, DANIEL F. RYAN, | ) |
| MEADOW VISTA FINANCIAL CORP., | ) |
| and DOWNSHIRE CAPITAL INC., | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### UNDER SEAL

### EXHIBITS IN SUPPORT OF PLAINTIFF
### SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* MOTION FOR
### TEMPORARY RESTRAINING ORDER AND OTHER EMERGENCY RELIEF

1.  Meadow Vista's Oppenheimer & Co., Inc. Account Application

2.  Downshire's Wilson-Davis & Co., Inc. Account Application

3.  Downshire's Wilson-Davis & Co., Inc. Account Application

4.  Meadow Vista Corporate Records, Wyoming Secretary of State Website

5.  Meadow Vista's Wilson-Davis & Co., Inc. Account Application

6.  May 12, 2010 Letter from Spiegel Sohmer to the Commission

7.  PennyStockChaser Press Release dated April 14, 2009

8.  Declaration of Michael Jacobs

9.  Declaration of Andrew Garbarini

10. Certified Copy of Daniel Ryan's Canada Passport Application

11. Downshire Term Sheet

12. Meadow Vista's SMH Capital Account Application

13. Composite of Ryan's Trading Instructions

14. Printout of www.downshirecapital.com Website

15. Printout of "About Us" Page, www.pennystockchaser.com Website

16. Posts touting Converge Global, Inc. on www.pennystockchaser.com Website

17. Posts touting Biocentric Energy Holdings, Inc. on www.pennystockchaser.com Website

18. Posts touting Bluewave Group, Inc. on www.pennystockchaser.com Website

19. Posts touting Avro Energy, Inc. on www.pennystockchaser.com Website

20. Posts touting Atlantic Wind & Solar, Inc. on www.pennystockchaser.com Website

21. Posts touting MSE Enviro-Tech Corp. on www.pennystockchaser.com Website

22. May 3, 2010 e-mail message from McKeown to Scott Eisler

23. Declaration of Timothy J. Galdencio

24. Declaration of Michael Riedlinger

25. Printout of "Disclaimer" Page, www.pennystockchaser.com Website

26. Converge Corporate Records from Utah Secretary of State Website

27. Biocentrics Corporate Records from Florida Secretary of State Website

28. Bluewave Corporate Documents from Nevada Secretary of State Website

29. Avro Corporate Documents from Nevada Secretary of State Website

30. Atlantic Corporate Documents from West Virginia Secretary of State Website

31. MSE Corporate Documents from Delaware Secretary of State Website

32. Composite of Ryan and McKeown's Trading Instructions

33. Composite of Issuer Business Descriptions

# OPPENHEIMER
Member SIPC
125 Broad Street, 16th Floor • New York NY 10004 • (212) 668-8000

## ACCOUNT INFORMATION

DATE OPENED _____
DATE UPDATED 08/31/09
SHORT NAME MEADOW VISTA FINANCIAL

| BRANCH OFFICE | ACCOUNT NUMBER* | F.A. NO. |
|---|---|---|
| | ████0916 | BU7 |

SOCIAL SECURITY or TAX I.D. NO. ████2565

ACCOUNT CLASS  Corporation

### TYPE OF ACCOUNT

☑ CASH  ☐ MARGIN *  ☐ MANAGED *
☐ OPTION *  ☐ COMMODITY *  ☐ IRA

*ADDITIONAL DOCUMENTS ARE REQUIRED AND WILL BE FORWARDED.

Special Mailing or Other Instructions
DupState mail – ☐ Confirms, ☐ Statements to:

LEGAL NAME AND SPOUSES NAME (if Joint Account) & ALTERNATE MAILING ADDRESS: Home or Business (if Business or P.O. Box is used, list Home Address under Special Mailing)

MEADOW VISTA FINANCIAL CORP
2710 THOMAS AVENUE SUITE 636  CHEYENNE, WY 82001
US

DATE OF BIRTH (IF UGMA – MINOR'S)  03/11/1966
DATE OF TRUST

LEGAL PERMANENT ADDRESS:
2710 THOMAS AVENUE SUITE
636  CHEYENNE, WY 82001  US

| HOME TELEPHONE NO. | MOBILE NO. | BUSINESS TELEPHONE NO. | EMAIL ADDRESS |
|---|---|---|---|
| 514-513-1969 | 514-513-1966 | 514-513-1966 | mckeown.carol@sympatico.ca |

### EMPLOYMENT

| EMPLOYER'S NAME (If Retired – Indicate Former Occupation and Employer) | RETIRED? | YEARS EMP. | NATURE OF BUSINESS | OCCUPATION |
|---|---|---|---|---|
| MEADOW VISTA FINANCIAL CORP | ☐ YES ☑ NO | 5 | INVESTMENT BANK | PRESIDENT/OWNER |

ADDRESS  2710 THOMAS AVENUE SUITE 636  CHEYENNE, WY 82001  US

EST. ANNUAL COMPENSATION  50,000

### SPOUSE / OTHER JOINT TENANT / MULTIPLE TRUSTEE

| NAME | EMPLOYER | SOCIAL SECURITY NO. or TAX I.D. NO. | DATE OF BIRTH |
|---|---|---|---|
| | | | |

ADDRESS

US CITIZEN ☐ YES ☐ NO
RETIRED? ☐ YES ☐ NO
OCCUPATION

EST. ANNUAL COMPENSATION

### REFERENCE

BANK NAME AND ADDRESS:  TD CANADA TRUST  WESTMONT QC H3Z 2A4  CANADA
☑ CHECKING ☐ SAVINGS
OWNERSHIP: ☐ ANNUITIES ☐ LIFE INSURANCE

ACCOUNT WITH OTHER BROKERAGE FIRM(S)
(1): NAME SCOTTSDALE ADVISORS / VALUE 50,000
(2): NAME _____ / VALUE _____
(3): NAME _____ / VALUE _____
(4): NO ☐

### GENERAL INFORMATION

INVESTMENT OBJECTIVES (Check all those that apply)
☑ LIQUIDITY (Cash Equivalents Short Term Investments)
☐ CURRENT INCOME (Conservative)
☑ CAPITAL APPRECIATION (Conservative)
☐ TAX FREE / DEFERRAL
☑ SPECULATION
☐ CURRENT INCOME (Aggressive)
☑ CAPITAL APPRECIATION (Aggressive)
☑ SHORT TERM TRADING

INVESTMENT EXPERIENCE (Indicate Number of Years)
☑ EQUITIES 20
☑ MUTUAL FUNDS ___
☑ IPO'S 5
☑ US TREAS. 10
☐ OTHER ___
☐ OPTIONS ___
☐ CORP. DEBT ___
☐ RESTRICTED STOCKS ___
☐ PRIVATE PLACEMENTS ___
☐ MUNICIPALS ___
☐ COMMODITIES / FUTURES ___
☐ MANAGED MONEY ___
☐ HIGH YIELD DEBT ___

U.S. CITIZEN ☐ YES ☑ NO (If not, specify Country of Citizenship) CANADA
MARITAL STATUS ☑ MARRIED ☐ SINGLE ☐ DIVORCED ☐ WIDOWED
NO. OF DEPENDENTS 1

IS CLIENT NOW OR HAS CLIENT EVER BEEN A CORPORATE OFFICER, DIRECTOR OR CLIENT OWN 10% OF CORPORATIONS STOCK? ☐ YES ☑ NO
IF YES, SPECIFY CORPORATION: _____

IS ANYONE AT OPPENHEIMER & CO. INC. OR RELATED TO AN EMPLOYEE? ☑ NO ☐ YES

DOES CLIENT OR SPOUSE HAVE ANOTHER ACCOUNT WITH US? ☐ NO ☐ YES  IF YES, SPECIFY _____

| ANNUAL INCOME (Approx) (From All Sources) $ 50,000 | TOTAL NET WORTH (Approx) $ 500,000 | LIQUID NET WORTH (Approx) (Excludes Home, Auto, Etc.) $ 10,000 | ESTIMATED TAX BRACKET 28 % |
|---|---|---|---|

ENTITIES OTHER THAN REAL PERSONS
NET VALUE / WORTH (Approx) $ 10,000
ASSETS AVAILABLE TO INVEST $ 5,000

ORIGINAL SOURCE OF FUNDS / ASSETS FOR INVESTING (Check All That Apply)
☐ EMPLOYMENT/PAYROLL  ☐ PENSION / RETIREMENT FUNDS
☑ OPERATING BUSINESS  ☐ SALE OF ASSETS (Other Than Securities)
☐ LOAN(S)  ☐ GIFT  ☐ INHERITANCE
☐ DIVORCE OR OTHER LEGAL SETTLEMENT  ☐ OTHER

IS CUSTOMER (OR PARTNER, IF PARTNERSHIP) ASSOCIATED WITH OR EMPLOYED BY ANY SECURITY FIRM, STOCK EXCHANGE, INSURANCE COMPANY, BANK, INVESTMENT COMPANY AND/OR INVESTMENT ADVISOR?
IF YES, Specify Name of Individual, Firm and Position: ☐ YES ☑ NO
NAME _____
POSITION _____

IF ACCOUNT IS OTHER THAN AN INDIVIDUAL, INDICATE PERSON AUTHORIZED TO PLACE ORDERS AND ISSUE INSTRUCTIONS?
NAME  CAROL MC KEOWN
POSITION  PRESIDENT
Written authorization must be obtained

HOW WAS ACCOUNT ACQUIRED?
☐ WALK IN / PHONE  ☐ PROSPECT (Prior Contact)  ☐ ADVERTISING
☑ KNOWN PERSONALLY  ☐ REFERRAL  ☐ OTHER (Specify)

INITIAL TRANSACTION ☐ BUY ☑ SELL
☑ OTHER (Specify) 140,000 SHARES AWSL

### TRADING AUTHORIZATION

ORDERS RECEIVED FROM (NAME OF AGENT OR INVESTMENT ADVISOR)
POWER OF ATTORNEY  ☐ LIMITED ☐ FULL ☐ LEGAL
☐ OTHER (Specify)
RELATIONSHIP _____

ADDRESS

TELEPHONE NO.
WRITTEN AUTHORIZATION OBTAINED: ☐ YES ☐ NO

IS AGENT EMPLOYED BY OPPENHEIMER & CO. INC.? ☐ YES ☐ NO

### STANDING INSTRUCTIONS

DISTRIBUTION OF INCOME
☑ HOLD IN ACCOUNT
☐ MAIL CHECK - WEEKLY  ☐ MAIL CHECK - MONTHLY  ☐ MAIL CHECK - QUARTERLY

AUTOMATIC REINVESTMENT (SWEEP ACCOUNT)
IF YES, SPECIFY:  ☐ YES ☐ NO
Primary Liquidity

DIVIDEND REINVESTMENT
☐ YES ☑ NO

RELATED NAME (FOR MUTUAL FUND BREAKPOINT):
MEADOW VISTA FINANCI

PROCEEDS: TO:
HOLD ☑  MAIL ☐

TRANSFER INSTRUCTIONS: ☑ HOLD IN ACCOUNT (STREET NAME)
☐ CUSTOMER NAME & SHIP (A)

IS FINANCIAL ADVISOR REGISTERED IN THE STATE IN WHICH THE CLIENT RESIDES? ☐ YES ☐ NO

| FINANCIAL ADVISOR APPROVAL | DATE | BRANCH MANAGER APPROVAL | DATE |
|---|---|---|---|
| SCOTT EISLER | 08/31/09 | RUSSELL S. LOWE | 08/31/09 |

| Office | Acct # | FA |
|--------|--------|-----|
| ■ | ■ O 916 | bu7 |



**35. DISCLOSURES TO AFFILIATED AND NONAFFILIATED THIRD PARTIES.** Under Regulation S-P, Oppenheimer is permitted to share personal information collected from Client in the course of its relationship with Client with affiliated and nonaffiliated parties under certain circumstances without Client's approval. If Client does not want his/her personal information shared outside of these permitted circumstances with nonaffiliated third parties without Client's prior notification, Client must indicate this preference by checking where indicated below.

☐ Yes, I do object to the disclosure of such information.

Further information on the circumstances under which such disclosures may be made may be found in Oppenheimer's Privacy Disclosure accompanying this Agreement.

**36. TAXPAYER IDENTIFICATION AND CERTIFICATION** -- Please refer to the accompanying instructions before completing.

Under penalties of perjury, Client hereby certifies that:

1. The number shown on this form is Client's correct Taxpayer Identification Number ("TIN") (or Client is waiting for a number to be issued); and
2. Client is not subject to backup withholding because: (a) Client is exempt from backup withholding, or (b) Client has not been notified by the Internal Revenue Service (IRS) that Client is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified Client that Client is no longer subject to backup withholding; and
3. Client is a U.S. person (including a U.S. resident alien).

**CERTIFICATION INSTRUCTIONS.** Client must cross out item 2 above if Client has been notified by the IRS that Client is currently subject to backup withholding because Client has failed to report all interest and dividends on Client's tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an Individual retirement arrangement (IRA), and generally, payments other than interest and dividends, Client is not required to sign the Certification, but Client must provide Client's correct TIN. (See enclosed Instructions.)

**FOR THOSE EXEMPT FROM BACKUP WITHHOLDING (SEE ENCLOSED INSTRUCTIONS), PLEASE CHECK THE FOLLOWING BOX:**

☐ Client is exempt from backup withholding.

THE ABOVE INSTRUCTIONS PERTAIN TO PRIMARILY THOSE CLIENTS WITH U.S. TINs. NON-U.S. PERSONS AND/OR THOSE WHO ARE NOT ELIGIBLE FOR U.S. TINs MUST COMPLETE ONE OF THE FORMS LISTED IN THE ENCLOSED INSTRUCTIONS, WHICH WILL BE PROVIDED TO CLIENT.

*CORPORATE*

**IF OPENING AN INDIVIDUAL CASH ACCOUNT:**

BY SIGNING THIS AGREEMENT THE CLIENT ACKNOWLEDGES THAT CLIENT HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ THIS AGREEMENT IN ITS ENTIRETY BEFORE SIGNING. THE CLIENT HAS ALSO RECEIVED AND READ THE DISCLOSURE STATEMENT, WHICH IS ATTACHED HERETO. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AS SET FORTH IN PARAGRAPHS 32 AND 33 ON PAGE 4.

(X) _CMS_____ 09/28/9
Client Signature                          Date

Client's TIN to be used by Oppenheimer is:
☐ social security number or ☐ EIN


| ■ | ■ | - | ■ | ■ | ■ | 2 | 5 | 6 | 5 |

---

IF OPENING A JOINT CASH ACCOUNT, PLEASE ENSURE THAT THE TYPE OF JOINT ACCOUNT INTENDED HAS BEEN INDICATED IN PARAGRAPH 31:

(X) _____
Joint Client Signature                    Date

Joint Client's TIN to be used by Oppenheimer is:
☐ social security number or ☐ EIN

| | | | | | | | | | |

(X) _____
Joint Client Signature                    Date

Joint Client's TIN to be used by Oppenheimer is:
☐ social security number or ☐ EIN

| | | | | | | | | | |

IF OPENING AN INDIVIDUAL MARGIN ACCOUNT:

BY SIGNING THIS AGREEMENT THE CLIENT ACKNOWLEDGES THAT:

1. THE SECURITIES IN THE CLIENT'S MARGIN ACCOUNT MAY BE LOANED TO OPPENHEIMER OR LOANED OUT TO OTHERS; AND
2. THE CLIENT HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ THIS AGREEMENT IN ITS ENTIRETY BEFORE SIGNING. THE CLIENT HAS ALSO RECEIVED AND READ THE DISCLOSURE STATEMENT, WHICH IS ATTACHED HERETO. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AS SET FORTH HEREIN IN PARAGRAPHS 32 AND 33 ON PAGE 4.

(X) _____
Client Signature                          Date

Client's TIN to be used by Oppenheimer is:
☐ social security number or ☐ EIN

| | | | | | | | | | |

IF OPENING A JOINT MARGIN ACCOUNT, PLEASE ENSURE THAT THE TYPE OF JOINT ACCOUNT INTENDED HAS BEEN INDICATED IN PARAGRAPH 31:

(X) _____
Joint Client Signature                    Date

Joint Client's TIN to be used by Oppenheimer is:
☐ social security number or ☐ EIN

| | | | | | | | | | |

(X) _____
Joint Client Signature                    Date

Joint Client's TIN to be used by Oppenheimer is:
☐ social security number or ☐ EIN

| | | | | | | | | | |

 

125 Broad Street, New York, NY 10004

| OFFICE | ACCOUNT NUMBER | F.A. |
|--------|----------------|------|
| ▆ ▆ | 0916 | *Bu7* |

# Corporation Account

### (SECURITY CASH ACCOUNTS ONLY - FULL AUTHORITY)

The undersigned Corporation, by

_____Carol McKeown_____ its President, pursuant to the resolutions, a copy of which, certified by its Secretary, is annexed hereto and made a part hereof, hereby authorizes you to open an account in the name of said corporation; and the undersigned represents that no one other than the undersigned has any interest in such account. The undersigned also encloses herewith your Customer's Agreement and Options Agreement (if applicable) duly executed on behalf of the Corporation. This authorization shall continue in force until revoked by the undersigned Corporation by a written notice addressed to you and delivered at your office at 125 BROAD STREET, NEW YORK, NEW YORK 10004.

Dated _23ʳᵈ August 2006_

City and State _Cheyenne Wyoming_

Corporation _Meadow Vista Financial Corp_

By signing this Corporation Account, I acknowledge receipt of a copy of this agreement.
This agreement contains a pre-dispute arbitration clause at page 2, paragraph 3 (resolution "Second").

By _Carol McKeown_ _____, President.

* * *

[SEAL]   NO SEAL

I, _____Carol McKeown_____ being the

Secretary of _State of Wyoming_ hereby certify that the annexed resolutions were duly adopted at a meeting of the Board of Directors of said Corporation, duly

held on the ____23____ day of ___August___, at which a quorum of said Board of Directors was present and acting throughout and that no action has been taken to rescind or amend said resolutions and that the same are now in full force and effect.

I further certify that each of the following has been duly elected and is now legally holding the office set opposite his/her name:

_Carol McKeown_ _____, President

___  N/A _____, Vice President

___  N/A _____, Treasurer

___  N/A _____, Secretary

I further certify that the said corporation is duly organized and existing and has the power to take the action called for by the resolutions annexed hereto.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said Corporation this ___08___ day of ___96___, year.

_____ _____, Secretary

FORM 105(B) (Rev. 5/05)

# OPPENHEIMER

657 - 142 0916

125 Broad Street, New York, NY 10004

## SOLE PROPRIETORSHIP CERTIFICATION

Date: _03 28 06_

Account Title: _Meadow Vista Financial Corp_

Account Number (s): _____

Tax ID Number: _▓▓▓▓ 2565_

TO: OPPENHEIMER & CO. INC.

I, _Carol McKeown_, hereby certify that I am engaged in business under the assumed name and style of _Meadow Vista Financial Corp_ at _2710 Thomas Ave Suit 63_ in the City of _Cheyenne_ State of _Wyoming_. I am the Sole Proprietor of the business so conducted and no other person, partnership or corporation has any ownership interest therein.

All securities, commodities and other property in the name of _Meadow Vista_ are owned soley by me.

I hereby agree to indemnify and hold Oppenheimer & Co. Inc., its controlling persons, directors, officers, agents, employees, affiliates and parent company and their respective personal representatives, successors and assigns (the "Indemnified Parties") harmless from and against and pay promptly on demand any damages, losses, claims and/or costs (including attorney's fees) which the Indemnified Parties may incur in complying with my instructions relating to the above listed account (s) at your firm.

_____
Signature of Sole Proprietor

_Carol McKeown_
Print Name of Sole Proprietor

G OPS FORMS SOLE
Version 9/03



*657-142 0916*

| Form **W-8BEN** | **Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding** | |
|---|---|---|
| (Rev. February 2006) | ▶ Section references are to the Internal Revenue Code.   ▶ See separate instructions. | OMB No. 1545-1621 |
| Department of the Treasury Internal Revenue Service | ▶ Give this form to the withholding agent or payer. Do not send to the IRS. | |

**Do not use this form for:**                                                    **Instead, use Form:**

- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . W-8ECI or W-8EXP

Note: *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

Note: *See instructions for additional exceptions.*

### Part I  Identification of Beneficial Owner (See instructions.)

**1** Name of individual or organization that is the beneficial owner      **2** Country of incorporation or organization

MEADOW VISTA FINANCIAL CORP          US

**3** Type of beneficial owner:
☐ Individual ☒ Corporation ☐ Disregarded entity ☐ Partnership ☐ Simple trust
☐ Grantor trust ☐ Complex trust ☐ Estate ☐ Government ☐ International organization
☐ Central bank of issue ☐ Tax-exempt organization ☐ Private foundation

**4** Permanent residence address (street, apt. or suite no., or rural route). Do not use a P.O. box or in-care-of address.

2710 Thomes Ave Suite 636

City or town, state or province. Include postal code where appropriate.     Country (do not abbreviate)

Cheyenne, WY 82001

**5** Mailing address (if different from above).

City or town, state or province. Include postal code where appropriate.     Country (do not abbreviate)

**6** U.S. taxpayer identification number, if required (see instructions)     **7** Foreign tax identifying number, if any (optional)

███ 2565    ☐ SSN or ITIN ☐ EIN

**8** Reference number(s) (see instructions)

### Part II  Claim of Tax Treaty Benefits (if applicable)

**9** I certify that (check all that apply):

a ☒ The beneficial owner is a resident of CANADA ....... within the meaning of the income tax treaty between the United States and that country.

b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☒ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

**10** Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article ........... of the treaty identified on line 9a above to claim a .............% rate of withholding on (specify type of income): ...........................
Explain the reasons the beneficial owner meets the terms of the treaty article: ...........................
...........................

### Part III  Notional Principal Contracts

**11** ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV  Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
2 The beneficial owner is not a U.S. person,
3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and
4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ▶ _____     08/26/2009     _____
Signature of beneficial owner (or individual authorized to sign for beneficial owner)    Date (MM-DD-YYYY)    Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions.    Cat. No. 25047Z    Form **W-8BEN** (Rev. 2-2006)

# State of Wyoming

## Office of the
## Secretary of State



United States of America, }
State of Wyoming        } ss.

I, JOSEPH B. MEYER, Secretary of State of the State of Wyoming, do hereby certify that according to the records in the office of the Secretary of State of Wyoming, **MEADOW VISTA FINANCIAL CORP** is a corporation organized under the laws of the state of Wyoming, whose date of incorporation is August 20, 2004; and whose period of duration is perpetual.

I FURTHER CERTIFY that this corporation has filed all annual reports and paid all annual license taxes to date, or is not yet required to file such annual reports; and that Articles of Dissolution have not been filed, thus making the corporation in existence in the State of Wyoming.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the Great Seal of the State of Wyoming. Done at Cheyenne, the Capital, this 23rd day of August A.D., 2004.



_____
Secretary of State

By _____

<u>ARTICLES OF INCORPORATION</u>

FILED: 08/20/2004
CID: 2004-00472309
WY Secretary of State

<u>OF</u>

<u>Meadow Vista Financial Corp</u>

**FIRST.** The name of the corporation is:

**Meadow Vista Financial Corp**

**SECOND.** Its registered office in the State of Wyoming is located at 2424 Pioneer Avenue Suite 405, Cheyenne, Wyoming 82001. This Corporation may maintain an office, or offices, in such other place within or without the State of Wyoming as may be from time to time designated by the Board of Directors, or by the By-Laws of said Corporation, and that this Corporation may conduct all Corporation business of every kind and nature, including the holding of all meetings of Directors and Stockholders, outside the State of Wyoming as well as within the State of Wyoming

**THIRD.** The objects for which this Corporation is formed are:

(A) To do all things necessary or convenient to carry out its business and affairs, including without limitation power to:

(B) Sue and be sued, complain and defend in its corporate name;

(C) Have a corporate seal, which may be altered at will, and to use it, or a facsimile of it, by impressing or affixing it or in any other manner reproducing it;        (D) Make and amend bylaws, not inconsistent with its articles of incorporation or with the laws of this state, for managing the business and regulating the affairs of the corporation;

(E) Purchase, receive, lease, or otherwise acquire, and own, hold, improve, use, and otherwise deal with, real or personal property, or any legal or equitable interest in property,

1

wherever located;

(F) Sell, convey, mortgage, pledge, lease, exchange, and otherwise dispose of all or any part of its property;

(G) Purchase, receive, subscribe for, or otherwise acquire; own, hold, vote, use, sell, mortgage, lend, pledge, or otherwise dispose of; and deal in and with shares or other interests in, or obligations of, any other entity;

(H) Make contracts and guarantees, incur liabilities, borrow money, issue its notes, bonds, and other obligations which may be convertible into or include the option to purchase other securities of the corporation, and secure any of its obligations by mortgage or pledge of any of its property, franchises, or income;

(I) Lend money, invest and reinvest its funds, and receive and hold real and personal property as security for repayment;

(J) Be a promoter, partner, member, associate, or manager of any partnership, joint venture, trust, or other entity;

(K) Conduct its business, locate offices, and exercise the powers granted by this act within or without this state;

(L) Elect directors and appoint officers, employees, and agents of the corporation, define their duties, fix their compensation, and lend them money and credit;

(M) Pay pensions and establish pension plans, pension trusts, profit sharing plans, share bonus plans, share option plans, and benefit or incentive plans for any or all of its current or former directors, officers, employees, and agents;

(N) Make donations for the public welfare or for charitable, scientific, or educational