3) Statement of Cash Flow

## BioCentric Energy, Inc

**A Development Stage Company**
## Statement of Cash Flows

|  | Three Months Ended March 31, 2010 | Inception thru (sic) March 31, 2010 |
|---|---|---|
| **Cash Flow from Operating Activities** | | |
| Net Loss for the period | $ (355,146) | $ (1,200,128) |
| Adjustments to reconcile let loss to net cash | | |
| used by operating activities | | |
| Change in accounts receivable | (5,000) | (5,000) |
| Change in inventory | (56,735) | (56,735) |
| Change in prepaid expenses | 7,249 | (30,900) |
| Change in due from affiliates | | (484) |
| Change in vendor deposits | (41,370) | (92,520) |
| Change in accounts payable and accurals | 4,741 | 63,882 |
| Change in accrued expenses | | |
| Change in franchise tax payable | 800 | 3,200 |
| Cash used by operating activities | (445,461) | (1,318,685) |
| **Cash Flows from Investing Activities** | | |
| Investment in property and equipment | (104,586) | (352,822) |
| Investment in organization costs | | (1,234) |
| Investment in loan receivable | (29,200) | (37,200) |
| Investment in long-tern deposits | | (5,000) |
| Investment in investment securities | | (600) |
|  | (133,786) | (396,856) |
| **Cash Flows from Financing Activities** | | |
| Advances from stockholders | (9,500) | 25,765 |
| Increase in notes payable | | 345,000 |
| Issuance of capital stock | 588,950 | 1,413,559 |
|  | 579,450 | 1,784,324 |
| Increase in Cash | 203 | 68,783 |
| Cash, beginning of period | 68,580 | - |
| Cash, end of period | $ 68,783 | $ 68,783 |

4) Statement of changes in stockholders' equity;

**BioCentric Energy, Inc**

A Development Stage Company

## Statement of Income (Loss)

| | Common Stock | Accumulated Earnings (Deficit) | Total |
|---|---|---|---|
| Balance June 1, 2006, Date of Inception | $ - | $ - | $ - |
| Loss, Six Months Ended December 31, 2006 | | (67,113) | (67,113) |
| Loss, Year Ended December 31, 2007 | | (197,355) | (197,355) |
| Balance Janunary 1, 2008 | | (264,468) | (264,468) |
| Common Stock Issued Year Ended December 31, 2008 (Exchange for Shareholder Debt) | 350,609 | | 350,609 |
| Loss, Year Ended December 31, 2008 | | (73,783) | (73,783) |
| Balance Janunary 1, 2009 | 350,609 | (338,251) | 12,358 |
| Common Stock Issued Year Ended December 31, 2009 | 474,000 | | 474,000 |
| Loss, Year Ended December 31, 2009 | | (506,731) | (506,731) |
| Balance December 31, 2009 | 824,609 | (844,982) | (20,373) |
| Common Stock Issued, Three Months Ended March 31, 2010 | 588,950 | | 588,950 |
| Loss, Year Ended December 31, 2009 | | (355,146) | (355,146) |
| | $ 1,413,559 | $ (1,200,128) | $ 213,431 |

5) financial notes; and
N/A

6) audit letter, if audited
N/A

Item XIII Similar financial information for such part of the two preceding fiscal years as the issuer or its predecessor has been in existence.

Item XIV Beneficial Owners.
Provide a list of the name, address and shareholdings of all persons beneficially owning more than five percent (5%) of any class of the issuer's equity securities.
*None*

Item XV The name, address, telephone number, and email address of each of the following outside providers that advise the issuer on matters relating to the operations, business development and disclosure:
None

1. Investment Banker
N/A

2. Promoters
N/A

3. Counsel
Kristin Kano
Newport Beach, California

4. Accountant or Auditor
Frank R. Rawson CPA (inactive)
13681 Newport Avenue, Suite 8-452,
Tustin, California 92780
949-275-2534

5. Public Relations Consultant(s)
N/A

7. Investor Relations Consultant
N/A

8. Any other advisor(s) that assisted, advised, prepared or provided information with respect to this disclosure statement - the information shall include the telephone number and email address of each advisor.
N/A

Item XVI Management's Discussion and Analysis or Plan of Operation.
A. Plan of Operation.
1. Describe the issuer's plan of operation for the next twelve months. This description should include such matters as:
i. a discussion of how long the issuer can satisfy its cash requirements and whether it will have to raise additional funds in the next twelve months;
At today's burn rate management has sufficient capital for the next six months to operate

ii. a summary of any product research and development that the issuer will perform for the term of the plan;
Management has the qualified staff, support and equipment in house such as a clean laboratory to facilitate the following:
1) site analysis (emission analysis, soil analysis, flora analysis, water analysis, climate review... as related to site specific objective{s})
2) algae strain selection best suited for site
3) determine nutrients selection available (and at the lowest cost for the most production)
4) identify and enhance future generations of algae for different objectives
5) possibly environmentally engineer a hybrid algae solution
6) Institute and enhance on BEHL proprietary IP and monitor, and document all results

iii. any expected purchase or sale of plant and significant equipment; and
Six qualified and interested parties are presently in negotiations to either joint venture or purchase the Algae Pro Photobioreactor Solution

iv. any expected significant changes in the number of employees.
Yes – projections dictate a 65% increase in employees

B. Management's Discussion and Analysis of Financial Condition and Results of Operations.
1. *Full fiscal years.*
i. Any known trends, events or uncertainties that have or are reasonably likely to have a material impact on the issuer's short term or long-term liquidity;
YES – the temporary drop in oil prices has begun again a false sense of security for the immediate need for alternative energy solutions – it because of this that management has focused our company direction to the sequestration and utilization of $CO_2$ and the byproduct is energy and growing algae for human nutritional supplements, animal feedstock, and pharmaceuticals.

ii. Internal and external sources of liquidity;
As of March 31, 2010 advances from Stockholders reflect
$25,765. The company is actively identifying new sources of debt and equity investments. The company is now entering its operational stage and accepting customer deposits for site evaluations and participation in the company's joint algae production program

Management focus is to secure funding via:
* bring in an outside investor for an equity share
* procure a leasing solution to provide the necessary capital
* Complete and issue a PPM for an equity share through Series C Preferred Shares
* Execute financial agreements from clients committed to owning their own algae farm

iii. Any material commitments for capital expenditures and the expected sources of funds for such expenditures;
no

iv. Any known trends, events or uncertainties that have had or that are reasonably expected to have a material impact on the net sales or revenues or income from continuing operations;
YES – the temporary drop in oil prices has begun again a false sense of security for the immediate need for alternative energy solutions – it because of this that management has focused our company direction to the sequestration and utilization of $CO_2$ and the byproduct is energy and growing algae for human nutritional supplements, animal feedstock, and pharmaceuticals.

v. Any significant elements of income or loss that do not arise from the issuer's continuing operations;
no

vi. The causes for any material changes from period to period in one or more line items of the issuer's financial statements; and
no

vii. Any seasonal aspects that had a material effect on the financial condition or results of operation.
No

C. Off-Balance Sheet Arrangements.
n/a
1. In a separately-captioned section, discuss the issuer's off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the issuer's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. The disclosure shall include the items specified in paragraphs C(1 )(i), (ii), (iii) and (iv) of this Item XVI to the extent necessary to an understanding of such arrangements and effect and shall also include such other information that the issuer believes is necessary for such an understanding.

* The nature and business purpose to the issuer of such off-balance sheet arrangements;
* The importance to the issuer of such off-balance sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits;
* The amounts of revenues, expenses and cash flows of the issuer arising from such arrangements; the nature and

amounts of any interests retained, securities issued and other indebtedness incurred by the issuer in connection with such arrangements; and the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the issuer arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise; and

• Any known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination, or material reduction in availability to the issuer, of its off-balance sheet arrangements that provide material benefits to it, and the course of action that the issuer has taken or proposes to take in response to any such circumstances.

2. As used in paragraph C of this Item XVI, the term off-balance sheet arrangement means any transaction, agreement or other contractual arrangement to which an entity unconsolidated with the issuer is a party, under which the issuer has:

i. Any obligation under a guarantee contract that has any of the characteristics identified in paragraph 3 of FASB Interpretation No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others (November 2002) ("FIN 45"), as may be modified or supplemented, and that is not excluded from the initial recognition and measurement provisions of FIN 45 pursuant to paragraphs 6 or 7 of that Interpretation;

ii. A retained or contingent interest in assets transferred to an unconsolidated entity or similar arrangement that serves as credit, liquidity or market risk support to such entity for such assets;

iii. Any obligation, including a contingent obligation, under a contract that would be accounted for as a derivative instrument, except that it is both indexed to the issuer's own stock and classified in stockholders' equity in the issuer's statement of financial position, and therefore excluded from the scope of FASB Statement of Financial Accounting Standards No. 133, Accounting for Derivative Instruments and Hedging Activities (June 1998), pursuant to paragraph 11(a) of that Statement, as may be modified or supplemented; or

v. Any obligation, including a contingent obligation, arising out of a variable interest (as referenced in FASB Interpretation No. 46, Consolidation of Variable Interest Entities (January 2003), as may be modified or supplemented) in an unconsolidated entity that is held by, and material to, the issuer, where such entity provides financing, liquidity, market risk or credit risk support to, or engages in leasing, hedging or research and development services with, the issuer.
N/A

Part E Issuance History
Item XVII List of securities offerings and shares issued for services in the past two years.
none

Part F Exhibits
The following exhibits must be either described in or attached to the disclosure statement:
Item XVIII Material Contracts.

A. Every material contract, not made in the ordinary course of business that will be performed after the disclosure statement is posted through the OTC Disclosure and News Service or was entered into not more than two years before such posting. Also include the following contracts:

1) Any contract to which directors, officers, promoters, voting trustees, security holders named in the disclosure statement, or the Designated Advisor for Disclosure are parties other than contracts involving only the purchase or sale of current assets having a determinable market price, at such market price;

2) Any contract upon which the issuer's business is substantially dependent, including but not limited to contracts with principal customers, principal suppliers, and franchise agreements;
We presently are working with multiple companies worldwide

3) Any contract for the purchase or sale of any property, plant or equipment for consideration exceeding 15 percent of such assets of the issuer; or
no

4) Any material lease under which a part of the property described in the disclosure statement is held by the issuer.
no

B. Any management contract or any compensatory plan, contract or arrangement, including but not limited to plans relating to options, warrants or rights, pension, retirement or deferred compensation or bonus, incentive or profit sharing (or if not set forth in any formal document, a written description thereof) in which any director or any executive officer of the issuer participates shall be deemed material and shall be included; and any other management contract or any other compensatory plan, contract, or arrangement in which any other executive officer of the issuer participates shall be filed unless immaterial in amount or significance.
Management has signed a management contract under the terms and conditions contained with the BioCentric Energy Algae, PPM. Further, Management has signed a contract with original shareholders of BioCentric Energy to satisfy Advances from Stockholders

C. The following management contracts or compensatory plans need not be included:
1) Ordinary purchase and sales agency agreements;
2) Agreements with managers of stores in a chain organization or similar organization;

3) Contracts providing for labor or salesmen's bonuses or payments to a class of security holders, as such; and
4) Any compensatory plan that is available to employees, officers or directors generally and provides for the same method of allocation of benefits between management and non-management participants

Item XIX Articles of Incorporation and Bylaws.
A. A complete copy of the issuer's articles of incorporation or in the event that the issuer is not a corporation, the issuer's certificate of organization. Whenever amendments to the articles of incorporation or certificate of organization are filed, a complete copy of the articles of incorporation or certificate of organization as amended shall be filed. Click here for complete access...

http://www.sunbiz.org/scripts/cordet.exe?action=DETFIL&inq_doc_number=P07000098713&inq_came_from=NAMFWD&
cor_web_names_seq_number=0003&names_name_ind=N&names_cor_number=&names_name_seq=&names_name_in
d=&names_comp_name=BIOCENTRICENERGY&names_filing_type=

B. A complete copy of the issuer's bylaws. Whenever amendments to the bylaws are filed, a complete copy of the bylaws as amended shall be filed. Click here for complete access...

http://www.sunbiz.org/scripts/cordet.exe?action=DETFIL&inq_doc_number=P07000098713&inq_came_from=NAMFWD&
cor_web_names_seq_number=0003&names_name_ind=N&names_cor_number=&names_name_seq=&names_name_in
d=&names_comp_name=BIOCENTRICENERGY&names_filing_type=

Item XX Purchases of Equity Securities by the Issuer and Affiliated Purchasers.
N/A

ISSUER PURCHASES OF EQUITY SECURITIES

No ownership was purchased in any entity - Advances from Stockholders financed BCE, Inc.

Item XXI Issuer's Certifications.
The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles, but having the same responsibilities).

The certifications shall follow the format below:

I, Dennis Fisher, Chairman of the Board of Directors certify that:

1. I have reviewed this annual disclosure statement of BioCentric Energy Holdings, Incorporation (BEHL);

2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Date: Saturday, April 10, 2010

Dennis Fisher  - Chairman of the Board

 

| Home | Quotes & News | Market Activity | OTC Company Search | OTC Guide | Produc |

Home >> Quotes & News >> Quote >> BLEW

**BLEW — Bluewave Group Inc.**

Common Stock
Par Value: 0.001

ql

**Quote   News   Charts   Company Info   Financials   Research   Short Sales   Insiders**

---

| Contact Information | Business Description |
|---|---|

**Contact Information**

Bluewave Group Inc.
2881 E. Oakland Park Blvd.
Suite 407
Ft. Lauderdale, FL 33306
Phone: 954-696-9253
Fax: 954-320-7852
E-mail:
admin@bluewavegrp.com

---

**OTC Market Tier**
OTCQB

**State Of Incorporation**
NV

**Jurisdiction Of Incorporation**
United States

**Company Officers**
Derek Jackson, Dir., President, CEO, CFO

**Reporting Standard**
U.S. Registered & Reporting: SEC Filer

**CIK**
0001439142

**Fiscal Year End**
4/30

**Estimated Market Cap**
$11,728,800 as of Jun 18, 2010

**Outstanding Shares**
97,740,000 as of Dec 18, 2009

**Authorized Shares**
500,000,000 as of Mar 17, 2010

**Current Capital Change**
shs increased by 9 for 1 split
Ex-Date: Dec 18, 2009
Record Date: Dec 3, 2009
Pay Date: Dec 17, 2009

**Dividends**
Div: 9-1 stk; Due Bill Redeemable Date: 12/22/2(
Ex-Date: Dec 18, 2009
Record Date: Dec 3, 2009
Pay Date: Dec 17, 2009

**Company Notes**
Formerly=Cape Cod Aquaculture Corp. until 3-20:

**Transfer Agent**
Island Stock Transfer
100 Second Avenue South
Suite 705S
St. Petersburg, FL 33701

**Legal Counsel**
Gracin & Marlow LLP
Chrysler Building
405 Lexington Avenue
26th Floor

---

**New York, NY 10174**

The information provided here has been obtained from publicly available sources as well as directly from issuers in so
Click here to update your company profile.

All information contained herein is provided "as is." Pink OTC Markets Inc. makes no representation or warranty,
as to the accuracy, timeliness, or completeness of the information provided herein. Neither Pink OTC Markets Inc
officers, employees, or third party data suppliers, shall bear any responsibility or liability to verify the informatior
for the use, misuse, or inability to use the information provided. None of the foregoing parties shall be liable to ar
or losses of any nature. Accordingly, investors should not use this information as the basis for making an investr
see Risk Warning and Terms of Service for more information.

Home | Quotes & News | Market Activity | OTC Company Search | Products & Services | OTC Guide | About Pin
Map | Contact Regulators

© 2009 Pink OTC Markets Inc.
Terms of Service | Linking Terms | Trademarks | Privacy Statement | Risk Warning | Investor Relations

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

(MARK ONE)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE QUARTERLY PERIOD ENDED JANUARY 31, 2010

OR

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM** _____ **TO** _____

*COMMISSION FILE NUMBER: 000-53804*

**BLUEWAVE GROUP, INC.**
(Exact name of registrant as specified in its charter)

| NEVADA | 26-1679683 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**2881 E. Oakland Park Blvd., Suite 407, Ft. Lauderdale, FL 33306**
(Address of principal executive offices)          (Zip Code)

**(954) 459-8229**
(Registrant's telephone number, including area code)

**CAPE COD AQUACULTURE**
**401 E. Las Olas Blvd., Suite 1560, Ft. Lauderdale, FL  33301**
(Former name, former address and former fiscal year, if changed since last report)

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every interactive data file required to be submitted and posted pursuant to Rule 405 of Regulation S-T (section 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes ☐   No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐   No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated Filer ☐     Accelerated Filer ☐          Non-Accelerated Filer ☐     Smaller Reporting Company ☒

Number of shares outstanding of the issuer's common stock as of the latest practicable date: 97,740,000 shares of common stock, $.001 par value per share, as of March 19, 2010.

Transitional Small Business Disclosure Format (Check one): Yes ☐     No ☒

## TABLE OF CONTENTS

### Index

**PART I. FINANCIAL INFORMATION**

| | | Page |
|---|---|---|
| Item 1. | Financial Statements | 4 |
| | Balance Sheets at January 31, 2010 (unaudited) and April 30, 2009 (audited) | 4 |
| | Statement of Operations for the three and nine months ended January 31, 2010 and 2009 (unaudited) and for the period from January 30, 2008 (Inception) to January 31, 2010 | 5 |
| | Cash Flows for the nine months ended January 31, 2010 and 2009 (unaudited) and for the period from January 30, 2008 (Inception) to January 31, 2010 | 6 |
| | Notes to Condensed Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis or Plan of Operation | 11 |
| Item 4T. | Controls and Procedures | 12 |

**PART II. OTHER INFORMATION**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 13 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 13 |
| Item 3. | Defaults Upon Senior Securities | 13 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 13 |
| Item 5. | Other Information | 13 |
| Item 6. | Exhibits | 13 |

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

Certain statements in this report contain or may contain forward-looking statements. These statements, identified by words such as "plan", "anticipate", "believe", "estimate", "should," "expect" and similar expressions include our expectations and objectives regarding our future financial position, operating results and business strategy. These statements are subject to known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward - looking statements. These forward-looking statements were based on various factors and were derived utilizing numerous assumptions and other factors that could cause our actual results to differ materially from those in the forward-looking statements.. You should consider the areas of risk described in connection with any forward-looking statements that may be made herein. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this report. Readers should carefully review this report in its entirety, including but not limited to our financial statements and the notes thereto and the risks described in our Annual Report on Form 10-K for the fiscal year ended April 30, 2009. We advise you to carefully review the reports and documents we file from time to time with the Securities and Exchange Commission (the "SEC"), particularly our quarterly reports on Form 10-Q and our current reports on Form 8-K. Except for our ongoing obligations to disclose material information under the Federal securities laws, we undertake no obligation to release publicly any revisions to any forward-looking statements, to report events or to report the occurrence of unanticipated events.

## OTHER PERTINENT INFORMATION

When used in this report, the terms "We Sell," "we," the "Company," "our," and "us" refers to Bluewave Group, Inc., a Nevada corporation.

3

# PART I - FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS AND NOTES

**BLUEWAVE GROUP, INC.**
f/k/a Cape Cod Aquaculture
(A Development Stage Company)

**BALANCE SHEET**

|  | As of January 31, 2010 | As of April 30, 2009 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash | $ 1,996 | $ 19,701 |
| **TOTAL ASSETS** | $ 1,996 | $ 19,701 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIENCY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 10,955 | $ - |
| Accrued interest | 20 | - |
| Notes payable - related party | 7,800 | - |
| **TOTAL CURRENT LIABILITIES** | 18,775 | - |
| **COMMITMENTS AND CONTINGENCIES** | - | - |
| **STOCKHOLDERS' DEFICIENCY** | | |
| Preferred stock, $.001 par value, 25,000,000 shares authorized, none issued and outstanding | - | - |
| Common stock, $0.001 par value, 475,000,000 shares authorized, 97,740,000 shares issued and outstanding, respectively | 97,740 | 97,740 |
| Additional paid in capital | (65,640) | (65,640) |
| Accumulated deficit during development stage | (48,879) | (12,399) |
| Total Stockholders' Deficiency | (16,779) | 19,701 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY** | $ 1,996 | $ 19,701 |

4

**BLUEWAVE GROUP, INC.**
**f/k/a Cape Cod Aquaculture**
**(A Development Stage Company)**

**STATEMENT OF OPERATIONS**

| | For The Three Month Ended January 31, | | For The Nine Month Ended January 31, | | For The Period From January 30, 2008 (Inception) to January 31, 2010 |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2009 | 2008 | |
| Sales | $ - | $ - | $ - | $ - | $ - |
| Cost of sales | - | - | - | - | - |
| Gross Loss | - | - | - | - | - |
| **OPERATING EXPENSES** | | | | | |
| Consulting | - | - | - | - | - |
| Professional fees | 7,123 | - | 18,123 | - | 18,123 |
| General and administrative | 3,105 | 2,442 | 18,337 | 2,992 | 30,736 |
| Total Operating Expenses | 10,228 | 2,442 | 36,460 | 2,992 | 48,859 |
| **LOSS FROM OPERATIONS** | (10,228) | (2,442) | (36,460) | (2,992) | (48,859) |
| **OTHER EXPENSES:** | | | | | |
| Interest Expense | 20 | - | 20 | - | 20 |
| Total Other Expenses | 20 | - | 20 | - | 20 |
| **LOSS BEFORE PROVISION FOR INCOME TAXES** | (10,248) | (2,442) | (36,480) | (2,992) | (48,879) |
| Provision for Income Taxes | - | - | - | - | - |
| **NET LOSS** | $ (10,248) | $ (2,442) | $ (36,480) | $ (2,992) | $ (48,879) |
| Net loss per share - basic and diluted | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) | |
| Weighted average number of shares outstanding during the period - basic and diluted | 97,740,000 | 90,000,000 | 97,740,000 | 90,000,000 | 97,740,000 |

5

**BLUEWAVE GROUP, INC.**
**f/k/a Cape Cod Aquaculture**
**(A Development Stage Company)**

**STATEMENT OF CASH FLOWS**

| | For the Nine Months Ended January 31, | | For The Period From January 30, 2008 (Inception) to January 31, 2010 |
|---|---|---|---|
| | 2010 | 2009 | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ (36,480) | $ (2,442) | $ (48,879) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Changes in operating assets and liabilities: | | | |
| (Decrease) / increase in account payable | 10,955 | - | 10,955 |
| Accrued Interest | 20 | | 20 |
| Net Cash Used In Operating Activities | (25,505) | (2,442) | (37,904) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from notes payable - related party | 7,800 | - | 7,800 |
| Proceeds from issuance of common stock | - | 15,000 | 32,100 |
| Net Cash Provided By Financing Activities | 7,800 | 15,000 | 39,900 |
| | | | |
| NET INCREASE (DECREASE) IN CASH | (17,705) | 12,558 | 1,996 |
| | | | |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 19,701 | 950 | - |
| | | | |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ 1,996 | $ 13,508 | $ 1,996 |

6

**Bluewave Group, Inc**
**(FKA Cape Cod Aquaculture)**

**(A DEVELOPMENT STAGE COMPANY)**

**NOTES TO FINANCIAL STATEMENTS**
**(Amount and disclosures at and for the three and nine months ended January 31, 2010 and 2009 are unaudited)**

## NOTE 1. ORGANIZATION AND BUSINESS

Bluewave Group, Inc. formally know as (FKA) Cape Cod Aquaculture (A Development Stage Company) was incorporated on January 30, 2008 under the laws of the State of Nevada.   It has no operations since its incorporation. In accordance with Accounting Standards Codification ("ASC") 915, Development Stage Entities, the Company is considered to be in the development stage.

On February 17, 2010 the Board of Directors approved the name change from Cape Cod Aquaculture to Bluewave Group, Inc.

## NOTE 2. INTERIM FINANCIAL STATEMENTS

The unaudited financial statements as of April 30, 2009 and for the three and nine months ended January 31, 2010 and 2009 have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with instructions to Form 10 - Q. In the opinion of management, the unaudited financial statements have been prepared on the same basis as the annual financial statements and reflect all adjustments, which include only normal recurring adjustments, necessary to present fairly the financial position as of April 30, 2009 and the results of operations and cash flows for the three and nine months ended January 31, 2010 and 2009. The financial data and other information disclosed in these notes to the interim financial statements related to these periods are unaudited. The results for the nine month period ended January 31, 2010 is not necessarily indicative of the results to be expected for any subsequent quarter or the entire year ending April 30, 2010. The balance sheet at April 30, 2009 has been derived from the audited financial statements at that date.

Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to the Securities and Exchange Commission's rules and regulations. These unaudited financial statements should be read in conjunction with our audited financial statements and notes thereto for the year ended April 30, 2009 included in our Form 10 –K filed June 9, 2009.

## NOTE 3. RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In February 2010, the FASB (Financial Accounting Standards Board) issued Accounting Standards Update 2010-08 (ASU 2010-08), Technical Corrections to Various Topics. This amendment eliminated inconsistencies and outdated provisions and provided the needed clarifications to various topics within Topic 815. The amendments are effective for the first reporting period (including interim periods) beginning after issuance (February 2, 2010), except for certain amendments. The amendments to the guidance on accounting for income taxes in a reorganization (Subtopic 852-740) should be applied to reorganizations for which the date of the reorganization is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. For those reorganizations reflected in interim financial statements issued before the amendments in this Update are effective, retrospective application is required. The clarifications of the guidance on the embedded derivates and hedging (Subtopic 815-15) are effective for fiscal years beginning after December 15, 2009, and should be applied to existing contracts (hybrid instruments) containing embedded derivative features at the date of adoption. The Company does not expect the provisions of ASU 2010-08 to have a material effect on the financial position, results of operations or cash flows of the Company.

In January 2010, the FASB (Financial Accounting Standards Board) issued Accounting Standards Update 2010-07 (ASU 2010-07), Not-for-Profit Entities (Topic 958): Not-for-Profit Entities: Mergers and Acquisitions. This amendment to Topic 958 has occurred as a result of the issuance of FAS 164. The Company does not expect the provisions of ASU 2010-07 to have a material effect on the financial position, results of operations or cash flows of the Company.

In January 2010, the FASB (Financial Accounting Standards Board) issued Accounting Standards Update 2010-06 (ASU

2010-06), Fair Value Measurements and Disclosures (Topic 820): Improving Disclosures about Fair Value Measurements. This amendment to Topic 820 has improved disclosures about fair value measurements on the basis of input received from the users of financial statements. This is effective for interim and annual reporting periods beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances, and settlements in the roll forward of activity in Level 3 fair value measurements. Those disclosures are effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years. Early adoption is permitted. The Company does not expect the provisions of ASU 2010-06 to have a material effect on the financial position, results of operations or cash flows of the Company.

In January 2010, the FASB (Financial Accounting Standards Board) issued Accounting Standards Update 2010-05 (ASU 2010-05), Compensation – Stock Compensation (Topic 718). This standard codifies EITF Topic D-110 Escrowed Share Arrangements and the Presumption of Compensation.

7

In January 2010, the FASB (Financial Accounting Standards Board) issued Accounting Standards Update 2010-04 (ASU 2010-04), Accounting for Various Topics—Technical Corrections to SEC Paragraphs.

In January 2010, the FASB (Financial Accounting Standards Board) issued Accounting Standards Update 2010-03 (ASU 2010-03), Extractive Activities—Oil and Gas (Topic 932): Oil and Gas Reserve Estimation and Disclosures. This amendment to Topic 932 has improved the reserve estimation and disclosure requirements by (1) updating the reserve estimation requirements for changes in practice and technology that have occurred over the last several decades and (2) expanding the disclosure requirements for equity method investments. This is effective for annual reporting periods ending on or after December 31, 2009. However, an entity that becomes subject to the disclosures because of the change to the definition oil- and gas- producing activities may elect to provide those disclosures in annual periods beginning after December 31, 2009. Early adoption is not permitted. The Company does not expect the provisions of ASU 2010-03 to have a material effect on the financial position, results of operations or cash flows of the Company.

In January 2010, the FASB issued Accounting Standards Update 2010-02, Consolidation (Topic 810): Accounting and Reporting for Decreases in Ownership of a Subsidiary. This amendment to Topic 810 clarifies, but does not change, the scope of current US GAAP. It clarifies the decrease in ownership provisions of Subtopic 810-10 and removes the potential conflict between guidance in that Subtopic and asset derecognition and gain or loss recognition guidance that may exist in other US GAAP. An entity will be required to follow the amended guidance beginning in the period that it first adopts FAS 160 (now included in Subtopic 810-10). For those entities that have already adopted FAS 160, the amendments are effective at the beginning of the first interim or annual reporting period ending on or after December 15, 2009. The amendments should be applied retrospectively to the first period that an entity adopted FAS 160. The Company does not expect the provisions of ASU 2010-02 to have a material effect on the financial position, results of operations or cash flows of the Company.

In January 2010, the FASB issued Accounting Standards Update 2010-01, Equity (Topic 505): Accounting for Distributions to Shareholders with Components of Stock and Cash (A Consensus of the FASB Emerging Issues Task Force). This amendment to Topic 505 clarifies the stock portion of a distribution to shareholders that allows them to elect to receive cash or stock with a limit on the amount of cash that will be distributed is not a stock dividend for purposes of applying Topics 505 and 260. Effective for interim and annual periods ending on or after December 15, 2009, and would be applied on a retrospective basis. The Company does not expect the provisions of ASU 2010-01 to have a material effect on the financial position, results of operations or cash flows of the Company.

In December 2009, the FASB issued Accounting Standards Update 2009-17, Consolidations (Topic 810): Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities. This Accounting Standards Update amends the FASB Accounting Standards Codification for Statement 167. (See FAS 167 effective date below)

In December 2009, the FASB issued Accounting Standards Update 2009-16, Transfers and Servicing (Topic 860): Accounting for Transfers of Financial Assets. This Accounting Standards Update amends the FASB Accounting Standards Codification for Statement 166. (See FAS 166 effective date below)

In October 2009, the FASB issued Accounting Standards Update 2009-15, Accounting for Own-Share Lending Arrangements in Contemplation of Convertible Debt Issuance or Other Financing. This Accounting Standards Update amends the FASB Accounting Standard Codification for EITF 09-1. (See EITF 09-1 effective date below)

In October 2009, the FASB issued Accounting Standards Update 2009-14, Software (Topic 985): Certain Revenue Arrangements That Include Software Elements. This update changed the accounting model for revenue arrangements that include both tangible products and software elements. Effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010. Early adoption is permitted. The Company does not expect the provisions of ASU 2009-14 to have a material effect on the financial position, results of operations or cash flows of the Company.

In October 2009, the FASB issued Accounting Standards Update 2009-13, Revenue Recognition (Topic 605): Multiple-Deliverable Revenue Arrangements. This update addressed the accounting for multiple-deliverable arrangements to enable vendors to account for products or services (deliverables) separately rather than a combined unit and will be separated in more circumstances that under existing US GAAP. This amendment has eliminated that residual method of allocation. Effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010. Early adoption is permitted. The Company does not expect the provisions of ASU 2009-13 to have a material effect on the financial position, results of operations or cash flows of the Company.

In September 2009, the FASB issued Accounting Standards Update 2009-12, Fair Value Measurements and Disclosures

(Topic 820): Investments in Certain Entities That Calculate Net Asset Value per Share (or Its Equivalent). This update provides amendments to Topic 820 for the fair value measurement of investments in certain entities that calculate net asset value per share (or its equivalent). It is effective for interim and annual periods ending after December 15, 2009. Early application is permitted in financial statements for earlier interim and annual periods that have not been issued. The Company does not expect the provisions of ASU 2009-12 to have a material effect on the financial position, results of operations or cash flows of the Company.

In July 2009, the FASB ratified the consensus reached by EITF (Emerging Issues Task Force) issued EITF No. 09-1, (ASC Topic 470) "Accounting for Own-Share Lending Arrangements in Contemplation of Convertible Debt Issuance" ("EITF 09-1"). The provisions of EITF 09-1, clarifies the accounting treatment and disclosure of share-lending arrangements that are classified as equity in the financial statements of the share lender. An example of a share-lending arrangement is an agreement between the Company (share lender) and an investment bank (share borrower) which allows the investment bank to use the loaned shares to enter into equity derivative contracts with investors. EITF 09-1 is effective for fiscal years that beginning on or after December 15, 2009 and requires retrospective application for all arrangements outstanding as of the beginning of fiscal years beginning on or after December 15, 2009. Share-lending arrangements that have been terminated as a result of counterparty default prior to December 15, 2009, but for which the entity has not reached a final settlement as of December 15, 2009 are within the scope. Effective for share-lending arrangements entered into on or after the beginning of the first reporting period that begins on or after June 15, 2009. The Company does not expect the provisions of EITF 09-1 to have a material effect on the financial position, results of operations or cash flows of the Company.

8

In June 2009, the FASB issued SFAS No. 168 (ASC Topic 105), "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162" ("SFAS No. 168") . Under SFAS No. 168 the "FASB Accounting Standards Codification" ("Codification") will become the source of authoritative US GAAP to be applied by nongovernmental entities. Rules and interpretive releases of the Securities and Exchange Commission ("SEC") under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. SFAS No. 168 is effective for financial statements issued for interim and annual periods ending after September 15, 2009. On the effective date, the Codification will supersede all then-existing non-SEC accounting and reporting standards. All other non-grandfathered non-SEC accounting literature not included in the Codification will become non-authoritative. SFAS No. 168 is effective for the Company's interim quarterly period beginning July 1, 2009. The Company does not expect the adoption of SFAS No. 168 to have an impact on the financial statements.

In June 2009, the FASB issued SFAS No. 167 (ASC Topic 810), "Amendments to FASB Interpretation No. 46(R) ("SFAS 167"). SFAS 167 amends the consolidation guidance applicable to variable interest entities. The provisions of SFAS 167 significantly affect the overall consolidation analysis under FASB Interpretation No. 46(R). SFAS 167 is effective as of the beginning of the first fiscal year that begins after November 15, 2009. SFAS 167 will be effective for the Company beginning in 2010. The Company does not expect the provisions of SFAS 167 to have a material effect on the financial position, results of operations or cash flows of the Company.

In June 2009, the FASB issued SFAS No. 166, (ASC Topic 860) "Accounting for Transfers of Financial Assets—an amendment of FASB Statement No. 140" ("SFAS 166"). The provisions of SFAS 166, in part, amend the derecognition guidance in FASB Statement No. 140, eliminate the exemption from consolidation for qualifying special-purpose entities and require additional disclosures. SFAS 166 is effective for financial asset transfers occurring after the beginning of an entity's first fiscal year that begins after November 15, 2009. The Company does not expect the provisions of SFAS 166 to have a material effect on the financial position, results of operations or cash flows of the Company.

In April 2009, the FASB issued SFAS No. 164, (ASC Topic 810) "Not-for-Profit Entities: Mergers and Acquisitions – including an amendment of FASB Statement No. 142" ("SFAS 164"). The provisions of SFAS 164 provide guidance on accounting for a combination of not-for-profit entities either via merger or acquisition. SFAS 164 is effective for mergers occurring on or after the beginning of an initial reporting period beginning on or after December 15, 2009 and acquisitions occurring on or after the beginning of the first annual reporting period beginning on or after December 15, 2009. The Company does not expect the provisions of SFAS 164 to have a material effect on the financial position, results of operations or cash flows of the Company.

In June 2009, the Securities and Exchange Commission's Office of the Chief Accountant and Division of Corporation Finance announced the release of Staff Accounting Bulletin (SAB) No. 112. This staff accounting bulletin amends or rescinds portions of the interpretive guidance included in the Staff Accounting Bulletin Series in order to make the relevant interpretive guidance consistent with current authoritative accounting and auditing guidance and Securities and Exchange Commission rules and regulations. Specifically, the staff is updating the Series in order to bring existing guidance into conformity with recent pronouncements by the Financial Accounting Standards Board, namely, Statement of Financial Accounting Standards No. 141 (revised 2007) (ASC Topic 805), Business Combinations, and Statement of Financial Accounting Standards No. 160 (ASC Topic 810), Non-controlling Interests in Consolidated Financial Statements. The statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

In September 2008, the FASB issued exposure drafts that eliminate qualifying special purpose entities from the guidance of SFAS No. 140 (ASC Topic 860), "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," and FASB Interpretation 46 (ASC Topic 810) (revised December 2003), "Consolidation of Variable Interest Entities – an interpretation of ARB No. 51 (ASC Topic 810)," as well as other modifications. While the proposed revised pronouncements have not been finalized and the proposals are subject to further public comment, the Company anticipates the changes will not have a significant impact on the Company's financial statements. The changes would be effective March 1, 2010, on a prospective basis.

## NOTE 4. GOING CONCERN

The Company's financial statements are prepared using generally accepted accounting principles in the United States of America applicable to a going concern which contemplates the realization of assets and liquidation of liabilities in the normal course of business. The Company has not yet established an ongoing source of revenues sufficient to cover its operating costs and allow it to continue as a going concern. For the nine months ended January 31, 2010, the Company had incurred a net loss of $36,480. Accumulated deficit from January 30, 2008 (date of inception) through January 31, 2010 totaled $48,879. The ability of the Company to continue as a going concern is dependent on raising capital to fund its business plan and ultimately to attain profitable operations. Accordingly, these factors raise substantial doubt as to the Company's ability to continue as a going concern.

The accompanying financial statements do not include any adjustments that might be necessary if the Company is unable to continue as a going concern.

## NOTE 5. RELATED PARTY

The Company borrowed from an a affiliate a total of $7,800 pursuant to four notes payable. The notes accrue interest at a rate of 5% per annum and a payable upon demand. Accrued interest at January 31, 2010 amounted to $20.

On October 20, 2009, the Company paid $10,946 to Mr. James Bright, for his services rendered to the Company from October 4, 2009 through October 19, 2009 in connection with the change of control of the Company. Mr. Bright was a principal shareholder of the Company until October 19, 2009 when he sold all of his shares in the Company to Mr. Jackson.

## NOTE 6. STOCKHOLDERS' EQUITY

Common Stock

On January 30, 2008, the Company issued 76,500,000 of its $0.001 par value common stock for $8,500 cash to the founders of the Company. During the quarter ending January 30, 2009, the Company issued 13,500,000 of its $.001 par value common stock at the price of $0.01 per share for $15,000 cash to investors of the Company. During the quarter ending April 30, 2009, the Company issued 7,740,000 of its $.001 par value common stock at the price of $0.01 per share for $8,600 cash to investors of the Company.

On December 1, 2009, the Board of Directors authorized a nine to one (9:1) forward stock dividend to be paid on December 17, 2009 to all holders of record on December 3, 2009. The dividend was approved by FINRA on December 16, 2009. As a result, issued and outstanding shares increased from 10,860,000 shares to 97,740,000 shares. The financial statements have been retroactively adjusted to reflect this stock dividend.

On February 17, 2010 the Board of Director approved to increase the number of shares of authorized stock from 100,000,000 shares to 500,000,000 shares; and authorize the creation of 25,000,000 of the 500,000,000 authorized shares as "blank check" preferred stock to be designated in such series or classes as the Board of Directors of the Corporation shall determine.

Change of control

On October 19, 2009, Mr. James Bright, the principal shareholder of the Company, entered into a Stock Purchase Agreement which provided for the sale of 76,500,000 shares of common stock of the Company owned by him (the "Purchased Shares") to Derek Jackson (the "Purchaser"). The consideration paid for the Purchased Shares, which represent 78.27% of the issued and outstanding share capital of the Company on a fully-diluted basis, was $75,000. The source of the cash consideration for the Purchased Shares was Mr. Jackson's personal funds.

## NOTE 7. SUBSEQUENT EVENTS

On March 5, 2010 the Company borrowed $5,000 pursuant to a note payable from an affiliate. The note accrues interest at a rate of 5% per annum and a payable upon demand. The Company has evaluated subsequent events through the March 22, 2010 of this Form 10-Q, and has determined that there were no other subsequent events to recognize or disclose in these financial statements.

http://www.otcmarkets.com/edgar/GetFilingHtml?FilingID=7139700                    6/21/2010

## ITEM 2. MANAGEMENT DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION

*This discussion and analysis should be read in conjunction with the accompanying Financial Statements and related notes. Our discussion and analysis of our financial condition and results of operations are based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of any contingent liabilities at the financial statement date and reported amounts of revenue and expenses during the reporting period. On an on-going basis we review our estimates and assumptions. Our estimates are based on our historical experience and other assumptions that we believe to be reasonable under the circumstances. Actual results are likely to differ from those estimates under different assumptions or conditions, but we do not believe such differences will materially affect our financial position or results of operations. Our critical accounting policies, the policies we believe are most important to the presentation of our financial statements and require the most difficult, subjective and complex judgments, are discussed below in "Critical Accounting Policies," and have not changed significantly.*

### FORWARD-LOOKING STATEMENTS

Certain statements made in this report may constitute "forward-looking statements *on our current expectations and projections about future events* ". These forward-looking statements involve known or unknown risks, uncertainties and other factors that may cause our actual results, performance, or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. *In some cases you can identify forward-looking statements by terminology such as "may," "should," "potential," "continue," "expects," "anticipates," "intends," "plans," "believes," "estimates," and similar expressions.* These statements are based on our current beliefs, expectations, and assumptions and are subject to a number of risks and uncertainties. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. These forward-looking statements are made as of the date of this report, and we assume no obligation to update these forward-looking statements whether as a result of new information, future events, or otherwise, other than as required by law. In light of these assumptions, risks, and uncertainties, the forward-looking events discussed in this report might not occur and actual results and events may vary significantly from those discussed in the forward-looking statements.

### Overview

Bluewave Group, Inc. (A Development Stage Company) was incorporated on January 30, 2008 under the laws of the State of Nevada to cultivate and sell oysters. It has no operations and in accordance with ASC 915 is considered to be in the development stage.

On December 1, 2009, the Board of Directors authorized a nine to one (9:1) forward stock dividend to be paid on December 17, 2009 to all holders of record on December 3, 2009. The dividend was approved by FINRA on December 16, 2009. As a result, issued and outstanding shares increased from 10,860,000 shares to 97,740,000 shares. The financial statements have been retroactively adjusted to reflect this stock dividend.

On February 17, 2010 the Board of Director approved an increase in the number of shares of authorized stock from 100,000,000 shares to 500,000,000 shares; and authorized the creation of 25,000,000 of the 500,000,000 authorized shares as "blank check" preferred stock to be designated in such series or classes as the Board of Directors of the Corporation shall determine. On January 29, 2010, the shareholders representing 74.47% of our outstanding shares of common stock approved an amendment to our certificate of incorporation authorizing such action. On March 17, 2010 the amendment to the certificate of incorporation was effective.

### Results of Operations

The following discussion should be read in conjunction with the Company's Annual Report on Form 10-K for the year ended April 30, 2009

Results for interim periods may not be indicative of results for the full year.

### Results of Operations

Since its inception, the Company has not generated any revenue.

11

Total expenses and net loss for the three months ending January 31, 2010 were $10,229 and $10,248 as compared to $2,442 and $2,442 for the three months ending January 31, 2009. Total expenses and net loss for the nine months ending January 31, 2010 were $36,460 and $36,480 as compared to $2,992 and $2,992 for the nine months ending January 31, 2009. All of the expenses were general and administrative expenses which were comprised of management fees and professional service fees. Basic net loss per share amounting to $.000 for the three and nine months ending January 31, 2010 and January 31, 2010.

## Liquidity and Capital Resources

At January 31, 2010 we had working capital deficit of ($16,779) as compared to working capital of $19,701 at April 30, 2009. At January 31, 2009 we had cash and cash equivalents of $1,996 as compared to 19,701 at April 30, 2009.

Net cash used in operating activities for the nine months ending January 31, 2010 was $25,525 as compared to $2,442 for the nine months ending January 31, 2009. The cash used in operating activities was comprised of the net loss for each period and for the nine months ended January 31, 2010 an increase in accounts payable of $10,955.

### Current and Future Financing Needs

We have incurred an accumulated deficit of $48,879 through January 31, 2010. We have incurred negative cash flow from operations since we started our business. We have spent, and expect to continue to spend, money in connection with implementing our business strategy, and fees in connection with regulatory compliance and corporate governance. At the present time we have minimal cash to run our business and will need to raise money in the near future. The actual amount of funds we will need to operate is subject to many factors, some of which are beyond our control. We do not currently have any committed sources of revenue. Therefore, we will need to raise additional capital from a financing, whether through a stock offering or otherwise, in order to continue our operations. Furthermore, if our expenses exceed our anticipations, we will need funds in addition to those estimated to implement our business plan. If we do not have adequate working capital we will not be able to fully establish our business or continue operations.

Our continued operations in the long term will depend on whether we are able to raise additional funds through various potential sources, such as equity and debt financing. Such additional funds may not become available on acceptable terms and there can be no assurance that any additional funding that we do obtain will be sufficient to meet our needs in the long term. We will continue to fund operations from cash on hand and through the similar sources of capital previously described. We can give no assurances that any additional capital that we are able to obtain will be sufficient to meet our needs.

### Critical Accounting Policies

Our financial statements and related public financial information are based on the application of accounting principles generally accepted in the United States ("GAAP"). GAAP requires the use of estimates; assumptions, judgments and subjective interpretations of accounting principles that have an impact on the assets, liabilities, revenues and expense amounts reported. These estimates can also affect supplemental information contained in our external disclosures including information regarding contingencies, risk and financial condition. We believe our use of estimates and underlying accounting assumptions adhere to GAAP and are consistently and conservatively applied. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ materially from these estimates under different assumptions or conditions. We continue to monitor significant estimates made during the preparation of our financial statements.

Our significant accounting policies are summarized in the notes to our Annual Report on Form 10-K for the year ended April 30, 2009. While all these significant accounting policies impact our financial condition and results of operations, we view certain of these policies as critical. Policies determined to be critical are those policies that have the most significant impact on our financial statements and require management to use a greater degree of judgment and estimates. Actual results may differ from those estimates. Our management believes that given current facts and circumstances, it is unlikely that applying any other reasonable judgments or estimate methodologies would effect our consolidated results of operations, financial position or liquidity for the periods presented in this report.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

Not applicable to a smaller reporting company.

## ITEM 4T. CONTROLS AND PROCEDURES

As required by SEC rules, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures at the end of the period covered by this report. This evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer, who is our principal executive officer and our principal financial officer. Management has been advised by its auditors that any company with one individual serving in the role of Chief Executive Officer and Chief Financial Officer has, per se, inadequate controls and procedures due to the lack of segregation of duties. Prior to receiving this advice from its auditors, Management was aware of the lack of segregation issue but did not believe that its control and procedures were inherently ineffective. Management recognizes that its controls and procedures would be substantially improved if there was segregation of the duties of Chief Executive Officer and Chief Financial Officer and as such is actively seeking to remediate this issue. Management believes that the material weakness in its controls and procedures referenced by its auditors did not have an effect on our financial results. There were no changes in our internal control over financial reporting or in other factors that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

12

Disclosure controls and procedures are our controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating our controls and procedures, our management recognized that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of disclosure controls and procedures are met. Additionally, in designing disclosure controls and procedures, our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible disclosure controls and procedures. The design of any disclosure controls and procedures also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS.

None.

### ITEM 1A. RISK FACTORS.

Not applicable to a smaller reporting company.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.

None.

### ITEM 3. DEFAULTS UPON SENIOR SECURITIES.

None.

### ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On January 29, 2010, the shareholders representing 74.47% of our outstanding shares of common stock approved an amendment to our certificate of incorporation authorizing an increase in the number of shares of authorized stock from 100,000,000 shares to 500,000,000 shares; and authorized the creation of 25,000,000 of the 500,000,000 authorized shares as "blank check" preferred stock to be designated in such series or classes as the Board of Directors of the Corporation shall determine.

### ITEM 5. OTHER INFORMATION.

None.

### ITEM 6. EXHIBITS.

| Regulation S-B Number | Exhibit |
|---|---|
| 31.1 | Certification of the Chief Executive Officer and Chief Financial Officer, Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act |

13

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

DATE: March 22, 2010

**BLUEWAVE GROUP, INC.**
(Registrant)

By: */s/ Derek Jackson*
    Derek Jackson, President, Chief Executive Officer and Chief Financial Officer
(Principal Executive Officer and Principal Accounting Officer)

15

**Exhibit 31.1**

### CERTIFICATION OF CHIEF EXECUTIVE OFFICER
### AND CHIEF FINANCIAL OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO SECTION 302 OF
### THE SARBANES-OXLEY ACT OF 2002

I, Derek Jackson, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Bluewave Group, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods present in this report;

4.  I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13-a-15(f) and 15d-15(f)) for the small business issuer and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

    c)  Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the small business issuer's internal control over financing reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5.  I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involved management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Dated:  March 22, 2010

_/s/ Derek Jackson_
_____
Derek Jackson
President, Chief Executive Officer and Chief Financial Officer
(Principal Executive Officer and Principal Accounting

Officer)

Exhibit 32.1

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Bluewave Group, Inc. (the "Registrant") on Form 10-Q for the period ending January 31 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Derek Jackson, certify, pursuant to 18 U.S.C. §. 1350, as adopted pursuant to Section. 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ Derek Jackson
Derek Jackson
President, Chief Executive Officer and Chief Financial Officer
(Principal Executive Officer and Principal Accounting Officer)

Dated: March 22, 2010





Home  |  Quotes & News  |  Market Activity  |  OTC Company Search  |  OTC Guide  |  Produc

Home >>    Quotes & News >>    Quote >>    AVOE

**AVOE — Avro Energy, Inc.**

Common Stock
Par Value: 0.001

**Quote    News    Charts    Company Info    Financials    Research    Short Sales    Insiders**

**Contact Information**          **Business Description**

Avro Energy, Inc.
Bankers Hall, 10th Floor
888 - 3rd Street SW
Calgary, ALB T2P 5C5
Canada
Phone: 403-444-6413

**OTC Market Tier**
OTCQB

**Primary SIC — Industry Classification**
1000 - Metal Mining

**State Of Incorporation**
NV

**Jurisdiction Of Incorporation**
United States

**Company Officers**
Donny Fitzgerald, Dir.
Mike Kurtanjek, President, CEO, CFO, Dir.

**Reporting Standard**
U.S. Registered & Reporting: SEC Filer

**CIK**
0001390778

**Fiscal Year End**
12/31

**Estimated Market Cap**
$3,181,320 as of Jun 18, 2010

**Outstanding Shares**
25,450,560 as of Nov 14, 2008

The information provided here has been obtained from publicly available sources as well as directly from issuers in sor
Click here to update your company profile.

All information contained herein is provided "as is." Pink OTC Markets Inc. makes no representation or warranty, as to the accuracy, timeliness, or completeness of the information provided herein. Neither Pink OTC Markets Inc officers, employees, or third party data suppliers, shall bear any responsibility or liability to verify the information for the use, misuse, or inability to use the information provided. None of the foregoing parties shall be liable to a or losses of any nature. Accordingly, investors should not use this information as the basis for making an investm see Risk Warning and Terms of Service for more information.

Home | Quotes & News | Market Activity | OTC Company Search | Products & Services | OTC Guide | About Pin Map | Contact Regulators

© 2009 Pink OTC Markets Inc.
Terms of Service | Linking Terms | Trademarks | Privacy Statement | Risk Warning | Investor Relations

# UNITED STATES
# SECURITIES AND EXCHANGE
# COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

[X] Quarterly Report under Section 13 or 15(d) of the Securities Exchange
Act of 1934

For the quarterly period ended March 31, 2010

[ ] Transition report under Section 13 or 15(d) of the Exchange Act

For the transition period from _____ to _____

*Commission File Number: 333-1416686*

**AVRO ENERGY INC.**
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| Nevada | 20-8387017 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S.Employer Identification No.) |
| 213 E Arkansas Ave Vivian, LA 71082, USA | Telephone: 318-734-4737 |
| (Address of principal executive offices) | (Registrant's telephone number, including area code) |

**Former Name, Address and Fiscal Year, If Changed Since Last Report**

Check whether the issuer: (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

We had a total of 25,450,560 shares of common stock issued and outstanding at May 14, 2010.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

Transitional Small Business Disclosure Format: Yes [ ] No [X]

## PART I - FINANCIAL INFORMATION

### ITEM 1. FINANCIAL STATEMENTS

The interim financial statements included herein are unaudited but reflect, in management's opinion, all adjustments, consisting only of normal recurring adjustments that are necessary for a fair presentation of our financial position and the results of our operations for the interim periods presented. Because of the nature of our business, the results of operations for the quarterly period ended March 31, 2010 are not necessarily indicative of the results that may be expected for the full fiscal year.

2

**AVRO ENERGY INC.**
(An Exploration Stage Company)

**INTERIM BALANCE SHEETS**
(Stated in US Dollars)

|  | March 31, 2010 | December 31, 2009 |
|---|---|---|
|  | (unaudited) |  |
| **ASSETS** |  |  |
|  |  |  |
| **CURRENT** |  |  |
| Cash | $ 12,900 | $ 14,046 |
| Accounts Recievable | 21,037 | 24,944 |
|  |  |  |
| Total Assets | $ 33,937 | $ 38,990 |
| **LIABILITIES** |  |  |
|  |  |  |
| **CURRENT LIABILITIES** |  |  |
| Accounts payable and accrued liabilities | $ 54,105 | $ 54,534 |
|  |  |  |
| Total Current Liabilities | 54,105 | 54,534 |
|  |  |  |
| **LONG TERM LIABILITIES** |  |  |
| Related Party Loan | 4,157 | 4,157 |
| Loan Payable | 365,999 | 269,213 |
| Property Payable | 200,000 | 335,000 |
|  |  |  |
| Total Long Term Liabilities | 570,156 | 608,370 |
|  |  |  |
| Total Liabilities | 624,261 | 662,904 |
|  |  |  |
| **STOCKHOLDERS' DEFICIT** |  |  |
| Common stock, $0.001 par value (100,000,000 shares authorized 25,450,560 shares issued) | 25,451 | 25,451 |
| Additional paid-in capital | 183,382 | 177,669 |
| Accumulated comprehensive income | 2,803 | 2,803 |
| Deficit accumulated during the exploration stage | (801,960) | (829,837) |
|  |  |  |
| Total Stockholders Deficit | (590,324) | (623,914) |
|  |  |  |
| Total Liabilities and Stockholders Equity | $ 33,937 | $ 38,990 |

The Accompanying notes are integral part of these financial statements.

3

**AVRO ENERGY INC.**
(An Exploration Stage Company)

**INTERIM STATEMENTS OF OPERATIONS**
(Stated in US Dollars)

(Unaudited)

| | Three Months Ended March 31, 2010 | Three Months Ended March 31, 2009 | January 31, 2 (Date of Incepti March 31, 2010 |
|---|---|---|---|
| **REVENUES** | | | |
| Oil Revenues | $    37,514 | $      -- | $    74,1 |
| Sale of Property | 60,000 | -- | 60,0 |
| Total Revenues | 97,514 | -- | 134,1 |
| **EXPENSES** | | | |
| Recognition of an Impairment Loss | 62,023 | -- | 678,4 |
| Accounting and Professional Fees | 1,800 | -- | 217,7 |
| Interest Expense | 5,714 | -- | 10,0 |
| Office and Administration | 100 | 19 | 29,9 |
| Total Expenses | 69,637 | 19 | 936,1 |
| Net income (Loss) from Operations | 27,877 | (19) | (801,9 |
| Other Comprehensive Income (loss) | -- | -- | 2,8 |
| Net Income (loss) | $    27,877 | $      (19) | $   (799,1 |
| Basic and diluted loss per share | 0.00 | (0.00) | |
| Weighted average number of shares outstanding | 25,450,560 | 25,450,560 | |

The Accompanying notes are integral part of these financial statements.

4

**AVRO ENERGY INC.**
(An Exploration Stage Company)

**INTERIM STATEMENTS OF CASH FLOWS**
(Stated in US Dollars)

(Unaudited)

| | Three Months Ended March 31, | | January 3 (Date of Inc March 2010 |
|---|---|---|---|
| | 2010 | 2009 | |
| OPERATING ACTIVITIES | | | |
| Net income (loss) for the period | $  27,877 | $    (19) | $(801, |
| Adjustment to reconcile net income(loss)to net cash provided by (used in)operating activities | | | |
| Foreign currency income (loss) | -- | -- | 2, |
| Imputed Interest | 5,714 | -- | 9, |
| Changes in: | | | |
| Accrued Property Expenses | -- | -- | 605, |
| Accounts Receivable | 3,907 | -- | (21, |
| Prepaid expenses and deposits | -- | -- | ( |
| Accounts payable and accrued liabilities | (429) | -- | 28, |
| Cash provided by(used in) operating activities | 37,069 | (19) | (176, |
| INVESTING ACTIVITIES | | | |
| Payable to Property | (135,000) | -- | 200, |
| Purchase of mineral claim | -- | -- | (575, |
| Net Cash used in Investing Activites | (135,000) | -- | (375, |
| FINANCING ACTIVITIES | | | |
| Capital stock issued | -- | -- | 25, |
| Related Party Loan | -- | -- | 4, |
| Loan Payable | 96,785 | -- | 365, |
| Subscription Received | -- | -- | 169, |
| Net Cash provided by financing activities | 96,785 | -- | 564, |
| Increase (decrease) in cash during the period | (1,146) | (19) | 12, |
| Cash, beginning of the period | 14,046 | 1,326 | |
| Cash, end of the period | $  12,900 | $   1,307 | $   12, |
| CASH PAID FOR: | | | |
| Interest | $    -- | $    -- | $ |
| Income Tax | $    -- | $    -- | $ |

The Accompanying notes are integral part of these financial statements.

5

**AVRO ENERGY INC.**
(An Exploration Stage Company)

**NOTES TO THE INTERIM FINANCIAL STATEMENTS**
March 31, 2010
(Stated in US Dollars)

(Unaudited)

## NOTE 1. DESCRIPTION OF BUSINESS

DESCRIPTION OF BUSINESS AND HISTORY - Avro Energy, Inc. (hereinafter referred to as the "Company") was incorporated on January 31, 2007 in the State of Nevada.

Avro Energy Inc. is an independent energy company engaged in the acquisition, exploration and development of oil and natural gas properties in North America, with current operations in the ArkLaTex region. Avro's objective is to seek out and develop opportunities in the oil and natural gas sectors that represent low risk opportunities for the Company and its shareholders. In addition, Avro aims to seek larger projects that can be developed and produced with Joint Venture partners.

GOING CONCERN The accompanying financial statements have been prepared assuming that the Company will continue as a going concern, which contemplates the realization of assets and the liquidation of liabilities in the normal course of business. However, the Company has accumulated a loss and is new. This raises substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from this uncertainty.

As shown in the accompanying financial statements, the Company has incurred a loss of $801,960 for the period from January 31, 2007 (inception) to March 31, 2010 and has only generated $134,196 in revenues. The future of the Company is dependent upon its ability to obtain financing and upon future profitable operations from the development of acquisitions. Management has plans to seek additional capital through a private placement and public offering of its common stock. The financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts of and classification of liabilities that might be necessary in the event the Company cannot continue in existence.

The accompanying financial statements have been prepared by the Company without audit. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows at March 31, 2010, and for all periods presented herein, have been made.

Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted

6

in the United States of America have been condensed or omitted. It is suggested that these condensed financial statements be read in conjunction with the financial statements and notes thereto included in the Company's December 31, 2009 and 2008 audited financial statements. The results of operations for the period ended March 31, 2010 is not necessarily indicative of the operating results for the full year.

YEAR END - The Company's fiscal year end is December 31.

USE OF ESTIMATES - The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

RESOURCE PROPERTIES - Company follows the successful efforts method of accounting for its oil and gas properties. Unproved oil and gas properties are periodically assessed and any impairment in value is charged to exploration expense. The costs of unproved properties, which are determined to be productive are transferred to proved resource properties and amortized on an equivalent unit-of-production basis. Exploratory expenses, including geological and geophysical expenses and delay rentals for unevaluated resource properties, are charged to expense as incurred. Exploratory drilling costs are initially capitalized as unproved property but charged to expense if and when the well is determined not to have found proved oil and gas reserves.

RECENTLY ADOPTED ACCOUNTING PRONOUNCEMENTS - Effective June 30, 2009, the Company adopted a new accounting standard issued by the FASB related to the disclosure requirements of the fair value of the financial instruments. This standard expands the disclosure requirements of fair value (including the methods and significant assumptions used to estimate fair value) of certain financial instruments to interim period financial statements that were previously only required to be disclosed in financial statements for annual periods. In accordance with this standard, the disclosure requirements have been applied on a prospective basis and did not have a material impact on the Company's financial statements.

On March 31, 2010, the Company adopted changes issued by the Financial Accounting Standards Board (FASB) to the authoritative hierarchy of GAAP. These changes establish the FASB Accounting Standards Codification (Codification) as the source of authoritative accounting principles recognized by the FASB to be applied by nongovernmental entities in the preparation of financial statements in conformity with GAAP. Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. The FASB will no longer issue new standards in the form of Statements, FASB Staff Positions, or Emerging Issues Task Force Abstracts; instead the FASB will issue Accounting Standards Updates. Accounting Standards Updates will not be authoritative in their own right as they will only serve to update the Codification. These changes and the

7

Codification itself do not change GAAP. Other than the manner in which new accounting guidance is referenced, the adoption of these changes had no impact on the Financial Statements.

RECENTLY ISSUED ACCOUNTING STANDARDS - In August 2009, the FASB issued an amendment to the accounting standards related to the measurement of liabilities that are recognized or disclosed at fair value on a recurring basis. This standard clarifies how a company should measure the fair value of liabilities and that restrictions preventing the transfer of a liability should not be considered as a factor in the measurement of liabilities within the scope of this standard. This standard is effective for the Company on October 1, 2009. The Company does not expect the impact of its adoption to be material to its financial statements.

In October 2009, the FASB issued an amendment to the accounting standards related to the accounting for revenue in arrangements with multiple deliverables including how the arrangement consideration is allocated among delivered and undelivered items of the arrangement. Among the amendments, this standard eliminated the use of the residual method for allocating arrangement considerations and requires an entity to allocate the overall consideration to each deliverable based on an estimated selling price of each individual deliverable in the arrangement in the absence of having vendor-specific objective evidence or other third party evidence of fair value of the undelivered items. This standard also provides further guidance on how to determine a separate unit of accounting in a multiple-deliverable revenue arrangement and expands the disclosure requirements about the judgments made in applying the estimated selling price method and how those judgments affect the timing or amount of revenue recognition. This standard, for which the Company is currently assessing the impact, will become effective for the Company on January 1, 2011.

In October 2009, the FASB issued an amendment to the accounting standards related to certain revenue arrangements that include software elements. This standard clarifies the existing accounting guidance such that tangible products that contain both software and non-software components that function together to deliver the product's essential functionality, shall be excluded from the scope of the software revenue recognition accounting standards. Accordingly, sales of these products may fall within the scope of other revenue recognition standards or may now be within the scope of this standard and may require an allocation of the arrangement consideration for each element of the arrangement. This standard, for which the Company is currently assessing the impact, will become effective for the Company on January 1, 2011.

## NOTE 3. OIL AND GAS PROPERTIES

### HOSS HOLMES LEASE

On August 26, 2009, Avro entered into an agreement to acquire for $100,000 the Hoss Holmes Lease located near Hosston, Louisiana, from Fredco LLC, a Louisiana private oil and gas operator. The company closed the acquisition of the property on September 30, 2009. This purchase was charged as an exploration expense.

On February 23, 2010 the company deemed this as a non core asset and divested it for $60,000.

8

## HERRINGS LEASE

On August 10, 2009, Avro Energy, Inc. entered into an agreement to acquire various oil leases near Hosston, Louisiana, from S.A.M., a Louisiana private partnership, and private oil and gas operator. Under the terms of the agreement, the Company has agreed to pay a total of ten dollars ($10) plus a one-fifth royalty interest in exchange for the exclusive grant, lease, and let of the following oil and gas leases:

One, Two, Three and Four (1-4) inclusive, Block One (1) Town of Hosston, together with all abandoned alleyways and streets insofar as it covers and affects the surface of the earth and the base of the Nacatosh Formation together with wells being Herring No. 1, Serial No 184124, and Herring No. 2, Serial No. 184735.

The agreement requires the Company to commence production within 90 days of the date of the agreement. The lease shall be maintained only by continuous production (no break in production longer than 59 days), reworking operations, and or maintaining the lease in paying quantities as defined under the Louisiana Mineral Code. If there is no production, re-working operations, or maintenance of the lease for a period of sixty days or more, the lease shall cancel and all rights revert back to the Lessor. The company has kept these terms of the agreement and the property has not been reverted back to the Lessor.

## MUSLOW LEASE

On September 9, 2009, Avro Energy, Inc. entered into an agreement to acquire four oil and gas leases in Caddo Parish, Louisiana, from a private oil and gas operator. The first three leases are the Muslow A, B, and C Leases, which in total comprise of 8 wells and equipment, of which 2 are currently producing. The fourth lease is the Caddo Levee Board Lease, comprising of 13 wells and equipment, of which 4 are currently producing.

## ARKANSAS LEASE

On October 24, 2009 Avro Energy, Inc. signed a letter agreement to acquire eleven producible deep oil wells north of Hosston, Louisiana, and in Southern Arkansas. Seven of these wells are in production. The deepest of these wells produce from the Smackover formation at 7800 feet. Four other wells are capable of production after work over operation has been completed. Also included with the agreement are three disposal wells.

The terms of this agreement, the Company is required to pay $385,000, which must be paid over a seven month period, with the first payment of $50,000 paid on November 24, 2009. The terms of the agreement allow Avro to receive production starting from November 1, 2009.

During the first quarter ending March 31, 2010 the company has paid an additional $135,000 towards this property resulting in an ending balance of $200,000.

9

Case 9:10-cv-80748-JIC Document 45 Entered on FLSD Docket 07/02/2010 Page 45 of 80

**NOTE 4. LOANS PAYABLE**

The loans are payable to a shareholder who owns 370,155 (aproximately 1.037% of issued and outstanding) shares. The loans are unsecured, are payable in five years from August 13 and September 3, 2009 and bear interest at 3% per annum. Imputed interest in the amount of $5,710 is included in additional paid-in capital due to the below market interest rate.

10

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

### FORWARD-LOOKING STATEMENTS

The information set forth in this section contains certain "forward-looking statements," including, among other things, (i) expected changes in our revenues and profitability, (ii) prospective business opportunities, and (iii) our strategy for financing our business. Forward-looking statements are statements other than historical information or statements of current condition. Some forward-looking statements may be identified by use of terms such as "believes," "anticipates," "intends," or "expects." These forward-looking statements relate to our plans, objectives and expectations for future operations. Although we believe that our expectations with respect to the forward-looking statements are based upon reasonable assumptions within the bounds of our knowledge of our business and operations, in light of the risks and uncertainties inherent in all future projections, the inclusion of forward-looking statements in this report should not be regarded as a representation by us or any other person that our objectives or plans will be achieved.

### PLAN OF OPERATION

Avro Energy Inc. is an independent energy company engaged in the acquisition, exploration and development of oil and natural gas properties in North America, with current operations in the ArkLaTex region. Avro's objective is to seek out and develop opportunities in the oil and natural gas sectors that represent low risk opportunities for the Company and its shareholders. In addition, Avro aims to seek larger projects that can be developed and produced with Joint Venture partners.

The ArkLaTex is a U.S. socio-economic region where Arkansas, Louisiana, Texas, and Oklahoma intersect. The region is centered on the Shreveport/Bossier metropolitan area in Northwest Louisiana. The region's history is heavily linked with the oil industry. The geology associated with the deposition of sediments from the Mississippi River, in particular, makes this area an abundant source for the oil and gas industries, which leads to the high levels of oil production within the region.

### RESULTS OF OPERATIONS

Avro Energy Inc. has acquired oil and natural gas properties in the ArkLaTex region. Specifically the company has acquired the Hoss Holmes Lease and the Herrings Lease and has begun work on these properties.

Since the date of our inception, January 31, 2007, we have generated $74,197 in oil revenues and $60,000 in the sale of a non-core property. Over the three months ending March 31, 2010 we have generated $27,877 in oil and gas revenue and $60,000 in the sale of a non core asset. Over the same period of time we incurred $69,637 in expenses giving the company an net income of $31,452. The bulk of our operating expenses were incurred in connection with the improvement, expenses, amd maintenance of our oil producing properties.

### DAILY OIL PRODUCTION

On April 16, 2010 the company made a news release in regard to its oil production. The release contained forward looking statements in regard to daily production. The daily measurements of the tanks on its oil leases indicated that

11

Case 9:10-cv-80748-JIC   Document 4-6   Entered on FLSD Docket 07/02/2010   Page 47 of 80

in that 24 hour period the company's daily production was approximately 40 barrels per day.

## SELECTED FINANCIAL INFORMATION

|                     | March 31, 2010 | December 31, 2009 |
|---------------------|----------------|-------------------|
| Current Assets      | $ 33,937       | $ 38,990          |
| Total Assets        | $ 33,937       | $ 38,990          |
| Current Liabilities | $ 54,105       | $ 54,534          |
| Loans Payable       | $365,999       | $269,213          |

## LIQUIDITY AND CAPITAL RESOURCES

At March 31, 2010, we had cash in the bank of approximately $12,900. We are contemplating raising additional capital to finance our exploration programs. No final decisions regarding the program or financing have been made at this time. We did not issue any shares during the three months ended March 31, 2010.

## OFF-BALANCE SHEET ARRANGEMENTS

We have no off-balance sheet arrangements.

## CRITICAL ACCOUNTING POLICIES

We have not changed our accounting policies since December 31, 2007.

## ITEM 4. CONTROLS AND PROCEDURES

## EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934 , as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our president (also our principal executive officer) and our secretary, treasurer and chief financial officer (also our principal financial and accounting officer) to allow for timely decisions regarding required disclosure.

As of March 31, 2010, we carried out an evaluation, under the supervision and with the participation of our president (also our principal executive officer), and our chief financial officer (also our principal financial and accounting officer) of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Financial Officer concluded that our disclosure controls and procedures were not effective in providing reasonable assurance in the reliability of our corporate reporting as of the end of the period covered by this Quarterly Report due to

12

certain deficiencies that existed in the design or operation of our internal controls over financial reporting as disclosed below and that may be considered to be material weaknesses.

## CHANGES IN INTERNAL CONTROLS.

There was no change in our internal controls or in other factors that could affect these controls during our last fiscal quarter that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We are not a party to any material legal proceedings and to our knowledge, no such proceedings are threatened or contemplated.

### ITEM 2. CHANGES IN SECURITIES AND USE OF PROCEEDS

Not applicable.

### ITEM 3. DEFAULTS UPON SENIOR SECURITIES

None.

### ITEM 4. REMOVED AND RESERVED

### ITEM 5. OTHER INFORMATION

None.

### ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

```
    Exhibit Number                  Description of Exhibit
    --------------                  ----------------------

        3.1           Articles of Incorporation (1)

        3.2           Bylaws (1)

        31.1          Certification by Chief Executive Officer and Chief Financial
                      Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the
                      Exchange Act, promulgated pursuant to Section 302 of the
                      Sarbanes-Oxley Act of 2002, filed herewith

        32.1          Certification by Chief Executive Officer and Chief Financial
                      Officer, required by Rule 13a-14(b) or Rule 15d-14(b) of the
                      Exchange Act and Section 1350 of Chapter 63 of Title 18 of the
                      United States Code, promulgated pursuant to Section 906 of the
                      Sarbanes-Oxley Act of 2002 filed herewith

    ----------
```

(1) Filed with the SEC as an exhibit to our Form SB-1 Registration Statement originally filed on March 30, 2007.

13

## SIGNATURES

In accordance with the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

```
Date: May 17, 2010

        Signature                    Title                      Date
        ---------                    -----                      ----


By: /s/ Mike P. Kurtanjek     Chief Executive Officer,      May 17, 2010
    -------------------------  Chief Financial Officer,
    Mike P. Kurtanjek          President, Secretary, Treasurer
                               and Director (Principal Executive
                               Officer and Principal Accounting
                               Officer)
```

14

**EXHIBIT 31.1**

## CERTIFICATION

I, Mike P. Kurtanjek, Chief Executive Officer and acting Chief Financial Officer certify that:

1. I have reviewed this report on Form 10-Q of Avro Energy Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and
c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on our evaluation; and
d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an quarterly report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

```
Date: May 17, 2010          By: /s/ Mike, P. Kurtanjek
                            ------------------------------------------------
                            Mike P. Kurtanjek
                            Chief Executive Officer, President,
                            acting Chief Financial Officer,
                            acting Principal Accounting Officer and Director
```

**EXHIBIT 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND
ACTING CHIEF FINANCIAL OFFICER OF
AVRO ENERGY INC.
FORM 10-Q FOR THE THREE MONTH PERIOD ENDED MARCH 31, 2009
PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mike P. Kurtanjek, am the Chief Executive Officer and acting Chief Financial Officer of Avro Energy Inc., a Nevada corporation (the "Company"). I am delivering this certificate in connection with the Quarterly Report on Form 10-Q of the Company for the three month period ended March 31, 2010 and filed with the Securities and Exchange Commission ("Quarterly Report").

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, I hereby certify that, to the best of my knowledge, the Quarterly Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Quarterly Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
        Date: May 17, 2010      By: /s/ Mike P. Kurtanjek
                                -----------------------------------------------
                                Mike P. Kurtanjek
                                Chief Executive Officer, President,
                                acting Chief Financial Officer,
                                acting Principal Accounting Officer and Director
```





Home | Quotes & News | Market Activity | OTC Company Search | OTC Guide | Produc

Home >>   Quotes & News >>   Quote >>   AWSL

---

**AWSL — Atlantic Wind & Solar, Inc.**

Common Stock
Par Value: 0.00001

 

**Quote     News     Charts     Company Info     Financials     Research     Short Sales     Insiders**

---

| Contact Information | Business Description |
|---|---|
| Atlantic Wind & Solar, Inc.<br>350 Bay St.<br>Suite 1201<br>Toronto, ONT M5H 2S6<br>Canada<br><br>http://www.atlanticwindandsolar.com<br><br>Phone: 800-891-1657<br>Fax: 888-316-0424<br>E-mail:<br>info@atlanticwindandsolar.com | The primary goal of Atlantic Wind & Solar is to expand and strengthen it forefront of technology-led developments in the global Renewable Energ order to capture a prominent market share in this true growth market of<br><br>Through vertical integration and the application of cutting edge technolo to compete strongly in several key sectors of the Renewable Energy mar focus on manufacturing technologically advanced, next generation, cost Turbines and Solar Panels that will outperform conventional offerings in<br><br>By becoming an Original Equipment Manufacturer (OEM), Atlantic Wind i itself as a pr ...<br><br>More >> |

---

**OTC Market Tier**
Pink Sheets Limited

**Primary SIC — Industry Classification**
3511 - Turbines and turbine generator sets

**State Of Incorporation**
WV

**Jurisdiction Of Incorporation**
United States

**Year Of Incorporation**
1977

**Company Officers**
Gilles A. Trahan, Chairman
Martin W. Baldwin, Dir., CFO, Treasurer
Venecia Gafter, Dir., CEO
Charles Mazzacato, VP, Sales & Bus. Dev.
Thomas W. Cleland, CTO

**Number of Employees**
6 as of Jul 10, 2009

**Reporting Standard**

**Current Capital Change**
shs decreased by 1 for 70 split
Pay Date: Oct 23, 2008

**Dividends**
Div: 25% stk; +Refer to Daily List of 6/15/2010.
announcement revised. Shareholders of record wi
restricted non-transferable common share for eve
held. Will not be quoted Ex
Record Date: Jul 6, 2010
Pay Date: Sept 9, 2010

**Company Notes**
Formerly=Environmental Technologies Internation
2008
Formerly=Aquatek Ltd. until 2-02
Formerly=Dragon Environmental UK Ltd. until 10-

**Security Notes**
Capital Change=shs increased by 10 for 1 split. E
Rec date=02/23/2002. Pay date=02/25/2002.
Capital Change=shs increased by 5 for 4 split Ex-
Rec date=01/16/2006. Pay date=01/16/2006.

Alternative Reporting Standard

**Fiscal Year End**
12/31

**Estimated Market Cap**
$79,987,330 as of Jun 18, 2010

**Outstanding Shares**
39,993,665 as of Mar 31, 2010

**Authorized Shares**
500,000,000 as of Dec 31, 2009

**Float(shares)**
7,624,079 as of Dec 31, 2009

**Number of Shareholders of Record**
619 as of Dec 31, 2009

**Number of Beneficial Shareholders**
2,030 as of Dec 31, 2009

**Transfer Agent**
Pacific Stock Transfer Co.
4045 South Spencer Street
Suite 403
Las Vegas, NV 89119

**Legal Counsel**
Jamie E. Frank, Attorney-at-Law
8 Haven Lane
Levittown, NY 11756

The information provided here has been obtained from publicly available sources as well as directly from issuers in so
Click here to update your company profile.

All information contained herein is provided "as is." Pink OTC Markets Inc. makes no representation or warranty,
as to the accuracy, timeliness, or completeness of the information provided herein. Neither Pink OTC Markets Inc
officers, employees, or third party data suppliers, shall bear any responsibility or liability to verify the information
for the use, misuse, or inability to use the information provided. None of the foregoing parties shall be liable to a
or losses of any nature. Accordingly, investors should not use this information as the basis for making an invest
see Risk Warning and Terms of Service for more information.

Home | Quotes & News | Market Activity | OTC Company Search | Products & Services | OTC Guide | About Pin
Map | Contact Regulators

© 2009 Pink OTC Markets Inc.
Terms of Service | Linking Terms | Trademarks | Privacy Statement | Risk Warning | Investor Relations

# Annual Report

**OTC: AWSL**
**Period Ending Dec 31, 2009**







**ATLANTIC**
WIND & SOLAR INC

# Annual Report

**Period Ending Dec 31, 2009**

ANNUAL REPORT • Atlantic Wind & Solar Inc.



## Chairman's Address to Shareholders

### ... Working Toward a Future of Clean, Economical and Secure Energy Resources

*The fiscal year ended December 31, 2009 saw Atlantic Wind and Solar Inc. record numerous important achievements as management sought to establish the Company as a strong competitor in the emerging Renewable Energy boom. With an immediate focus on the Province of Ontario, Canada, AWSL is now marketing its superior solar energy systems across Canada's most populous province with considerable success and we believe that the strong renewable energy market brought about by Ontario's newly introduced Feed-in-Tariff ("FIT") will fuel extraordinary growth in sales of AWSL's solar systems in 2010 and beyond.*

**2009 HIGHLIGHTS**
In early 2009, AWSL acquired a 47.5% interest in Canadian affiliate Hybridyne Power Systems Canada Inc. (HPSC), thus achieving its goal of securing a leading technical position at the forefront of the dynamic Renewable Energy industry by allowing the Company to fully exploit HPSC's license of Aim Energy's revolutionary Conversion/Inversion Technology. Aim's proprietary technology represents a quantum leap forward in efficiency when converting wind & solar power into electricity. Having forged a strong relationship with a large and dependable supplier of solar panels, the HPSC acquisition paved the way for the Company to begin marketing a solar renewable energy system that offered industry-leading efficiencies in producing electricity from solar power.

**A Focused Approach**
When the Ontario Government passed its revolutionary Green Energy Act and in September introduced North America's most lucrative FIT in order to promote Renewable Energy across the Province, it gained international recognition for its pro-renewable stance and left little doubt that Ontario was about to undergo a surge in Renewable Energy development. Atlantic Wind and Solar seized upon this opportunity immediately, moving its Head Office to the heart of Toronto's financial community and launching an aggressive marketing program to focus on the enormous potential for the installation of rooftop solar energy systems throughout the Province. Integral to its efforts to lease rooftop space for solar development across Ontario, the Company has cultivated affiliations and strategic relationships with key members of the Real Estate development and Property Management industries which have greatly assisted AWSL in making inroads into the Ontario rooftop solar industry and capturing impressive market share.



**A Strong Market Response**

Since the introduction of Ontario's FIT, Letters of Intent (LOIs), purchase orders and advanced negotiations covering some 30 AWSL rooftop solar projects encompassing approximately 12MW of electricity-generating capacity have been received by Atlantic Wind and Solar and/or Atlantic Solar Inc. Additional projects are being discussed daily.

Power generated by these projects will be sold directly into the grid through Power Purchase Agreements (PPA) contracted to the Ontario Power Authority (OPA) for 20 years, at an average price of 71.3 cents per kilowatt hour. The OPA guarantees a quick connection to the grid.

**Subsequent Events**

To fund its rapid growth, AWSL signed a $120,000,000 financing agreement with Canada Green ESCO that would fund 20 Megawatts in solar projects and also provide funding for additional prospective acquisitions, technology advancements, and other corporate purposes. The 20 Megawatts is anticipated to represent approximately $480 million in revenues for AWSL and its equity partners, which will be secured and guaranteed over the next 20 years for power sold directly to the Ontario Government.

In addition to its rapidly growing Solar Energy business, AWSL has been involved in planning and negotiations regarding its intention to launch a Wind Energy business in 2010 that will also incorporate the AIM Energy CIT technology made available to Atlantic through a limited license to Hybridyne Power Systems Canada in order to capture efficiencies not readily available in conventional Wind Power systems. Ultimately, AWSL anticipates expanding its market for high-efficiency Solar and Wind energy systems across North America and overseas.

*In light of the Company's successes and overall corporate progress achieved in 2009, management expresses its deep appreciation to its employees, suppliers, affiliates, consultants and all stakeholders as it looks forward to accelerating its corporate progress and blazing new trails in the dynamic Wind and Solar Renewable Energy sectors in the year ahead.*

Sincerely,

*Gilles A. Trahan*

Gilles A. Trahan
Chairman

April 4, 2010



# Atlantic Wind & Solar

Atlantic Wind & Solar
2009 Annual Report

**Item 1 Exact name of the issuer and the address of its principal executive offices:**

Atlantic Wind & Solar Inc.
350 Bay St. Suite 1201, Toronto ON M5H 2S6
Tel: +1 800 891-1657
Fax: +1 888 316-0424

**Item 2 Shares outstanding:**

The company currently has (1) one Class of Common Stock and (1) one Preferred Stock Outstanding.



Atlantic Wind & Solar

CUSIP: 049127103
Trading Symbol: OTC: AWSL
Authorized Number of Shares: 500,000,000
Issued number of shares: 29,995,249 As of Dec 31, 2009. However a 1:3 stock dividend was paid in the 1st Q 2010 bringing the total issued and outstanding to 39,993,665. The Company expects to cancel 4,000,000 shares. See Notes.

(i)  Period end date: December 31, 2009
(ii)  Number of shares authorized: 500,000,000
(iii)  Number of shares outstanding: 29,995,249 As Dec 31 /09.  Post dividend 39,993,667
(iv)  Freely tradable shares (public float): 7,624,079
(v)  Total number of beneficial shareholders: 2030
(vi)  Total number of shareholders of record: 619

**Item 3 Financial statements:**

See attached Financial Statements



ATLANTIC
WIND & SOLAR INC

**Item 4 Management's discussion and analysis or plan of operation:**

A. Plan of Operation.

In the next twelve months Atlantic Wind and Solar Inc. (AWS), via Atlantic Solar Inc. in Ontario Canada, plans to follow through on its agreements to build multiple rooftop energy parks in the Greater Toronto Area.

i. AWS has finalized its agreement with the Remington Group for seven rooftop sites. The project summary report for the buildings has been completed including the cost summary and financial analysis. The costs were based on a site inspection and structural review by Halsall Engineering.

ii. AWS is in the final stages of agreement on its next thirteen rooftop projects.

iii. AWS is in advanced stage discussions on the 24 more projects.

iv. Atlantic continues to explore future opportunities in wind technology, however the next year will see solar power in Ontario as the primary focus.

v. The company has purchased equipment for the installation of the initial rooftop energy parks but itself does not have significant plant and equipment holdings.

vi. In addition to the recently hired Vice President, AWS has hired an Ontario F-I-T program manager to help with general company management as well as the management of specific projects on an on-going basis. Also hired recently, a receptionist and an in house Auto CAD designer. Otherwise there are no plans for significant changes in the number of employees.

B. Management's Discussion and Analysis of Financial Condition and Results of Operations.

i. In addition to the previously reported funding line of US$2.5 million, Atlantic has issued a Preferred Series A security for US$1,000,000. It is secured specifically by the general assets of Atlantic Wind and Solar and generally by the underlying OPA contracts and the associated 20-year revenue streams. Within the first 5 years the holder may convert principle into AWSL common shares at pre-defined prices.

ii. AWS has furthered its relationship with the Ontario based law firm Aird & Berlis, LLP as previously reported. Aird & Berlis comprises a diverse group of more than 120 lawyers. The firm provides a wide range of legal services that includes a dedicated Energy Team with strong capabilities in various facets of the Renewable Energy sector, as well as its industry leading Real Estate Group serving major developers of commercial, institutional, residential and industrial real estate. The retention of Aird & Berlis LLP is in keeping with Atlantic Wind and Solar's policy of aligning the Company with leaders in relevant businesses and services.

iii. Atlantic Wind and Solar continues to work with SEC auditor Sam Kan & Company to audit the last two fiscal years. AWS expects to file these audit shortly and begin immediately on 2009. AWS maintains its intention to file with the SEC to become a reporting Issuer and to seek to move AWSL forward towards achieving a listing status upgrade. The Company plans to elevate its share listing to a larger, higher profile stock exchange

iv. The company's 47.5% ownership of Hybridyne Power Systems Canada, Inc. is now in question and pending litigation. See Notes to F/S and pending litigation.



**C. Off-Balance Sheet Arrangements:**

Atlantic has no Off-Balance Sheet Arrangements.

This report contains forward-looking statements about the company's business, financial condition and prospects that reflect management's assumptions and beliefs based on information currently available. We can give no assurance that the expectations indicated by such forward-looking statements will be realized. If any of our management's assumptions should prove incorrect, or if any of the risks and uncertainties underlying such expectations should materialize, then actual results may differ materially from those indicated by the forward-looking statements.

The key factors that are not within our control and that may have a direct bearing on operating results include, but are not limited to, acceptance of our services, our ability to expand our customer base, management's ability to raise capital in the future, the retention of key employees and changes in the regulation of our industry.

**Item 5 Legal Proceedings:**

On May 26, 2009 Atlantic Wind & Solar Inc. reached an agreement to purchase 47.5% interest in Hybridyne Power Systems Canada, Inc. for $2,000,000. The purchase price was payable by way of 3,000,000 shares of AWSL common stock as directed by the seller. All AWSL common share issuance required by the seller were made in a timely manner in accordance with the agreement.

After seven months of Hybridyne Power systems Canada Inc. and Atlantic working together as affiliates, with numerous press releases from both companies stating the same, and approximately $314,354 CDN in shareholder loans made by Atlantic to Hybridyne, the management of Hybridyne abruptly decided the deal was not complete. Thomas Cleland, CEO of Hybridyne, stated he did not approve the transaction. Based on the foregoing Atlantic issued a notice of default and a demand for the return of the 3,000,000 AWSL common shares. To date the shares directed by the seller to be issued to Thomas Cleland (2,000,000 shares) and 1084765 Ontario Ltd. (300,000 shares) and 1084766 Ontario Ltd. (300,000 shares) as part of closing have not been returned.

All dividends issued to the parties related to the HPSC acquisition have been held by Atlantic pending the cancellation of the underlying shares.

The Company anticipates filing suit against Hybridyne Power Systems Canada Inc. for the repayment of $314,354 in shareholder advances, plus interest, other damages and costs in relation to the aborted transaction.

The Company anticipates filing suit against Thomas Cleland for the return of the 2,000,000 common shares, plus damages and costs.

The Company anticipates filing suit against 1084765 Ontario Ltd., 1084766 Ontario Ltd. and Wind Solar Energy Venture Corp. for the return of the AWSL shares, plus damages and costs.

The Company anticipates filing suit against Richard Leverton for damages and costs.

In relation to the above a suit has been filed against Atlantic by David Goldman and Liz Monteith. Goldman and Monteith claim they are due commissions upon completion of the above transaction. Atlantic, notes that the transaction has not completed and thus any alleged commission would not be earned. Atlantic, has requested all documents from Goldman and/or Monteith related to the claim and as of this writing has received no response.

Atlantic considers this a frivolous and vexatious claim regarding a transaction that was, in any case, never in fact completed. From the Company's perspective a key point regarding the Goldman/Monteith claim is that it was filed shortly AFTER Atlantic announced in the press that the Hybridyne acquisition had not been completed as planned. Atlantic plans to file a Motion to Dismiss and if necessary, follow-up with a counter suit.



The Company is not aware of any other legal proceeding, nor aware of any pending proceedings.

**Item 6 Defaults upon senior securities:**

The Company is not in Default on any senior Securities.

**Item 7 Other information:**

None

**Item 8 Exhibits:**

15C2-11 filed on OTC disclosure and news service



**Item 9 Certifications:**

### CERTIFICATION
### of
### FINANCIAL STATEMENT AND NOTES

I, Venecia Gafter, certify that:

1.  I have reviewed the year end financial statement of Atlantic Wind and Solar, Inc., a West Virginia corporation;

2.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of Atlantic Wind and Solar, Inc. as of, and for, the period presented in this report according to US Generally Accepted Accounting Principles;

3.  I am responsible for establishing and maintaining disclosure controls and procedures for Atlantic Wind and Solar, Inc. and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to Atlantic Wind and Solar, Inc. is made known, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of Atlantic Wind and Solar, Inc.'s disclosure controls and procedures done according to US Generally Accepted Accounting Principles; and

    c)  Disclosed in this report any change in Atlantic Wind and Solar, Inc.'s internal control over financial reporting that occurred during Atlantic Wind and Solar, Inc.'s most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, Atlantic Wind and Solar, Inc.'s internal control over financial reporting or any fraud, whether or not material, that involves management or other employees who have a significant role in Atlantic Wind and Solar, Inc.'s internal control over financial reporting.

Date: 6th of April 2010.

By:/s/ Venecia Gather
CEO, Director



Atlantic Wind & Solar Inc.

**PART 3 - FINANCIAL INFORMATION**

Accountant's Letter Dated April 6th, 2010

Balance Sheet – December 31, 2009

Income Statement – Year Ended December 31, 2009

Statement of Cash Flow - Year Ended December 31, 2009

Statement of Changes in Financial Position – Year Ended December 31, 2009

Statement of Changes in Shareholder Equity - Year Ended December 31, 2009

Notes to the Financial Statements



ATLANTIC
WIND & SOLAR INC

**MICHAEL HYNSON**
**ACCOUNTANT**
1854 Everhart Drive
Orlando, Florida 32806
407-925-5154

April, 6, 2010

Atlantic Wind and Solar Inc.
a West Virginia Corporation

I have compiled, and recorded in the corporate accounting system, the attached financial information for the one year period ended December 31, 2009. Items of record have been recorded in accordance with Generally Accepted Accounting Principles.

No opinion as to the validity or accuracy of the information provided is given. All documents are unaudited and are stated as such.

Michael J. Hynson
Accountant

ANNUAL REPORT • Atlantic Wind & Solar • 2009



**ATLANTIC**
WIND & SOLAR INC

# Balance Sheet

**As of December 31**

| Assets | 2009 |
|---|---|
| **Current Assets** | |
| US Dollar Checking Account | $1,012,278 |
| Canadian Checking Account (USD) | $1,180 |
| Inventory | $191,172 |
| Employee Advances | $9,780 |
| Note Receivable - Hybridyne | $236,635 |
| **Total Current Assets** | **$1,451,044** |
| **Fixed Assets** | |
| Property and Equipment | $3,411 |
| **Total Fixed Assets** | **$3,411** |
| **Other Assets** | |
| AWE | $135,000 |
| Hybridyne Power Systems | $2,000,000 |
| **Total Net Fixed Assets** | **$2,135,000** |
| **Total Assets** | **$3,589,456** |

| Liabilities and Shareholders' Equity | 2009 |
|---|---|
| **Current Liabilities** | |
| Accounts Payable | $4,409 |
| **Total Current Assets** | **$4,409** |
| Long-Term Liabilities | |
| N P Shareholder Loans | $139,858 |
| **Long-Term Liabilities** | **$139,858** |
| **Total Liabilities** | |
| **Capital** | |
| Paid-in Capital | $4,847,775 |
| Retained Earnings | ($1,232,948) |
| Net Income | ($169,638) |
| **Total Capital** | **$3,445,188** |
| **Total Liabilities and Equity** | **$3,589,456** |



ATLANTIC
WIND & SOLAR INC

# Income Statement

**For the Twelve Months Ending December 31**

|  | 2009 | 2008 |
|---|---|---|
| **Revenues** | $0 | $0 |
| **Gross Profit** | $0 | $0 |
| **Expenses** | | |
| Advertising Expense | $8,143 | $0 |
| Bank Charges | $932 | $0 |
| Exchange Rate Adjustment | $13 | $0 |
| Conference Expense | $682 | $2,038 |
| Delivery Expense | $826 | $0 |
| Interest Expense | $42 | $0 |
| Legal and Professional Expense | $43,851 | $0 |
| Marketing Expense | $5,000 | $0 |
| Meals and Entertainment Expense | $11,298 | $8,667 |
| Office Expense | $716 | $4,099 |
| West Virginia State Taxes | $407 | $0 |
| Public Relations | $12,581 | $0 |
| Postage Expense | $383 | $134 |
| Printing Expense | $256 | $0 |
| Professional Fees | $3,501 | $0 |
| Rent or Lease Expense | $22,356 | $2,000 |
| Supplies Expense | $180 | $0 |
| Salaries Expense | $18,145 | $0 |
| Regulatory Filing Fees | $6,000 | $0 |
| Stock Transfer Expenses | $944 | $0 |
| Technical Support | $1,057 | $0 |
| Travel Expenses | $23,296 | $14,586 |
| Telephone Expense | $6,642 | $645 |
| Web Hosting | $902 | $779 |
| Other Expense | $1,485 | $0 |
| Total Expenses | $169,638 | $32,948 |
| **Net Income** | ($169,638) | ($32,948) |



**ATLANTIC**
WIND & SOLAR INC

# Statement of Cash Flow

**For the Twelve Months Ending December 31**

|  | 2009 |
|---|---|
| **Cash Flow from Operating Activities** | |
| Net Income | ($169,638) |
| Adjustments to reconcile net | |
| income to net cash provided | |
| by operating activities | |
| Inventory | ($191,172) |
| Employee Advances | ($9,780) |
| Note Receivable - Hybridyne | ($236,635) |
| Accounts Payable | ($1,195,591) |
| Total Adjustments | ($1,633,178) |
| **Net Cash provided by Operations** | ($1,802,817) |

|  | |
|---|---|
| **Cash Flows from investing activities** | |
| Used For | |
| Hybridyne Power Systems | ($2,000,000) |
| Equipment | ($3,411) |
| **Net cash used in investing** | ($2,003,411) |

|  | |
|---|---|
| **Cash Flows from financing activities** | |
| Proceeds From | |
| N P Shareholder Loans | $154,598 |
| Paid-in Capital | $4,847,775 |
| Used For | |
| N P Shareholder Loans | ($182,688) |
| Net cash used in financing | $4,819,685 |
| **Net increase <decrease> in cash** | $1,013,457 |

|  | |
|---|---|
| **Summary** | |
| Cash Balance at End of Period | $1,013,457 |
| Cash Balance at Beg of Period | $0 |
| **Net Increase <Decrease> in Cash** | $1,013,457 |



ATLANTIC
WIND & SOLAR INC

# Changes in Working Capital

**For the Twelve Months Ending December 31**

|  | 2009 |
|---|---|
| **Sources of Working Capital** | |
| Net Income | ($169,638) |
| Add back items not requiring working capital | |
| Working capital from operations | ($169,638) |
| **Other sources** | |
| N P Shareholder Loans | $154,598 |
| Paid-in Capital | $4,847,775 |
| **Total sources** | **$4,832,735** |

| **Uses of working capital** | |
|---|---|
| Hybridyne Power Systems | ($2,000,000) |
| Equipment | ($3,411) |
| N P Shareholder Loans | ($182,688) |
| Total uses | ($2,186,099) |
| **Net change** | **$2,646,635** |

| **Analysis of Components of Changes** | |
|---|---|
| Increase <Decrease> in Current Assets | |
| US Dollar Checking Account | $1,012,278 |
| Canadian Checking Account (USD) | $1,180 |
| Inventory | $191,172 |
| Employee Advances | $9,780 |
| Note Receivable - Hybridyne | $236,635 |
| <Increase> Decrease in Current Liabilities | |
| Accounts Payable | $1,195,591 |
| **Net change** | **$2,646,635** |



# Notes to Financial

**ATLANTIC WIND AND SOLAR, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**
**December 31, 2009**

### 1.  Development Stage Company

Atlantic Wind and Solar, Inc. herein "the Company" was incorporated on January 13, 1977 as Aetna Operating Company, Inc. pursuant to the laws of the State of West Virginia. The Company changed its name to Dragon Environmental (UK) Ltd. on November 4, 1997. On October 26, 1998 the Company changed its name to Aquatek, Ltd. On February 8, 2002 the company changed its name to Environmental Technologies, Inc. On September 19, 2008 the Company changed its name to Atlantic Wind and Solar, Inc.

The company has three subsidiaries;
>  Atlantic Wind Energy Corp. f/k/a AWE Engineering, Inc., a Florida Corporation
>  Atlantic Wind and Solar Corp (a Bahamas Corporation)
>  Atlantic Solar Inc. (an Ontario Corporation)

On May 26, 2009 Atlantic Wind & Solar Inc. reached an agreement to purchase 47.5% interest in Hybridyne Power Systems Canada, Ltd. for $2,000,000. The purchase price was payable by way of 3,000,000 shares of AWSL common stock as directed by the seller. All AWSL common share issuance required by the seller were made in a timely manner in accordance with the agreement.

After seven months of Hybridyne Power systems Canada Inc. and Atlantic working together as affiliates, with numerous press releases from both companies stating the same, and approximately $314,354 CDN in shareholder loans made by Atlantic to Hybridyne, the management of Hybridyne abruptly decided the deal was not complete. Thomas Cleland, CEO of Hybridyne, stated he did not approve the transaction. Based on the foregoing Atlantic issued a notice of default and a demand for the return of the 3,000,000 AWSL common shares.  To date the shares directed by the seller to be issued to Thomas Cleland (2,000,000 shares) and 1084765 Ontario Ltd. (300,000 shares) and 1084766 Ontario Ltd. (300,000 shares) as part of closing have not been returned. The return of the balance of 400,000 shares from other invloved parties is not in dispute.

All dividends issued to the parties related to the HPSC acquisition have been held by Atlantic pending the cancellation of the underlying shares.

The Company anticipates filing suit against Hybridyne Power Systems Canada Inc. for the repayment of $314,354 in shareholder advances, plus interest, other damages and costs in relation to the aborted transaction.

The Company anticipates filing suit against Thomas Cleland for the return of the 2,000,000 common shares, plus damages and costs.

The Company anticipates filing suit against 1084765 Ontario Ltd., 1084766 Ontario Ltd. and Wind Solar Energy Venture Corp. for the return of the AWSL shares, plus damages and costs.

The Company anticipates filing suit against Richard Leverton for damages and costs.

The Company is a development stage company. Please refer to the Company's latest 15C2-11 filed on OTC disclosure and news service for details on the Company's ongoing research and development program.


ATLANTIC
WIND & SOLAR INC

In a development stage company, management devotes most of its activities to establishing a new business and development of product(s). Planned principal product has not produced significant revenue, as the Company has been engaged in developing and refining the product for production.

**2.  Common Stock**

The Company has authorized 500,000,000 shares of stock and has issued 29,995,249 as of 31 December 2009. (The Company issued a 1:3 dividend on January 25th, 2010 bringing the shares issued and outstanding to 39,993,667.)

**3.  Summary of Significant Accounting Policies**

a.   Year End

The Company's fiscal year end is December 31.

b.   Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenditures during the period. Actual results may differ from those estimates.

c.   Income Taxes

Since the Company is in its development stage and has no income, no income tax expense is reported on the financial statements.





Home >> Quotes & News >> Quote >> MEVT

## MEVT — MSE Enviro-Tech Corp.

Common Stock
Par Value: 0.0001

**STO**

**Quote    News    Charts    Company Info    Financials    Research    Short Sales    Insiders**

| Contact Information | Business Description |
| --- | --- |
| MSE Enviro-Tech Corp.<br>Ste 474 - 3109 Grand Ave<br>Miami, FL 33133<br><br>http://www.mseenviro-tech.com<br><br>Phone: 305-704-2432<br>Fax: 416-628-1614<br>E-mail: info@mseenviro-tech.com | Acquisition and development of socially and environmentally responsible techno |

**OTC Market Tier**
Pink Sheets No Information

**State Of Incorporation**
DE

**Jurisdiction Of Incorporation**
United States

**Year Of Incorporation**
1998

**Company Officers**
Gilles Trahan, Chairman, CEO

**Number of Employees**
2 as of Aug 10, 2007

**Reporting Standard**
Dark (This company does not provide information to investors pursuant
to the OTC Reporting Standards)

**Fiscal Year End**
3/31

**Estimated Market Cap**

**Company Notes**
Formerly=MSE EcoEngine, Inc. until 2-07

**Transfer Agent**
Heritage Trust
4 King Street West
Toronto, ONT M5H 1B6
Canada

**Auditor/Accountant**
Schwartz Levitsky Feldman LLP
1167 Caledonia Rd.
Toronto, ONT M6A 2X1
Canada

**Legal Counsel**
Gary Blum
3278 Wilshire Blvd

$1,212,510 as of Jun 18, 2010

**Outstanding Shares**
15,156,375 as of Aug 10, 2007

**Authorized Shares**
100,000,000 as of Aug 10, 2007

**Float(shares)**
8,483,041 as of Aug 10, 2007

Los Angeles, CA 90010

**Investor Relations Firm**
Geneva Bancorp Inc.
155 DalHousie St.
Suite 80
Toronto, ONT
Canada

The information provided here has been obtained from publicly available sources as well as directly from issuers in sor
Click here to update your company profile.

All information contained herein is provided "as is." Pink OTC Markets Inc. makes no representation or warranty,
as to the accuracy, timeliness, or completeness of the information provided herein. Neither Pink OTC Markets Inc
officers, employees, or third party data suppliers, shall bear any responsibility or liability to verify the information
for the use, misuse, or inability to use the information provided. None of the foregoing parties shall be liable to ar
or losses of any nature. Accordingly, investors should not use this information as the basis for making an investn
see Risk Warning and Terms of Service for more information.

Home | Quotes & News | Market Activity | OTC Company Search | Products & Services | OTC Guide | About Pin
Map | Contact Regulators

© 2009 Pink OTC Markets Inc.
Terms of Service | Linking Terms | Trademarks | Privacy Statement | Risk Warning | Investor Relations

MSE Enviro-Tech Corp



MEVT strives to seek out technologies that meet some or all of the following criteria: a significant technological advancement, have a global market and are socially and environmentally responsible. Our focus is to partner with innovative technology companies and facilitate the adoption of their technologies with our established prospect organizations.

© 2006 MEVT Enviro-Technologies Corp.

Content requires latest version





COMPANY     TECHNOLOGY     MANAGEMENT



COMPANY PROFILE

MSE Enviro-Tech Corporation (MSEE), a company incorporated under the laws of the Sta
agent in technology transfer, dedicated to providing access to world class technologies av

Many innovative technologies never gain significant market adoption in the marketplace.
when there is a major investment in the technology. The common reason for the slow ma
innovative technology centers on the challenges of field execution in gaining commitment
decision making, prospects. Slow adoption also occurs because of the great expense and
needed to build a highly effective sales channels, sales teams and a market presence.

MSEE strives to seek out technologies that meet some or all of the following criteria: a si
advancement, have a global market and are socially and environmentally responsible. Ou
with innovative technology companies and facilitate the adoption of their technologies wit
prospect organizations.

Using a market driven approach to facilitate the identification and acquisition of external
transfers proprietary technologies to beneficial companies to help develop superior produ
strategic marketplace advantage.

MSEE provides comprehensive solutions for transferring new technologies, managing inte
providing intellectual property consultation. In exchange for facilitating the integration of
into a company's portfolio MSEE is compensated in the form of cash payment, percentag
equity securities or a combination thereof.

© 2006 MSEE Enviro-Technologies Corp.

Content requires latest version



MSE Enviro-Tech Corp

COMPANY    TECHNOLOGY    MANAGEMEN



TECHNOLOGY

### The Need

The United States has a severe fire problem, more so than is generally perceived. Nation of fires, thousands of deaths, tens of thousands of injuries, and billions of dollar loss - wh problem one of great national importance. Between 1996 and 2005, an average of 3,932 lives and another 20,919 were injured annually as the result of fire. These averages do n September 11, 2001.

The following table shows the number of fires, deaths, injuries and dollar loss in the Unite 2005.

| Year | Fires | Deaths | Injuries | Loss In Millions |
|------|-------|--------|----------|------------------|
| 1999 | 1,823,000 | 3,570 | 21,875 | $10,024 |
| 2000 | 1,708,000 | 4,045 | 22350 | $11,207 |
| 2001[1] | 1,734,500 | 3,745 | 20,300 | $10,583 |
| 2002 | 1,687,500 | 3,380 | 18,425 | $10,337 |
| 2003 | 1,584,500 | 3,925 | 18,125 | $12,307 |
| 2004[3] | 1,550,500 | 3,900 | 17,785 | $9,794 |
| 2005 | 1,602,000 | 3,675 | 17,925 | $10,672 |



Clic

© 2006 MSEE Enviro-Technologies Corp.

Content requires latest version



**MSE Enviro-Tech Corp**

COMPANY    TECHNOLOGY    MANAGEMENT



MANAGEMENT

**Gilles A. Trahan - Chairman of the Board, CEO.**

As Chairman and CEO, Mr. Trahan brings a wealth of experience in public markets, capita business acumen. His experience has primarily evolved around investment banking pract in real estate as a developer of commercial properties beginning in 1991, and subsequen operated a hotel resort in the Caribbean. Mr. Trahan has served as President and CEO of investment Banking firm in Toronto, Canada where his responsibilities included the struct financing, mergers, and acquisitions. He was instrumental in the creation of Symphony T Symphony Telecom under his leadership grew from no revenues to over $16 million annu market capitalization of over 500 million in a few short years.

Over the last 5 years he has served in senior officer positions including President and CE( Inc., an international financial consulting and investment banking company. During his ye Bancorp, Mr. Trahan advised numerous private and public companies on strategic acquisi and assisted numerous client-companies in expanding their shareholder base. Mr. Trahar base spans the globe both personally and institutionally.

Mr. Trahan will fulfill a comprehensive, hands-on role in the direction and corporate gove Tech Corp. as it pursues its goal of becoming a well managed growth company in its chos His depth of experience in business development, corporate finance, and mergers and ac company arena are expected to prove invaluable to MSE as it progresses towards its corp sustained growth and enhancement of shareholder value.

**Martin W. Baldwin - Director**

To his position on the Board of MSE Enviro-Tech Corp., Mr. Martin Baldwin, BSc, BA, Bed of experience and capabilities in Business and Finance, gained through fifteen years of su experience in banking and finance at the senior executive levels. Martin worked as a trad The Bank of Nova Scotia from 1993 to 2002. He traded interest rate products for various bank's operations in Toronto, Singapore, New York, and London as well as serving a brief an affiliate bank during the Indonesian currency crisis. In 2002 he accepted the challenge Scotiabank's new Caribbean Treasury Unit in The Bahamas.

Mr. Baldwin also worked in Australia, and was a teacher for the US Army in Europe and t broad educational background, including bachelors' degrees in Computer Science, English Education, plus a Masters of Business Administration in Finance and International Busines unique perspective to most problems and opportunities.





**COMPANY**   **TECHNOLOGY**   **MANAGEMENT**

INVESTOR RELATIONS

MSE Enviro-Tech Corp. Voting Common Stock
CUSIP number: 553549 10 6
Trading symbols:
   OTC PK - **MEVT**
   Frankfurt - **MEH**
Issued & Outstanding shares:
   15,979,375 (as of 08-18-2008)

**Join Our Er**

Email: [_____]

Privacy by ☒✔ Saf

MSE Enviro-Tech Corporation (MEVT), a company incorporated under the laws of the Stat
agent in technology transfer, dedicated to providing access to world class technologies av

Many innovative technologies never gain significant market adoption in the marketplace.
when there is a major investment in the technology. The common reason for the slow ma
innovative technology centers on the challenges of field execution in gaining commitment
decision making, prospects. Slow adoption also occurs because of the great expense and
needed to build a highly effective sales channels, sales teams and a market presence.

MEVT strives to seek out technologies that meet some or all of the following criteria: a si
advancement, have a global market and are socially and environmentally responsible. Ou
with innovative technology companies and facilitate the adoption of their technologies wi
prospect organizations.

Using a market driven approach to facilitate the identification and acquisition of external
transfers proprietary technologies to beneficial companies to help develop superior produ
strategic marketplace advantage.

MEVT provides comprehensive solutions for transferring new technologies, managing inte
providing intellectual property consultation. In exchange for facilitating the integration of
into a company's portfolio MEVT is compensated in the form of cash payment, percentag
equity securities or a combination thereof.

*Notice:*
*MSE Enviro-Tech Corp. does not engage in any blast fax or spam email campaigns direct*
*Anyone receiving any such material should report it immediately to our offices at info@m*
*unsubscribe to any unsolicited email please follow any such link provided in the email and*
*unsubscribe request to MSE Enviro-Tech Corp.*

**Cautionary Note About Press Release Communications**

**Communications are provided to inform our shareholders, customers and potential custo**
**regular and timely basis of rapidly-occurring developments concerning our products and**

**Communications contain disclosures concerning developments relating to our business a**
**services, the actual results of which involve substantial risks and uncertainties. Althoug**
**communications contain information about what we and the reader may view as positive**
**developments concerning our products and services, such as test results and letters of in**
**communications are intended to infer or imply that development of commercially viable**
**relationships will occur or that we or our strategic partners will be able to generate reve**

the sale of our products and services.

**Shareholders and investors are strongly cautioned against placing undue reliance on inf**
**these communications in making any investment decisions concerning our securities.**

© 2007 MSE Enviro-Technologies Corp.

Content requires latest version



COMPANY    TECHNOLOGY    MANAGEMENT



CONTACT

**Corporate Offices:**

**Ste 474 – 3109 Grand Ave**
**Miami, FL 33133**

**Telephone:**
305.704.2432
**Fax:**
416.628.1614

Gilles A. Trahan
Chairman, Chief Executive Officer
**ceo@mseenviro-tech.com**

MSE Enviro-Tech Corp. Voting Common Stock
CUSIP number: 553549 10 6
Trading symbols:
    OTC PK - **MEVT**
    Frankfurt - **MEH**

---

© 2006 MEVT Enviro-Technologies Corp.                                    Content requires latest version