EXHIBIT
38

# BUREAU DE DÉCISION ET DE RÉVISION

CANADA
PROVINCE OF QUEBEC
MONTREAL

FILE NO.:  2010-024

DECISION NO.:  2010-024-001

DATE:    June 25, 2010

---

**IN THE PRESENCE OF:**     **ALAIN GÉLINAS, ESQ.**
**CLAUDE ST. PIERRE, ESQ.**

---

**AUTORITÉ DES MARCHÉS FINANCIERS**
800 Square Victoria, 22nd floor, PO Box 246, Montreal, district of Montreal
     Plaintiff
v.
**CAROL MCKEOWN**, 3011 rue Barat, Montreal (Quebec) H3Y 2H4
and
**DANIEL F. RYAN**, 3011 rue Barat, Montreal (Quebec) H3Y 2H4
and
**DOWNSHIRE CAPITAL INC.**, a legal entity located at 3011 rue Barat, Montreal (Quebec) H3Y 2H4
and
**MEADOW VISTA FINANCIAL CORP.**, a legal entity incorporated under the laws of Wyoming, located at 2710 Thomes Ave., Cheyenne, WY 82001 USA and 1000, rue Sherbrooke Ouest, suite 2700, Montreal (Quebec) H3A 3G4
and
**MCKEOWN BABOON BUILDING FAMILY TRUST**, 3011 rue Barat, Montreal (Quebec) H3Y 2H4
and
**HERBERT BABOON BUILDING FAMILY TRUST**
and
**MCKWEON BABOON BUSINESS FAMILY TRUST**
and

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

**MCKEOWN/RYAN PRINCIPAL RESIDENCE TRUST,** located at 3011 rue Barat, Montreal
(Quebec) H3Y 2H4
      Respondents
and
**DEMERS VALEURS MOBILIÈRES INC.,** 615 René-Lévesque Ouest, Suite 1120, Montreal (Quebec)
H3B 1P5
and
**DUNDEE SECURITIES CORPORATION,** 2055, rue Peel, Suite 410, Montreal (Quebec) H3A 1V4
and
**DESJARDINS VALEURS MOBILIÈRES,** 1170 rue Peel, Suite 300, Montreal (Quebec) H3B 0A9
and
**TD CANADA TRUST,** branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A4
      Parties joined to the proceedings

---

### FREEZE ORDER, PROHIBITION TO TRADE SECURITIES AND TO OPERATE AS A CONSULTANT AND DECISION FOR SPECIAL METHOD OF DELIVERY
[art. 249, 265 and 266, *Securities act* (L.R.Q., c. V.-1.1) and art. 93, 94 and 115.9, *Act respecting the Autorité des marches financiers* (L.R.Q., c. A-33.2) and art. 16, *Regulations concerning the procedural rules of the Bureau de décision et de révision* ([2004]) 136 G.O. II, 4695)]

---

Mélanie Hébert, Esq.
(Girard et al.)
Attorney for the *Autorité des marchés financiers*

Hearing date:  June 25, 2010

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

## DECISION

On June 25, 2010, the *Autorité des marches financiers* (hereinafter the "*Autorité*") submitted a request to the *Bureau de décision et de révision* (hereinafter the "*Bureau*") asking it, pursuant to articles 249, 265 and 266 of the *Securities Act* and articles 93, 94 and 115.9 of the *Act respecting the Autorité des marchés financiers*, to issue a freeze order, a prohibition to trade securities and to operate as a consultant against the following respondents and parties joined to the proceedings:

**The respondents:**

- Carol McKeown;
- Daniel F. Ryan;
- Downshire Capital Inc.
- Meadow Vista Financial Corp.;
- Mckeown Baboon Building Family Trust;
- Herbert Baboon Building Family Trust;
- Mckeown Baboon Business Family Trust;
- Mckeown/Ryan Principal Residence Trust;

**The parties joined to the proceedings:**

- Demers Valeurs mobilières inc.;
- Dundee Securities Corporation;
- Desjardins Valeurs mobilières;
- TD Canada Trust;

The request filed by the *Autorité* was submitted pursuant to article 115.9 of the *Act respecting the Autorité des marchés financiers* according to which the *Bureau* is free to render a decision unfavorably affecting the rights of a person with any prior hearing when a compelling reason so requires. An *ex parte* hearing was thus held at the *Bureau* headquarters on June 25, 2010 so that the *Autorité* could present its request.

The *Autorité* filed along with its request the affidavit required by article 19 of the *Regulations on the procedural rules of the Bureau de décision et de révision* pursuant to which a request founded on compelling reasons must be accompanied by a sworn written statement in support of the facts of the request and the compelling reasons. True copies of the *Autorité's* request and of the sworn statements are

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

appended to this decision.

**THE REQUEST**

The *Bureau* will now present the facts that appear in the *Autorité's* request, as amended during the hearing:

**I.      INTRODUCTION**

    A.      The *Autorité des marchés financiers*

1.      The plaintiff, the *Autorité des marchés financiers* "the "*Autorité*"), is the agency responsible for the application of the *Securities Act* ("Securities Act"), and it carries out the duties that are set forth in this Act in accordance with article 7 of the *Act respecting the Autorité des marchés financiers* ("AAMF");

2.      The facts contained in this request stem both from the investigation conducted by the *Autorité* and the investigation conducted by the U.S. Securities and Exchange Commission (the "SEC"), particularly with regard to the respondents;

3.      Thus, some of the alleged documents in support of this request are appended to proceedings instituted by the SEC against the respondents and entitled "Emergency Complaint for Injunctive and Other Relief" and "Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support";

    B.      The respondents

4.      Carol McKeown is director, president, secretary and treasurer of Downshire Capital Inc. ("Downshire").  She is also the majority shareholder;

5.      Downshire is a legal entity that was incorporated on June 23, 2006 and that is located at 3011, rue Barat, Montreal;

6.      This address is also the address at which Carol McKeown resides;

7.      According to its Internet site, Downshire's place of business is 1980 rue Sherbrooke Ouest, Suite 1110, Montreal;

8.      Carol McKeown opened a brokerage account in the name of Downshire with Wilson Davis and Company Investment in Salt Lake City, USA;

9.      Daniel F. Ryan is one of the directing minds of Downshire.  He sometimes presents himself as being a "managing partner" of Downshire or as a person having control over this company;

10.      Daniel F. Ryan also gave instructions to Downshire's brokers to carry out operations on the shares of stock held by Downshire;

11.      Meadow Vista Financial Corp. ("Meadow") is an American company that was set up under the

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

laws of the state of Wyoming, as indicated by a copy of the document entitled "Filing information" coming from the state of Wyoming;

12. According to this same document, Carol McKeown is the president of Meadow;

13. The CIDREQ system certificate indicates that Carol McKeown is director, president and secretary of Meadow;

14. This certificate also indicates that Meadow has a place of business at 1000 rue Sherbrooke Ouest, Montreal, province of Quebec;

15. Carol McKeown opened two brokerage accounts in Meadow's name:

    a.    a first account with Oppenheimer in New York, USA; and

    b.    a second account with Wilson Davis & Company Investment;

16. Daniel F. Ryan is authorized to buy or sell in one of the Meadow accounts.  He instructed Meadow's brokers to carry out operations involving stock held by Meadow;

17. Carol McKeown is the owner of the trademark "PennyStockChaser" in Canada and in the United States;

18. Downshire has the right to use the trademark "PennyStockChaser," pursuant to a licensing agreement signed by Carol McKeown and Downshire;

19. In particular, the Internet site www.PennyStockChaser.com ("PSC") promotes stocks of companies listed on the stock exchange, in cents;

20. More precisely, PSC's describes its goal as follows:

    "Our goal

    **PSC** aims to ease your investing endeavors by conducting thorough research on the stocks and their companies.  It is our goal to ensure that all members are first to receive information on the best stock picks.  **At PSC, our members' best interest is always our first priority!**"

21. A press release was issued by PCS on April 14, 2009, that states that Carol McKeown is the owner of the Internet site PCS as well as the person to contact in case of any questions concerning this press release.  The address given in this press release is 1980 rue Sherbrooke Ouest, Suite 1100, Montreal (Quebec) H3Y 2H4;

22. Daniel F. Ryan exercises control over the PSC Internet site, having more particularly approached brokers in order to sign an agreement with them;

23. Carol McKeown, Daniel F. Ryan, Downshire, Meadow and PSC are not registered with the *Autorité*;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

**II.**   **THE FACTS**

A.  Information received by the *Autorité* and steps taken to analyze the facts raised by the informant;

24.  On October 19, 2009, the *Autorité* received information indicating the following facts:

a.  Downshire had deposited around 22 million shares of Biocentric in a brokerage account that it owned at Valeurs mobilières Demers;

b.  Roger E. Pawson allegedly transferred this block of shares to Daniel F. Ryan for services rendered;

c.  The informant had doubts about whether PSC had acted in concert with Biocentric in order to influence the value of the Biocentric share;

25.  After receiving this information, the *Autorité* took steps to verify the allegations contained in this statement. These steps taken revealed the following facts;

a.  Biocentric Energy Holdings Inc. ("Biocentric") is a company located in Santa Ana, California, which presents itself as specializing in the bio-energy field;

b.  Biocentric is not a reporting issuer in Quebec; its shares are quoted on the Pink Sheets under the symbol BEHL;

c.  According to Biocentric's unaudited income statements displayed on the Pink Sheets Internet site, from the company's start date until December 31, 2009, the company sold $2,800 (US currency) worth of products;

d.  Biocentric's balance sheet as of December 31, 2009 indicates US$ 421,433 in assets and US$ 96,806 in liabilities, giving a net book value of US$ 324,627;

e.  During the period between January 1, 2009 and December 31, 2009, the Biocentric shares traded at between US 0.013 cent and US 15.5 cents per share;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

**2010-024-001**                                                                  **Page:  7**

[See original for graph 1]

*Source:  Pink Sheets*

  f.  On September 7, 2009, PSC indicated at its Internet site that *"September is going to be a very good month for BEHL"*);

  g.  On September 9, 2009, Carol McKeown opened two brokerage accounts with Valeurs mobilières Demers, more precisely the accounts numbered ████DD4A (CAN) and ████DD4B (US);

  h.  On September 9, 2009, Biocentric issued a press release through Marketwire, a communication firm based in Toronto, announcing a joint venture between Biocentric and Envirotek, a California company;

  i.  On September 12, 2009, PSC published an alert at its Internet site indicating that the price of the Biocentric share might *"...still have room to go"*);

  j.  On September 16, 2009, through Marketwire, Biocentric issued a press release informing the public about various updates made to its shareholders;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

k.     On September 21, 2009, through Marketwire, Biocentric announced a merger with a company that it did not name (*"Biocentric has reached an agreement with a fully reporting company which will enable BioCentric to emerge as a fully reporting OTC Bulletin Board company"*);

l.     No explanation was given regarding the financing of this merger and no concrete amount was advanced in this press release;

m.    On September 22, 2009, 22,904,141 Biocentric shares were deposited in account No. ███DD4B (US) held by Downshire at Valeurs mobilières Demers;

n.     On September 23, 2009, Downshire sold 2,630,810 Biocentric shares for net proceeds on disposition of US$ 117,303.56 or proceeds of approximately 4.40 US cents per share;

o.     On September 24, 2009, PSC published an alert at it Internet site indicating that the BEHL share would increase further following the announcement of the merger between Biocentric and a company in Nevada whose name was not disclosed;

p.     On the same day, PSC published a second alert at its Internet site concerning the BEHL shares. The title of the press release is *"BEHL, This is a company that is doing all the right things, WE THINK BEHL IS READY FOR LIFT-OFF, BEHL is a monster buy";*

q.     Furthermore, this press release mentions that once the merger process has been established, the market makers will have to close their short positions in the stock;

r.     Now, according to a warning at the Pink Sheets Internet site, there are no market makers for the Biocentric share;

s.     On September 24, 2009, Downshire sold 4,157,415 Biocentric shares for net proceeds of disposition of US$ 201,944.96, or proceeds of approximately 4.86 US cents per share;

t.     On September 25, 2009, through Marketwire, Biocentric issued a press release informing the public of the different updates made to its shareholders;

u.     On September 25, 2009, Downshire sold 2,585,569 Biocentric shares for net proceeds on disposition of US$ 123,385.51 or proceeds of approximately 4.77 US cents per share;

v.     On September 27, 2009, PSC published an alert at its Internet site indicating that it had had discussions with Biocentric during which Biocentric indicated that it would issue two press releases during the week that could contain information about the merger and/or announcing new sales agreements;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

w.      On the same day, PSC published a second alert at its Internet site indicating that the shares of Biocentric and two other companies will be very profitable ("*BIG PROFITS WILL COME IN ALL THREE*") and once again confirmed that Biocentric would make two announcements during the week;

x.      Still on the same day, PSC published a third alert at its Internet site indicating that Biocentric should announce sensational news and that the price of the share could increase up to ten times. No specifies were given concerning the news;

y.      On September 28, 2009, Downshire sold 2,000,000 Biocentric shares for net proceeds of disposition of US$ 102,184.92, or earnings per share of 5.11 US cents;

z.      On September 29, 2009, through Marketwire, Biocentric issued a press release informing the public of the different updates made to its shareholders;

aa.      On September 29, 2009, Downshire sold 969,461 Biocentric shares for net proceeds of disposition of US$ 46,553.44 or proceeds of approximately 4.80 US cents per share;

bb.      On October 1, 2009, through Marketwire, Biocentric issued a press release clarifying its future with respect to the environment ""*statement of clarification as to the company's path towards the Green Environment*");

cc.      On October 1, 2009, PSC published an alert at its Internet site indicating that the Biocentric shares were worth more than the current price of 4.4 US cents per share. Furthermore, PSC also indicated that Biocentric had confirmed that it was going to announce important news the following day;

dd.      On October 1, 2009, PSC published a second alert at its Internet site reiterating that at 4.4 US cents per share, Biocentric's stock was undervalued;

ee.      On October 1, 2009, Downshire sold 500,000 Biocentric shares for net proceeds of disposition of US$ 22,343.60 or proceeds of approximately 4.47 US cents per share;

ff.      On October 2, 2009, Biocentric issued a press release through Marketwire announcing various developments;

gg.      The news did not have any positive impact on the Biocentric share. The stock closed at 4.05 US cents on October 2, although it had closed at 4.3 US cents the day before, i.e., on October 1. The following graph shows the price of the Biocentric share for the period from October 9 to October 14, 2009;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

[See original for graph]

*Source: Bloomberg*

hh.   On October 2, 2009, Downshire sold 2,181,399 Biocentric shares for proceeds of disposition of US$ 95,573.92 or proceeds of approximately 4.38 US cents per share;

ii.   On October 3, 2009, Downshire sold 3,769,470 Biocentric shares for net proceeds of disposition of US$ 153,044.95 or proceedings of approximately 4.06 US cents per share;

jj.   On October 7, 2009, a press release was issued by Biocentric through Marketwire, stating that Emerginggreencompanies.com would take part in the "2009 Algae Biomass" summit;

kk.   On the same day, Biocentric issued a second press release announcing that the "200 Algae Biomass" summit would have a record number of presentations and speeches;

ll.   On October 13, 2009, a *"notice of outgoing transfer"* was sent by the Penson Canada financial services so that Valeurs mobilières could transfer all of Downshire's assets at Dundee Securities to account ████VCBN;

mm.   On October 14, 2009, Biocentric announced, through Marketwire, that it had received US$ 500,000 for research purposes from a group of investors, without revealing the identity of the investors;

nn.   On October 15, 2009, Biocentric announced, through Marketwire, that it had received an order to sell 2,000 kg of one of its algae-related products. The name of the clients or clients behind this order is not indicated. The amount of the order does not appear in the announcement either;

oo.   On November 6, 2009, the transfer of Downshire assets to account ████VCNB to Dundee Securities was confirmed;

pp.   During the period from September 23 to October 5, 2009, Downshire sold 18,794,124 Biocentric shares for net proceeds of disposition of US$ 864,608.00, which represents net proceeds of disposition of 4.6 US cents per share.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

qq.    The graph below shows the price of the Biocentric stock for the period from September 4 to November 9:

[See original for Graph 3]

*Source: Bloomberg*

rr.    The net proceeds of disposition from the 18,794,124 Biocentric shares sold by Downshire represent a little more than twice the book value of Biocentric, which is US$ 324,627;

26.    These facts demonstrate that the PSC Internet site provided advice concerning the purchase of Biocentric shares;

27.    Furthermore, these facts demonstrate that Downshire was selling Biocentric shares even though the PSC Internet site was promoting the stock and more specifically, was recommending that investors buy Biocentric stock;

B. The investigation conducted by the SEC

28.    As mentioned earlier, the SEC conducted an investigation that focused in particular on the respondents.  This investigation demonstrated that the respondents implemented the following stratagem:

a.    Beginning in April 2009, Carol McKeown and Daniel F. Ryan published recommendations concerning various American micro capitalization ("microcap") companies on the PSC Internet site;

b.    Carol McKeown, Daniel F. Ryan, Downshire or Meadow received shares from these companies in exchange for the recommendations published at the PSC Internet site;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

    c.    Although the recommendations published at the PSC Internet site urged investors to buy shares of these companies, Carol McKeown, Daniel F. Ryan, Downshire and/or Meadow were selling the shares of these companies thus profiting from the increase in the volume and the price of these shares;

    d.    Carol McKeown and Daniel F. Ryan did not adequately disclose the fact that they were selling shares of these companies at the very same time as they were recommending at the PSC Internet site that investors buy shares of these companies;

    e.    Carol McKeown and Daniel F. Ryan did not disclose, on certain occasions, the complete compensation that they received for the recommendations made at the PSC Internet site.

29.    More specifically, the SEC investigation demonstrated that the stratagem explained in the preceding paragraph was used by Carol McKeown and Daniel F. Ryan with regard to the following 6 companies: Converge global Inc., Biocentric Energy Holdings Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind and Solar Inc., and MSE Enviro-Tech Corp.;

30.    Additionally, according to the information obtained by the SEC, the stratagem in place with respect to the companies Avro Energy Inc. and Bluewave Group Inc. was still being pursued on June 9, 2010.

31.    The SEC's investigation also made it possible to demonstrate that the proceeds realized by the respondents in connection with this stratagem were transferred to Quebec into accounts held by the respondents, as explained below;

C. The SEC's request for assistance

32.    On June 9, 2010, the *Autorité* received an urgent request for assistance from the SEC;

33.    As part of this request for assistance, the *Autorité* was advised that the SEC filed and submitted urgent proceedings entitled *"Emergency Complaint for Injunctive and Other Relief"* as well as proceedings entitled *"Plaintiffs Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support"* (exhibit D-1) before the United States District Court of Southern District of Florida on June 23, 2010;

34.    Through the proceedings entitled *"Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support,"* the SEC is seeking to obtain the following orders:

    a.    *"An Ex Parte Temporary Restraining Order"*;

    b.    *"Freeze of Assets"*;

    c.    *"Sworn Accounting"*;

    d.    *"Order Prohibiting Destruction of Records and Expediting Discovery"*;

    e.    *"Repatriation Orders"*;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

35.   On June 23, 2010, the Honorable James I. Cohn of the United States District Court of Southern District of Florida rendered two judgments in connection with this case;

36.   These two judgments contain the following orders with regard to the respondents:

   a.   A first order scheduling a hearing for July 6 in order to allow the respondents to demonstrate that the orders handed down against them should be lifted;

   b.   A second order entitled *"Temporary Restraining Order"* prohibiting the respondents from contravening certain provisions of U.S. law;

   c.   A third order entitled *"Asset Freeze,"* which is similar to a freeze order in Quebec;

   d.   A fourth order entitled *"Accountings"* ordering Carol McKeown and Daniel F. Ryan in particular, within 5 days following delivery of the decision, to (i) *"make sworn accounting (...) of all funds, whether in the form of compensation, commission, income (including payments for assets, shares or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature)"* received by Carol McKeown and Daniel F. Ryan; (ii) *"make sworn accounting (...) of all assets, funds or other properties held by McKeown and Ryan, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value and disposition of each such asset, fund and other property;* and (iii) *"provide (...) a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposit of any kind) in which they (whether solely or jointly) directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or right to exercise control."*;

   This fourth order also orders Downshire and Meadow to produce such sworn accountings aimed more particularly at disclosing all funds earned following the sale of shares of the following companies: Converge Global Inc., Biocentric Energy Holding Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind & Solar Inc. and MSE Enviro-Tech Corp.;

   e.   A fifth order entitled *"Record Preservation"* ordering the respondents and their directors, managers, agents, employees, attorneys, depositories, banks and *"those persons in active concert of participation with any one or more of them"* not to destroy the books, registers, correspondence, etc., related to the respondents;

   f.   A sixth order entitled *"Expedited Discovery"* allowing interrogations to be held;

   g.   A seventh order entitled *"Repatriation Order"* aimed at repatriating the funds to the United States;

37.   Furthermore, in his second judgment, the Honorable James I. Cohn ordered the proceedings sealed for up to a maximum of 3 business days so that the SEC could deliver the judgments to the

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

2010-024-001                                                                                        Page:  14

financial institutions concerned;

38.   Thus, the proceedings will be sealed until Monday, June 28, 2010;

**III.   THE BANK ACCOUNTS**

39.   The investigation conducted by the *Autorité* revealed that the respondents own the following
accounts in the province of Quebec:

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Downshire | ██DD4A (CAN) and ██DD4B (US) | Account inactive for the time being | Demers Valeurs Mobilières |
| Downshire | ██VCBN and ██VCAN | US$ 1,513,885.21 and 69,654.79$ | Dundee Securities Corporation |
| Carol McKeown | ██91 AN and ██91 BN | Accounts inactive for the time being | Dundee Securities Corporation |
| Carol McKeown | ██NHB0 and ██NHW1 | 182$ and inactive account | Desjardins Valeurs Mobilières |
| Meadow | ██5416 and ██7730 | 796.72$ and US$ 304,643.92 | TD Canada Trust (branch 4772) |
| Downshire | ██1666 and ██5479 | 55,957.55$ and US$ 331,65 | TD Canada Trust (branch 4772) |
| McKeown/Ryan Principal Residence | ██8024 | 377.23$ | TD Canada Trust (branch 4772) |
| Carol McKeown | ██0815, ██7278 and ██4520 | 30,349.46$, 1,000,024.00$ and US$ 18.96 | TD Canada Trust (branch 4772) |

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

40.   Carl McKeown has a safe deposit box at the TD Canada Trust branch located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A4;

41.   The SEC investigation made it possible to demonstrate that the proceeds realized by the respondents in connection with this stratagem were transferred to Quebec into certain of the accounts held by the respondents, as will be more fully explained during the hearing;

42.   Finally, assets that are at first sight being used by Carol McKeown seem to belong to the following trusts:  McKeon Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeon Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust;

## IV     FREEZE AND PROHIBITION

### A.  Market manipulation

43.   In light of the facts mentioned earlier, the *Autorité* and the SEC have reasonable and probable cause to believe that the respondents are taking part, in various ways, in organized activities aimed at manipulating the price of different stocks and that they are benefiting from these organized activities to the detriment of investors;

44.   More particularly, these unfair and abusive acts cause injury to investors who proceed with securities trades based on the recommendations contained on the PSC Internet site;

45.   These unfair and abusive acts also cause injury to the Canadian and American stock markets since they place their integrity into question and destroy the trust of all investors;

### B.  Securities advisor activities

46    None of the respondents is currently registered with the *Autorité* as a broker or securities advisor;

47.   Now, given the facts mentioned earlier, the *Autorité* has reasonable and probable cause to believe that the respondents are carrying on a securities advisor activity by placing alerts on line at the PSC Internet site containing recommendations regarding securities transactions without being registered in this capacity with the *Autorité*;

### C.  The respondents' assets

48.   The *Autorité* and the SEC have reasonable and probable cause to believe that the respondents have transferred to financial institutions in the province of Quebec gains realized in violation of the Securities Act and/or the laws applicable in the United States, particularly into the accounts mentioned earlier;

### D.  The orders requested

49.   The *Autorité* therefore requests, for the protection of investors, the integrity of the market and

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

in the public interest, that the *Bureau* render the prohibition orders sought in this request;

50.   The *Autorité* also asks, for the protection of investors and in the public interest, that the *Bureau* render the freeze orders sought in this request.

51.   Furthermore, the *Autorité* asks, in order to ensure that the freeze orders requested against the respondents are fully effective, that freeze orders also be rendered against the following trusts: McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust;

## V.   URGENCY AND COMPELLING REASONS

52.   The *Autorité* and the SEC have reasonable and probable cause to believe that the respondents' activities were continuing on June 9, 2010, particularly concerning the shares of the companies Avro Energy Inc. and Bluewave Group Inc.;

53.   The PSC Internet site is still currently operational and accessible;

54.   Without an immediate decision from the *Bureau,* it is to be feared, among other things, that the respondents' activities will continue to the detriment of all investors;

55.   Furthermore, and since the proceedings filed by the SEC will be sealed until Monday, June 28, it is to be feared that the respondents will be advised of the existence of these proceedings and will attempt to misappropriate, transfer or hide the sums held in the accounts mentioned above or their other assets;

56.   It is therefore urgent for the protection of the public and the integrity of the market that the *Bureau* render its decision without any prior hearing in accordance with article 115.9 of the *Act respecting the Autorité des marchés financiers;*

## ANALYSIS

During the *Bureau*'s hearing, the *Autorité* introduced in evidence the facts that it enumerated in its request, offering the testimony of two investigators in its employ and who filed documents related to this case. The *Bureau* examined this evidence offered by the plaintiff. It is more specifically worried about the following facts as well as certain of the allegations leveled by the *Autorité:*

- The respondents are taking part in activities aimed at manipulating the price of different stocks and they are benefiting from this manipulation to the detriment of investors and the financial markets;

- During the period from September 23 to October 5, 2009, Downshire sold 18,794,124 Biocentric shares for which it received net proceeds of disposition of US$ 864,608, representing a

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

net value of 4.6 US cents per share;

- The net proceeds of disposition from the 18,794,124 Biocentric shares sold by Downshire represent a little more than twice the book value of Biocentric, which amounts to US$ 324,627;

- The profits realized by the respondents were transferred into accounts in Quebec;

- The respondents announced at their Internet site that the price of the shares of a company would increase or were undervalued, but on the same day or the day after, they sold the shares they held, sometimes at a lower value than the one they mentioned as being undervalued;

- Until June 23, 2010, the respondents were still promoting shares at the Internet site www.pennystockchaser.com;

- The acts alleged by the *Autorité* as unfair and abusive cause injury to investors who proceed with stock transactions based on the recommendations contained at the Internet site www.pennystockchaser.com;

- Furthermore, these acts cause injury to the Canadian and American stock markets since they attack their integrity and undermine the trust of public investors;

- The respondents allegedly carry on consulting activities by placing alerts on their Internet site that contain recommendations related to stock trades, even though they are not registered with the *Autorité* as either consultant or broker;

Additionally, the investigation conducted by the United States Securities and Exchange Commission has demonstrated that the respondents used the following stratagem:

- Beginning in April 2009, Carol McKeown and Daniel F. Ryan have published, recommendations concerning various American micro capitalization companies at the PSC Internet site;

- Carol McKeown, Daniel F. Ryan, Downshire and Meadow received shares of these companies in exchange for the recommendations published at the PSC Internet site;

- Although the recommendations published at the PSC Internet site urged investors to buy the shares of any of these companies, Carol McKeown, Daniel F. Ryan, Downshire and/or Meadow sold the shares of these companies thus profiting from the increase in the volume and the price of these shares;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

- Carol McKeown and Daniel F. Ryan did not adequately disclose the fact that they sold shares of these companies at the very same time as they were recommending on the PSC Internet site that investors buy shares of these companies;

- Carol McKeown and Daniel F. Ryan did not disclose on certain occasions the full compensation that they received for the recommendations made at the PSC Internet site;

On June 23, 2010, the Honorable James I. Cohn, United States District Court of Southern District of Florida rendered two judgments in connection with this case. These two judgments contain seven orders against the respondents.

In her arguments, the attorney for the *Autorité* submitted to the *Bureau* that the respondents in this case were acting in violation of the following provisions of the Securities Act:

" **148.** No one may act as broker, advisor or investment fund manager unless they are registered to do so.

**195.2.** Affecting or attempting to affect the price or the value of a stock through unfair, abusive or fraudulent practices constitutes an offense.

**200.** Any person who, not being registered as a broker, advisor or representative, disseminates information to investors likely to influence their investment decisions and derives a benefit separate from his normal remuneration from this commits an offense."

This means that the respondents acted as advisor as defined in article 5 of the same law, even though they are not registered in this capacity with the *Autorité*. Therefore, they disseminated information to investors likely to influence their investment decisions and derived a distinct benefit from this activity. Furthermore, through their activities, they affected or attempted to affect stock prices through unacceptable practices. As the *Autorité's* investigator put it, the respondents attempted to create interest for stocks to get rid of their own shares at a higher price.[1]

---

[1] This process is generally referred to as *"pump and dump,"* which is defined as follows:
"A scheme that attempts to boost the price of a stock through recommendations based on false, misleading or greatly exaggerated statements. The perpetrators of this scheme, who already have an established position in the company's stock, sell their positions after the hype has led to a higher share price. This practice is illegal based on securities law and can lead to heavy fines. The victims of this scheme will often lose a considerable amount of their investment as the stock often falls back down after the process is complete. Traditionally, this type of scheme was done through cold calling, but with the advent of the Internet this illegal practice has become even more prevalent. Pump and dump schemes usually target micro- and small-cap stocks, as they are the easiest to manipulate. Due to the small float of these types of stocks it does not take a lot of new buyers to push a stock higher; See *Investopedia*, (http://www.investopedia.com/terms/p/pumpanddump.asp).

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

The *Autorité* argued that the *Bureau* should render an *ex parte* decision without allowing the respondents to present their arguments.  The fact that an American court rendered the decisions mentioned in the *Autorité's* request must induce our court to have a simultaneous reaction so that the interests of investors are protected but also so that the profits from the respondents' presumably illegal operations are sheltered from any attempts at hasty withdrawals.

The *Bureau* notes that in this case a decision rendered *ex parte* is effectively necessary, particularly to ensure the protection of investors, trust in the integrity of the financial markets and their proper operation, in Quebec as in the United States.  Therefore, pursuant to article 115.9 of the Securities Act, the *Bureau* feels that there are compelling reasons to render the freeze and trading and consulting prohibition orders against the respondents.

## DECISION

After examining the *Autorité's* request, the testimony of its investigators, the documents introduced in evidence in support of this request and the arguments of the plaintiff's attorney, as presented to the court during the hearing of June 25, 2010, the *Bureau de décision et de révision*, pursuant to articles 249, 265 and 266 of the Securities Act and articles 93, 94 and 115.9 of the *Act respecting the Autorité des marchés financiers* renders the following orders:

1)      **FREEZE ORDER PURSUANT TO ARTICLE 249 OF THE *SECURITIES ACT* AND ARTICLES 93, 94 AND 115.9 OF THE *ACT RESPECTING THE AUTORITÉ DES MARCHÉS FINANCIERS*:**

   **IT ORDERS** Valeurs mobilières Demers not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts:  ███FD4A (CAN) and███DD4B (US) in the name of Downshire Capital Inc.;

   **IT ORDERS**  Dundee Securities Corporation not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts:

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Downshire Capital Inc. | ███VCBN and ███VCAN | US$ 1,513,885.21 and 69,654.79$ | Dundee Securities Corporation |
| Carol McKeown | ███91 AN and ███91 BN | Accounts inactive for the time being | Dundee Securities Corporation |

**IT ORDERS** Desjardins Valeurs mobilières not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts: ███NHB0 and ███NHW1 in the name of Carol McKeown;

**IT ORDERS** TD Canada Trust, branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts:

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Meadow Vista Financial Corp. | ███5416 and ███7730 | 796.72$ and US$ 304,643.92 | TD Canada Trust (branch 4772) |
| Downshire Capital Inc. | ███1666 and ███5479 | 55,957.55$ and US$ 331.65 | TD Canada Trust (branch 4772) |
| McKeown/Ryan Principal Residence | ███8024 | 377.23$ | TD Canada Trust (branch 4772) |

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

2010-024-001                                                    Page:  21

| Carol McKeown | ▉0815,<br>▉7278 and<br>▉4520 | 30,349.46$,<br>1,000,024$ and<br>US$ 18.96 | TD Canada Trust<br>(branch 4772) |
|---|---|---|---|

**IT ORDERS** TD Canada Trust, branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A4 not to release funds, securities or other assets that it has on deposit or of which it has custody or control in any safe deposit boxes in the name or on behalf of the respondents;

**IT ORDERS** the parties joined to the proceedings Demers Valeurs Mobilières, Dundee Securities Corporation, Desjardins Valeurs Mobilières, TD Canada Trust, branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A2 not to allow the opening of any bank account or brokerage account in the name or on behalf of the respondents;

**IT ORDERS** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital Inc. and Meadow Vista Financial Corp. not to directly or indirectly withdraw funds, securities or other assets from bank accounts or brokerage accounts that they hold, including, but without limiting the general nature of what precedes, the following accounts:

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Downshire Capital Inc. | ▉DD4A (CAN) and ▉DD4B (US) | Account inactive for the time being | Demers Valeurs Mobilières |
| Downshire Capital Inc. | ▉VCBN and ▉VCAN | US$ 1,513,885.21 And 69,654.79$ | Dundee Securities Corporation |
| Carol McKeown | ▉91 AN and ▉91 BN | Accounts inactive for the time being | Dundee Securities Corporation |

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

2010-024-001                                                                 Page:  22

| Carol McKeown | ■■NHB0 and ■■NHW1 | Account inactive for the time being | Desjardins Valeurs Mobilières |
|---|---|---|---|
| Meadow Vista Financial Corp. | ■■5416 and ■■7730 | 796.72$ and US$ 304,643.92 | TD Canada Trust Branch 4772) |
| Downshire Capital Inc. | ■■1666 and ■■5479 | 55,957.55$ and US$ 331.65 | TD Canada Trust Branch 4772) |
| McKeown/Ryan Principal Residence | ■■8024 | 377.23$ | TD Canada Trust Branch 4772) |
| Caro. McKeown | ■■0815, ■■7278 and ■■4520 | 30,349.46$ 1,000,024.00$ and US$ 18.96 | TD Canada Trust Branch 4772) |

**IT ORDERS** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital inc. and Meadow Vista Financial Corp. not to directly or indirectly dispose of funds, securities or other assets in their possession;

**IT ORDERS** the respondents McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust not to directly or indirectly dispose of funds, securities or other assets in their possession;

2)    **PROHIBITION TO TRADE SECURITIES AND TO CARRY ON THE ACTIVITY OF ADVISOR PURSUANT TO ARTICLES 265 AND 266 OF THE *SECURITIES ACT* AND ARTICLES 93 AND 115.9 OF THE *ACT RESPECTING THE AUTORITÉ DES MARCHÉS FINANCIERS*:**

**IT PROHIBITS** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital inc. and Meadow Vista Financial Corp. from any activity directly or indirectly in view of carrying out any stock trades;

**IT PROHIBITS** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital inc. and Meadow Vista Financial Corp. from operating as an advisor as defined in article 5 of the *Securities Act;*

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

3)   **SPECIAL METHOD OF DELIVERY OF THE DECISION PURSUANT TO ARTICLE 16 OF THE *REGULATIONS CONCERNING THE RULES OF PROCEDURE OF THE BUREAU DE DÉCISION ET DE RÉVISION***

> **IT AUTHORIZES** delivery of this decision to the respondents McKeown Baboon Family Building Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust at the following address: 3011 rue Barat, Montreal (Quebec) H3Y 2H4.

Pursuant to the second paragraph of article 115.9 of the *Act Respecting the Autorité des marchés financiers,* the *Bureau* informs the respondents that they have a period of fifteen days to ask the *Bureau* to hold a hearing related to this decision. This hearing will then be held in the *Paul Fortugno* courtroom located at 500, boulevard René-Lévesque Ouest, suite 16.40, Montreal (Quebec).

It is up to the respondents to communicate with the Secretariat of the *Bureau* at 1-877-873-2211 in order to inform the *Bureau* that they intend to exercise their right to be heard.

The respondents are also asked to note that a party has the right to be represented by an attorney. The *Bureau* also informs legal entities and entities wishing to be heard in connection with this case that they are required to be represented by an attorney during a hearing before the *Bureau.*

The orders prohibiting stock trades and prohibiting the activity of advisor take effect on the date on which they are rendered, and they will remain in force until they are modified or rescinded.

In accordance with the first paragraph of article 250 of the *Securities Act,* the freeze order takes effect on the date on which it is rendered and will remain in force for a period of 120 days unless it is modified or rescinded before the end of this period.

Done in Montreal on June 25, 2010.

> *(S) Alain Gélinas*
> **Alain Gélinas, Esq., president**

> *(S) Claude St. Pierre*
> **Claude St. Pierre, Esq., vice president**

**CERTIFIED TRUE COPY**
    [Signature]

**Cathy Jalbert, legal counsel**
**Bureau de décision et de révision**

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

# SEVEN LANGUAGES TRANSLATING SERVICES, INC.

## T R A N S L A T O R S   •   I N T E R P R E T E R S

Conferences • Depositions • Documents • Translations • Legal • Commercial • Medical • Technical • U.S. Court Certified Interpreters
Web site: www.sevenlanguages.com • E-mail: sevenlan@gate.net

### CERTIFICATE OF TRANSLATION

STATE OF FLORIDA           }

COUNTY OF MIAMI-DADE    }

BEFORE ME, on this day, personally appeared ELISE GICHON-STRAUSS on

behalf of SEVEN LANGUAGES TRANSLATING SERVICES, INC., who being

duly sworn, deposes and says that she is fully versed in both the FRENCH and

ENGLISH languages, is accredited by the American Translators Association;  and

that to the best of her knowledge and belief,  the translation attached hereto is a true

and accurate rendition of the original aforesaid,  consisting of __23__ pages and

that this is the last of the attached.

_____
ELISE GICHON -STRAUSS

The foregoing instrument was acknowledged by me on this __1__ day of __July__, 20__10__
ELISE GICHON-STRAUSS personally appeared before me at the time of notarization.  She is
personally known to me and produced a driver's license as identification and she did take an oath.

_____
Natasha M. Sanchez, Notary Public
State of Florida at Large



**NATASHA M SANCHEZ**
MY COMMISSION # DD811182
EXPIRES August 03, 2012
(407) 396-0153     FloridaNotaryService.com

The utmost care has been taken to ensure the accuracy of all translations.  Seven Languages Translating Services and its
employees shall not be liable for any damages due to negligence or error in typing or translation.

SPANISH
FRENCH
ITALIAN
HEBREW
CREOLE
DUTCH
PORTUGUESE
GERMAN
CHINESE
JAPANESE
RUSSIAN
SCANDINAVIAN
ASIAN
SLAVIC
& ALL OTHER
LANGUAGES

OFFICES IN MIAMI • FT. LAUDERDALE • ORLANDO • TOKYO
19 W. FLAGLER ST. • SUITE 806 • MIAMI, FLORIDA 33130
DADE (305) 374-6761 • 24 HR. FAX (305) 374-0339 • 1-800-374-6761

# BUREAU DE DÉCISION ET DE RÉVISION

CANADA
PROVINCE DE QUÉBEC
MONTRÉAL

DOSSIER N° :  2010-024

DÉCISION N° :  2010-024-001

DATE :        Le 25 juin 2010

EN PRÉSENCE DE :   Mᵉ ALAIN GÉLINAS
                   Mᵉ CLAUDE ST PIERRE

**AUTORITÉ DES MARCHÉS FINANCIERS**
800 Square Victoria, 22ᵉ étage, C.P. 246, Montréal, district de Montréal
        Partie demanderesse
c.
**CAROL MCKEOWN,** 3011 rue Barat, Montréal (Québec) H3Y 2H4
et
**DANIEL F. RYAN** 3011 rue Barat, Montréal (Québec) H3Y 2H4
et
**DOWNSHIRE CAPITAL INC.,** personne morale ayant son domicile au 3011 rue Barat,
Montréal (Québec) H3Y 2H4
et
**MEADOW VISTA FINANCIAL CORP.,** personne morale constituée en vertu des lois du
Wyoming, ayant son domicile au 2710 Thomes Ave, Cheyenne, WY 82001 USA et
1000, rue Sherbrooke Ouest, bureau 2700, Montréal (Québec) H3A 3G4
et
**MCKEOWN BABOON BUILDING FAMILY TRUST,** 3011 rue Barat, Montréal (Québec)
H3Y 2H4
et
**HERBERT BABOON BUILDING FAMILY TRUST**
et
**MCKEOWN BABOON BUSINESS FAMILY TRUST**
et

**2010-024-001**                                                            **Page :  2**

**MCKEOWN/RYAN PRINCIPAL RESIDENCE TRUST,** ayant son domicile au 3011 rue Barat, Montréal (Québec) H3Y 2H4
     Parties intimées
et
**DEMERS VALEURS MOBILIÈRES INC.,** 615 René-Lévesque Ouest, Bureau 1120, Montréal (Québec) H3B 1P5
et
**DUNDEE SECURITIES CORPORATION,** 2055, rue Peel, Bureau 410, Montréal (Québec) H3A 1V4
et
**DESJARDINS VALEURS MOBILIÈRES,** 1170 rue Peel, Bureau 300, Montréal (Québec) H3B 0A9
et
**TD CANADA TRUST,** succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4
     Parties mises en cause

---

**ORDONNANCE DE BLOCAGE, INTERDICTION D'OPÉRATION SUR VALEURS ET D'EXERCER L'ACTIVITÉ DE CONSEILLER ET DÉCISION POUR MODE SPÉCIAL DE SIGNIFICATION**
[art. 249, 265 et 266, *Loi sur les valeurs mobilières* (L.R.Q., c. V.-1.1) et art. 93, 94 et 115.9, *Loi sur l'Autorité des marchés financiers* (L.R.Q., c. A-33.2) et art. 16, *Règlement sur les règles de procédure du Bureau de décision et de révision* ([2004] 136 G.O. II, 4695)]

---

Me Mélanie Hébert
(Girard et al.)
Procureure de l'Autorité des marchés financiers


Date d'audience :   25 juin 2010

2010-024-001                                          Page : 3

---

## DÉCISION

---

Le 25 juin 2010, l'Autorité des marchés financiers (ci-après l'« *Autorité* ») a saisi le Bureau de décision et de révision (ci-après le « *Bureau* ») d'une demande afin qu'il prononce, en vertu des articles 249, 265 et 266 de la *Loi sur les valeurs mobilières* et des articles 93, 94 et 115.9 de la *Loi sur l'Autorité des marchés financiers*, une ordonnance de blocage, une interdiction d'opération sur valeurs et d'exercer l'activité de conseiller à l'encontre des intimés et à l'égard des mises en cause qui suivent :

**Les intimés :**

- Carol McKeown;
- Daniel F. Ryan;
- Downshire Capital inc.;
- Meadow Vista Financial Corp.;
- McKeown Baboon Building Family Trust;
- Herbert Baboon Building Family Trust;
- McKeown Baboon Business Family Trust;
- McKeown/Ryan Principal Residence Trust;

**Les mises en cause :**

- Demers Valeurs mobilières inc.;
- Dundee Securities Corporation;
- Desjardins Valeurs mobilières;
- TD Canada Trust;

La demande de l'Autorité a été présentée en vertu de l'article 115.9 de la *Loi sur l'Autorité des marchés financiers* selon lequel il est loisible au Bureau de prononcer une décision affectant défavorablement les droits d'une personne sans audition préalable, lorsqu'un motif impérieux le requiert. Une audience *ex parte* s'est donc tenue au siège du Bureau le 25 juin 2010, afin que l'Autorité puisse présenter sa demande.

L'Autorité a déposé avec sa demande l'affidavit requis par l'article 19 du *Règlement sur les règles de procédure du Bureau de décision et de révision*, en vertu duquel une demande fondée sur des motifs impérieux doit être accompagnée d'une déclaration sous serment écrite à l'appui des faits de la demande et des motifs impérieux. Des

copies conformes de la demande de l'Autorité et des déclarations sous serment sont annexées à la présente décision.

## LA DEMANDE

Le Bureau présente maintenant les faits qui apparaissent à la demande de l'Autorité, telle qu'amendée durant l'audience :

### I. INTRODUCTION

#### A. L'Autorité des marchés financiers

1. La demanderesse, l'Autorité des marchés financiers (l'« Autorité »), est l'organisme chargé de l'application de la *Loi sur les valeurs mobilières* (« LVM »), et elle exerce les fonctions qui y sont prévues conformément à l'article 7 de la *Loi sur l'Autorité des marchés financiers* (« LAMF »);

2. Les faits contenus dans la présente demande proviennent à la fois de l'enquête menée par l'Autorité et de celle menée par la U.S. Securities and Exchange Commission (la « SEC »), à l'égard, notamment, des intimés;

3. Ainsi, certaines des pièces alléguées au soutien de la présente demande sont jointes aux procédures entamées par la SEC contre les intimés et intitulées « Emergency Complaint for Injunctive and Other Relief » et « Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support »;

#### B. Les intimés

4. Carol McKeown est administratrice, présidente, secrétaire et trésorière de Downshire Capital inc. (« Downshire »). Elle en est également l'actionnaire majoritaire;

5. Downshire est une personne morale, qui a été constituée le 23 juin 2006, et qui a son domicile au 3011, rue Barat à Montréal;

6. Cette adresse est également l'adresse à laquelle réside Carol McKeown;

7. La place d'affaires de Downshire est, selon son site Internet, le 1980 rue Sherbrooke Ouest, bureau 1110, à Montréal;

8. Carol McKeown a procédé à l'ouverture d'un compte de courtage au nom de Downshire auprès de Wilson Davis & Company Investment à Salt Lake City aux États-Unis;

9. Daniel F. Ryan est une des âmes dirigeantes de Downshire. Il se représente parfois comme étant un « managing partner » de Downshire ou encore, comme une personne ayant le contrôle sur cette compagnie;

10. Daniel F. Ryan a également donné des instructions aux courtiers de Downshire pour que des opérations sur les titres détenus par Downshire soient faites;

11. Meadow Vista Financial Corp (« Meadow ») est une compagnie américaine qui a été

constituée en vertu des lois du Wyoming, tel qu'il appert d'une copie d'un document intitulé « Filing information » émanant de l'état du Wyoming;

12.    Selon ce même document, Carol McKeown est la présidente de Meadow;

13.    Le relevé du système CIDREQ précise que Carol McKeown est administratrice, présidente et secrétaire de Meadow;

14.    Ce relevé indique également que Meadow a une place d'affaires au 1000 rue Sherbrooke Ouest à Montréal dans la province de Québec;

15.    Carol McKeown a notamment procédé à l'ouverture de deux comptes de courtage au nom de Meadow :

      a.    un premier auprès de Oppenheimer à New York aux États-Unis; et

      b.    un deuxième auprès Wilson Davis & Company Investment;

16.    Daniel F. Ryan est autorisé à transiger dans un des comptes de Meadow. Il a donné des instructions aux courtiers de Meadow pour que des opérations sur les titres détenus par cette dernière soient faites;

17.    Carol McKeown est la propriétaire de la marque de commerce « PennyStockChaser » au Canada et aux États-Unis;

18.    Downshire a le droit d'utiliser la marque de commerce « PennyStockChaser », en vertu d'un contrat de licence intervenu entre Carol McKeown et Downshire;

19.    Le site Internet www.PennyStockChaser.com (« PSC »), fait notamment la promotion d'actions de sociétés cotées en bourse, en cents;

20.    De façon plus précise, PSC décrit ainsi son objectif:

    « Our goal

    **PSC** aims to ease your investing endeavors by conducting thorough research on the stocks and their companies. It is our goal to ensure that all members are first to receive information on the best stock picks. **At PSC, our members' best interest is always our first priority! »**

21.    Un communiqué de presse a été émis par PSC en date du 14 avril 2009, lequel précise que Carol McKeown est la propriétaire du site Internet PSC ainsi que la personne à contacter en cas de question sur ledit communiqué. L'adresse donnée à ce communiqué est le 1980 rue Sherbrooke Ouest, bureau 1100, Montréal (Québec) H3Y 2H4;

22.    Daniel F. Ryan exerce un contrôle sur le site Internet PSC, ayant notamment approché des courtiers afin de signer une entente avec ces derniers;

23.    Carol McKeown, Daniel F. Ryan, Downshire, Meadow et PSC ne sont pas inscrits à l'Autorité;

2010-024-001                                                      Page :  6

## II.   LES FAITS

A.   Dénonciation reçue par l'Autorité et démarches d'analyse des faits soulevés par la dénonciation;

24.   Le 19 octobre 2009, l'Autorité a reçu une dénonciation indiquant les éléments factuels suivants :

a.   Downshire avait déposé environ 22 millions d'actions de Biocentric dans un compte de courtage qu'elle possédait auprès de Valeurs mobilières Demers;

b.   Roger E. Pawson aurait transféré ce bloc d'actions à Daniel F. Ryan pour services rendus;

c.   Le dénonciateur entretenait des doutes sur le fait que PSC aurait agi de concert avec Biocentric afin d'influencer la valeur du titre de Biocentric;

25.   À la suite de la réception de cette dénonciation, l'Autorité a entrepris des démarches afin de vérifier les allégations de ladite déclaration. Ces démarches ont révélé les faits suivants :

a.   Biocentric Energy Holdings inc. (« Biocentric ») est une compagnie située à Santa Ana en Californie qui se représente comme étant spécialisée dans le domaine de la bio-énergie;

b.   Biocentric n'est pas un émetteur assujetti au Québec; ses actions sont cotées sur le Pink Sheets sous le symbole BEHL;

c.   Selon les états de résultats non vérifiés de Biocentric, affichés sur le site Internet de Pink Sheets, de la date de début de la compagnie jusqu'au 31 décembre 2009, la compagnie a vendu, en devise US, 2 800 $ de produits;

d.   Le bilan de Biocentric au 31 décembre 2009, indique 421 433 $ US d'actif et 96 806 $ US de passif, donc une valeur comptable nette de 324 627 $ US;

e.   Au cours de la période entre 1er janvier 2009 et le 31 décembre 2009, les actions de Biocentric se sont négociées entre 0,013 cent et 15,5 cents US l'action;

2010-024-001                                                            Page : 7

Graphique 1



Source : Pink Sheets

f.   Le 7 septembre 2009, PSC a indiqué, sur son site Internet, que le mois de septembre sera un très bon mois pour BEHL (« *September is going to be a very good month for BEHL* »);

g.   Le 9 septembre 2009, Carol McKeown a ouvert deux comptes de courtage auprès de Valeurs mobilières Demers, plus précisément, les comptes portant les numéros ████DD4A (CAN) et ████DD4B (US);

h.   Le 9 septembre 2009, un communiqué a été émis par Biocentric, par l'entremise de Marketwire, une firme de communication basée à Toronto, annonçant une coentreprise entre Biocentric et Envirotek, une compagnie de la Californie;

i.   Le 12 septembre 2009, PSC a publié une alerte sur son site Internet indiquant que le cours du titre de Biocentric pouvait encore augmenter (« …*still have room to go* »);

j.   Le 16 septembre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué informant le public au sujet de différentes mises à jour faites à ses

actionnaires;

k. Le 21 septembre 2009, par l'entremise de Marketwire, Biocentric a annoncé une fusion avec une compagnie qu'elle n'a pas nommée (« *BioCentric has reached an agreement with a fully reporting company which will enable BioCentric to emerge as a fully reporting OTC Bulletin Board company.* »);

l. Aucune explication n'est fournie quant au financement de cette fusion et aucun montant concret n'est avancé dans ce communiqué;

m. Le 22 septembre 2009, 22 904 141 actions de Biocentric ont été déposées dans le compte détenu par Downshire, auprès de Valeurs mobilières Demers, et portant le numéro ████DD4B (US);

n. Le 23 septembre 2009, Downshire a vendu 2 630 810 actions de Biocentric pour un produit de disposition net de 117 303,56 $ US, soit un produit approximatif de 4,40 cents US par action;

o. Le 24 septembre 2009, PSC a publié une alerte sur son site Internet indiquant que le titre de BEHL augmenterait davantage à la suite de l'annonce de la fusion entre Biocentric et une compagnie du Nevada, dont le nom n'a pas été dévoilé;

p. Le même jour, PSC a publié une deuxième alerte sur son site Internet portant sur l'achat des actions de BEHL. Le titre du communiqué est « *BEHL, This is a company that is doing all the right things, WE THINK BEHL IS READY FOR LIFT-OFF, BEHL is a monster buy* »;

q. De plus, ce communiqué mentionne qu'une fois le processus de fusion établi, les teneurs de marché devront fermer leurs positions à découvert sur l'action;

r. Or, selon un avertissement sur le site Internet de Pink Sheets, il n'y a pas de teneurs de marché pour le titre de Biocentric;

s. Le 24 septembre 2009, Downshire a vendu 4 157 415 actions de Biocentric pour un produit de disposition net de 201 944,96 $ US, soit un produit approximatif de 4,86 cents US l'action;

t. Le 25 septembre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué informant le public au sujet de différentes mises à jour faites à ses actionnaires;

u. Le 25 septembre 2009, Downshire a vendu 2 585 569 actions de Biocentric pour un produit de disposition net de 123 385,51 $ US, soit un produit approximatif de 4,77 cents US l'action;

v. Le 27 septembre 2009, PSC a publié une alerte sur son site Internet indiquant avoir eu des discussions avec Biocentric au cours desquelles cette dernière a indiqué qu'elle émettrait deux communiqués au courant de la semaine, lesquels pourraient contenir de l'information au sujet de la fusion et/ou annonçant de nouvelles ententes de ventes;

w.   La même journée, PSC a publié une deuxième alerte sur son site Internet indiquant que les actions de Biocentric et deux autres compagnies seront très rentables (« *BIG PROFITS WILL COME IN ALL THREE* ») et a confirmé de nouveau que Biocentric ferait deux annonces au cours de la semaine;

x.   Toujours la même journée, PSC a publié une troisième alerte sur son site Internet indiquant que Biocentric devrait annoncer une nouvelle sensationnelle et que le cours du titre pourrait augmenter jusqu'à dix fois. Aucune précision n'est donnée au sujet de la nouvelle;

y.   Le 28 septembre 2009, Downshire a vendu 2 000 000 actions de Biocentric pour un produit de disposition net de 102 184,92 $ US, soit un produit par action de 5,11 cents US l'action;

z.   Le 29 septembre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué informant le public de différentes mises à jour faites à ses actionnaires;

aa.  Le 29 septembre 2009, Downshire a vendu 969 461 actions de Biocentric pour un produit de disposition net de 46 553,44 $ US, soit un produit approximatif de 4,80 cents US l'action;

bb.  Le 1er octobre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué clarifiant son avenir par rapport à l'environnement (« *statement of clarification as to the company's path towards the Green Environment* »);

cc.  Le 1er octobre 2009, PSC a publié une alerte sur son site Internet indiquant que les actions de Biocentric valaient plus que le cours actuel de 4,4 cents US l'action. De plus, PSC indique également que Biocentric avait confirmé qu'elle allait annoncer une nouvelle importante le lendemain;

dd.  Le 1er octobre 2009, PSC a publié une deuxième alerte sur son site Internet réitérant qu'à 4,4 cents US l'action, la valeur de Biocentric est sous-évaluée;

ee.  Le 1er octobre 2009, Downshire a vendu 500 000 actions de Biocentric pour un produit de disposition net de 22 343,60 $ US soit un produit approximatif de 4,47 cents US l'action;

ff.  Le 2 octobre 2009, Biocentric a émis un communiqué, par l'entremise de Marketwire, annonçant différents développements;

gg.  La nouvelle n'a pas eu d'impact positif sur l'action de Biocentric. Le titre a clôturé à 4,05 cents US le 2 octobre, alors qu'il avait clôturé à 4,3 cents US la journée précédente, soit le 1er octobre. Le graphique ci-bas fait état du cours du titre de Biocentric pour la période du 9 octobre au 14 octobre 2009;



*Source : Bloomberg*

hh.   Le 2 octobre 2009, Downshire a vendu 2 181 399 actions de Biocentric pour un produit de disposition de 95 573,92 $ US, soit un produit approximatif de 4,38 cents US l'action;

ii.   Le 3 octobre 2009, Downshire a vendu 3 769 470 actions de Biocentric pour un produit de disposition net de 153 044,95 $ US, soit un produit approximatif de 4,06 cents US par action;

jj.   Le 7 octobre 2009, un communiqué a été émis par Biocentric, par l'entremise de Marketwire, précisant que Emerginggreencompanies.com participerait au sommet « 2009 Algae Biomass »;

kk.   Le jour même, Biocentric a émis un deuxième communiqué annonçant que le sommet « 2009 Algae Biomass », aurait un nombre record de présentations et de discours;

ll.   Le 13 octobre 2009, un « *un avis de transfert sortant* » a été transmis par les Services financiers Penson Canada afin que Valeurs mobilières Demers transfère la totalité des actifs de Dowshire chez Dundee Securities, dans le compte ██████VCBN;

mm.   Le 14 octobre 2009, Biocentric a annoncé, par l'entremise de Marketwire, qu'elle avait reçu 500 000 $ US pour des fins de recherche d'un groupe d'investisseurs, sans par ailleurs dévoiler l'identité des investisseurs;

nn.   Le 15 octobre 2009, Biocentric a annoncé, par l'entremise de Marketwire, qu'elle avait reçu une commande pour la vente de 2 000 kg d'un de ses produits reliés aux algues. Le nom du ou des clients à l'origine de cette commande n'est pas identifié. La valeur de la commande n'apparaît pas non plus dans le communiqué;

oo.   Le 6 novembre 2009, le transfert des actifs de Downshire vers le compte ██████VCBN auprès de Dundee Securities a été confirmé;

pp.   Au cours de la période du 23 septembre au 5 octobre 2009, Downshire a vendu 18 794 124 actions de Biocentric, pour un produit de disposition net de 864 608,00 $ US ce qui représente un produit de disposition net de 4,6 cents US

par action.

   qq.  Le graphique ci-dessous démontre le cours du titre de Biocentric pour la période du 4 septembre au 9 novembre :

Graphique 3



*Source : Bloomberg*

   rr.  Le produit de disposition net des 18 794 124 actions de Biocentric vendues par Downshire représente un peu plus que deux fois la valeur comptable de Biocentric qui est de 324 627 $ US;

26.  Ces faits démontrent que le site Internet PSC fournissait des conseils au sujet de l'achat des actions de Biocentric;

27.  De plus, ces faits démontrant que Downshire vendait des actions de Biocentric alors que le site Internet de PSC faisait la promotion du titre et plus précisément, recommandait aux investisseurs d'acheter le titre de Biocentric;

B.  L'enquête menée par la SEC

28.  Tel que mentionné précédemment, la SEC a mené une enquête portant notamment sur les intimés. Cette enquête a démontré que les intimés ont mis sur pied le stratagème suivant :

   a.  À compter d'avril 2009, Carol McKeown et Daniel F Ryan ont publié, sur le site Internet de PSC, des recommandations portant sur différentes sociétés américaines de micro capitalisation (« microcap »);

   b.  Carol McKeown, Daniel F Ryan, Downshire ou Meadow ont reçu des actions de ces sociétés en contrepartie des recommandations publiées sur le site Internet de PSC;

    c. Alors que les recommandations publiées sur le site Internet de PSC incitaient (« urge ») les investisseurs à acheter les actions de l'une ou de l'autre de ces compagnies, Carol McKeown, Daniel F Ryan, Downshire et/ou Meadow vendaient les actions de ces sociétés profitant ainsi de l'augmentation du volume et du prix desdites actions;

    d. Carol McKeown et Daniel F Ryan n'ont pas dévoilé adéquatement le fait qu'ils vendent des actions de ces sociétés au moment même où ils recommandaient aux investisseurs, sur le site Internet de PSC, d'acheter des actions de ces sociétés;

    e. Carol McKeown et Daniel F Ryan n'ont pas dévoilé, à certaines occasions, la compensation complète qu'ils ont reçue pour les recommandations faites sur le site Internet de PSC;

29. De façon plus précise, l'enquête de la SEC a démontré que le stratagème expliqué au paragraphe précédent a été utilisé par Carol McKeown et Daniel F Ryan à l'égard des 6 sociétés suivantes : Converge global Inc., Biocentric Energy Holdings Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind and Solar Inc. et MSE Enviro-Tech Corp.;

30. D'ailleurs, selon l'information obtenue par la SEC, le stratagème en place à l'égard des sociétés Avro Energy Inc. et Bluewave Group Inc. se poursuivait en date du 9 juin 2010.

31. L'enquête de la SEC a également permis de démontrer que les produits réalisés par les intimés dans le cadre de ce stratagème ont été transférés au Québec, dans des comptes détenus par les intimés, tel qu'expliqué ci-après;

C. La demande d'assistance de la SEC

32. Le 9 juin 2010, l'Autorité a reçu une demande urgente d'assistance de la SEC;

33. Dans le cadre de cette demande d'assistance, l'Autorité a été avisée que la SEC a déposé et présenté, de façon urgente, une procédure intitulée « Emergency Complaint for Injunctive and Other Relief » ainsi qu'une procédure intitulée « Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support » (pièce D-1) devant la United States District Court of Southern District of Florida le 23 juin 2010;

34. Par la procédure intitulée « Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support », la SEC cherche à obtenir les ordonnances suivantes :

    a. « An Ex Parte Temporary Restraining Order »;

    b. « Freeze of Assets »;

    c. « Sworn Accounting »;

    d. « Order Prohibiting Desctruction of Records and Expediting Discovery »;

    e. « Repatriation Orders »;

35.  Le 23 juin 2010, l'honorable juge James I. Cohn de la United States District Court of Southern District of Florida a rendu deux jugements dans le cadre de ce dossier;

36.  Ces deux jugements contiennent les ordonnances suivantes à l'égard des intimés :

    a.  Une première ordonnance fixant une audition au 6 juillet afin de permettre aux intimés de démontrer que les ordonnances prononcées à leur égard devraient être levées;

    b.  Une deuxième ordonnance intitulée « *Temporary Restraining Order* » interdisant aux intimés de contrevenir à certaines dispositions de la loi américaine;

    c.  Une troisième ordonnance intitulée « *Asset Freeze* », laquelle est similaire à une ordonnance de blocage;

    d.  Une quatrième ordonnance intitulée « *Accountings* » enjoignant notamment Carol McKeown et Daniel F. Ryan, dans les 5 jours suivant la signification de la décision, à (i) « *make sworn accounting (...) of all funds, whether in the form of compensation, commission, income (including payments for assets, shares or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature)* » reçus par Carol McKeown et Daniel F. Ryan; (ii) « *make sworn accounting (...) of all assets, funds, or other properties held by McKeown and Ryan, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value and disposition of each such asset, fund, and other property;* » et (iii) « *provide (...) a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposit of any kind) in which they (whether solely or jointly), directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or rigth to exercise control.* »;

       Cette quatrième ordonnance enjoint également Dowshire et Meadow à produire de telles déclarations sous serment visant notamment à divulguer tous les fonds réalisés suite à la vente des actions des sociétés suivantes : Converge Global Inc., Biocentric Energy Holding Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind & Solar Inc. et MSE Enviro-Tech Corp.;

    e.  Une cinquième ordonnance intitulée « *Record Preservation* » enjoignant aux intimés et à leurs administrateurs, dirigeants, agents, employés, avocats, dépositaires, banques et « *those persons in active concert or participation with any one or more of them* » de ne pas notamment, détruire les livres, registres, correspondance, etc. relativement aux intimés;

    f.  Une sixième ordonnance intitulée « *Expedited Discovery* » permettant notamment la tenue d'interrogatoires;

    g.  Une septième ordonnance intitulée « *Repatriation Order* » visant le rapatriement des fonds vers les Etats-Unis;

37.  De plus, l'honorable juge James I. Cohn a, dans son deuxième jugement, ordonné que les procédures soient gardées sous scellés et ce, jusqu'à un maximum de 3 jours ouvrables

afin que la SEC puisse procéder à la signification des jugements notamment aux institutions financières concernées;

38. Ainsi, les procédures seront gardées sous scellés jusqu'au lundi 28 juin 2010;

## III. LES COMPTES BANCAIRES

39. L'enquête de l'Autorité a révélé que les intimés possèdent les comptes suivants dans la province de Québec :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Downshire | ■DD4A (CAN) et ■DD4B (US) | Compte inactif pour le moment | Demers Valeurs Mobilières |
| Downshire | ■VCBN et ■VCAN | 1,513,885.21$US et 69,654.79$ | Dundee Securities Corporation |
| Carol McKeown | ■91 AN et ■91 BN | Comptes inactifs pour le moment | Dundee Securities Corporation |
| Carol McKeown | ■NHB0 et ■NHW1 | 182$ et compte inactif | Desjardins Valeurs Mobilières |
| Meadow | ■5416 et ■7730 | 796,72$ et 304 643,92US$ | TD Canada Trust (succursale 4772) |
| Downshire | ■1666 et ■5479 | 55 957,55$ et 331,65US$ | TD Canada Trust (succursale 4772) |
| McKeown/Ryan Principal Residence | ■8024 | 377,23$ | TD Canada Trust (succursale 4772) |
| Carol McKeown | ■0815, ■7278 et ■4520 | 30 349,46$, 1 000 024,00$ et 18,96US$ | TD Canada Trust (succursale 4772) |

40. Carol McKeown possède un coffret de sûreté à la succursale TD Canada Trust située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4;

41. L'enquête de la SEC a permis de démontrer que les produits réalisés par les intimés dans le cadre de ce stratagème ont été transférés au Québec, dans certains des comptes détenus par les intimés, tel qu'il sera plus amplement expliqué lors de l'audition;

42. Enfin, des actifs qui sont à première vue utilisés par Carol McKeown semblent appartenir aux fiducies suivantes : McKeon Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeon Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust;

## IV.   BLOCAGE ET INTERDICTION

### A.   Les activités de manipulations de marché

43. À la lumière des faits mentionnés précédemment, l'Autorité et la SEC ont des motifs raisonnables et probables de croire que les intimés participent, à différents titres, à des activités organisées visant la manipulation du cours de différents titres et qu'ils tirent profits de ces activités organisées, au détriment des investisseurs;

44. Ces actes déloyaux et abusifs causent notamment un préjudice aux investisseurs qui procèdent à des opérations sur les titres en se fondant sur les recommandations contenues sur le site Internet de PSC;

45. Ces actes déloyaux et abusifs causent également un préjudice aux marchés des valeurs canadiens et américains puisqu'ils mettent en cause leur intégrité et détruisent la confiance des épargnants dans leur ensemble;

### B.   Activités de conseiller en valeurs

46. Aucun des intimés n'est présentement inscrit auprès de l'Autorité à titre de courtier ou de conseiller en valeurs;

47. Or, à la lumière des faits mentionnés précédemment, l'Autorité a des motifs raisonnables et probables de croire que les intimés exercent l'activité de conseiller en valeurs en participant à la mise en ligne, sur le site Internet de PSC, d'alertes contenant des recommandations portant sur des opérations sur valeurs et ce, sans être inscrits à ce titre auprès de l'Autorité;

### C.   Les actifs des intimés

48. L'Autorité et la SEC ont des motifs raisonnables et probables de croire que les intimés ont transféré à des institutions financières dans la province de Québec des gains réalisés en contravention de la LVM et/ou de la législation applicable aux États-Unis, particulièrement dans les comptes mentionnés précédemment;

### D.   Les ordonnances demandées

49. L'Autorité demande donc, pour la protection des épargnants, l'intégrité du marché et dans

l'intérêt du public, que le Bureau prononce les ordonnances d'interdiction recherchées dans la présente demande;

50. L'Autorité demande également, pour la protection des épargnants et dans l'intérêt du public, que le Bureau prononce les ordonnances de blocage recherchées dans la présente demande;

51. De plus, l'Autorité demande, afin d'assurer que les ordonnances de blocage demandées à l'égard des intimés soient pleinement efficaces, que des ordonnances de blocage soient également prononcées à l'égard des fiducies suivantes : McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust;

## V.  URGENCE ET MOTIFS IMPÉRIEUX

52. L'Autorité et la SEC ont des motifs raisonnables et probables de croire que les activités des intimés se poursuivaient en date du 9 juin 2010, notamment sur les actions des sociétés Avro Energy Inc. et Bluewave Group Inc;

53. Le site Internet de PSC est toujours opérationnel et accessible, en date des présentes;

54. Sans une décision immédiate du Bureau, il est à craindre, entre autres, que les activités des intimés se poursuivent au détriment de l'ensemble des épargnants;

55. De plus, et compte tenu que les procédures déposées par la SEC seront gardées sous scellés jusqu'au lundi 28 juin, il est à craindre que les intimés soient avisés de l'existence desdites procédures et tentent de dilapider, transférer ou cacher les sommes détenues dans les comptes mentionnés ci-hauts ou leurs autres actifs;

56. Il est donc impératif pour la protection du public et l'intégrité du marché, que le Bureau rende sa décision sans audition préalable, conformément à l'article 115.9 de la LAMF;

## L'ANALYSE

Au cours de l'audience du Bureau, l'Autorité a mis en preuve les faits qu'elle a énumérés dans sa demande, en faisant entendre le témoignage de deux enquêteurs qui sont à son service et qui ont déposé les documents relatifs au présent dossier. Le Bureau a pris connaissance de cette preuve de la demanderesse. Il est plus particulièrement inquiet des faits suivants ainsi que de certaines des allégations avancées par l'Autorité :

- Les intimés participeraient à des activités visant la manipulation du cours de différents titres et ils en tireraient profit au détriment des investisseurs et des marchés financiers;

- Au cours de la période du 23 septembre au 5 octobre 2009, Downshire aurait vendu 18 794 124 actions de Biocentric, pour lesquelles il aurait obtenu un produit de disposition net de 864 608 $ É.-U., représentant une

valeur nette de 4,6 cents É.-U. par action;

- Le produit de disposition net des 18 794 124 actions de Biocentric vendues par Downshire représenterait un peu plus de deux fois la valeur comptable de Biocentric qui s'élève à 324 627 $ É.-U.;

- Les profits réalisés par les intimés auraient été transférés dans des comptes au Québec;

- Les intimés auraient annoncé sur leur site Internet que le cours des titres d'une société augmenterait ou serait sous-évalué, mais le même jour ou le lendemain, ils auraient vendu les titres qu'ils détenaient, parfois à une valeur moindre que celle qu'ils mentionnaient comme étant sous-évaluée;

- Jusqu'au 23 juin 2010, les intimés feraient encore la promotion de titres sur le site Internet www.pennystockchaser.com;

- Les actes allégués par l'Autorité comme déloyaux et abusifs causeraient notamment un préjudice aux investisseurs qui procèdent à des opérations sur les titres en se fondant sur les recommandations contenues sur le site Internet de www.pennystockchaser.com;

- Ces actes causeraient de surcroît un préjudice aux marchés des valeurs canadiens et américains puisqu'ils s'attaquent à leur intégrité et minent la confiance du public investisseur;

- Les intimés exerceraient des activités de conseiller en plaçant des alertes sur leur site Internet qui contiennent des recommandations relatives à des opérations sur valeurs, alors qu'ils ne détiennent aucune inscription auprès de l'Autorité à titre de conseiller ou de courtier;

Par ailleurs, l'enquête menée par la Securities and Exchange Commission des États-Unis aurait démontré que les intimés pratiqueraient le stratagème suivant :

- À compter d'avril 2009, Carol McKeown et Daniel F Ryan auraient publié, sur le site Internet de PSC, des recommandations portant sur différentes sociétés américaines de micro capitalisation;

- Carol McKeown, Daniel F Ryan, Downshire ou Meadow auraient reçu des actions de ces sociétés en contrepartie des recommandations publiées sur le site Internet de PSC;

- Alors que les recommandations publiées sur le site Internet de PSC incitaient les investisseurs à acheter les actions de l'une ou de l'autre de ces compagnies, Carol McKeown, Daniel F Ryan, Downshire et\ou Meadow auraient vendu les actions de ces sociétés profitant ainsi de l'augmentation du volume et du prix desdites actions;

- o  Carol McKeown et Daniel F Ryan n'auraient pas dévoilé adéquatement le fait qu'ils auraient vendu des actions de ces sociétés au moment même où ils recommandaient aux investisseurs, sur le site Internet de PSC, d'acheter des actions de ces sociétés;

- o  Carol McKeown et Daniel F Ryan n'auraient pas dévoilé, à certaines occasions, la compensation complète qu'ils auraient reçue pour les recommandations faites sur le site Internet de PSC;

Le 23 juin 2010, l'honorable juge James I. Cohn de la United States District Court of Southern District of Florida a rendu deux jugements dans le cadre de ce dossier. Ces deux jugements contiennent sept ordonnances à l'égard des intimés.

Dans son argumentation, la procureure de l'Autorité a fait valoir au Bureau que les intimés au présent dossier agiraient en contravention des dispositions suivantes de la *Loi sur les valeurs mobilières* :

> « 148. Nul ne peut agir à titre de courtier, de conseiller ou de gestionnaire de fonds d'investissement, à moins d'être inscrit à ce titre.
>
> 195.2. Constitue une infraction le fait d'influencer ou de tenter d'influencer le cours ou la valeur d'un titre par des pratiques déloyales, abusives ou frauduleuses.
>
> 200. Commet une infraction toute personne qui, n'étant pas inscrite comme courtier, conseiller ou représentant, diffuse auprès des épargnants des renseignements de nature à influencer leurs décisions d'investissement et en retire un avantage distinct de sa rémunération normale.»

C'est-à-dire que les intimés agiraient à titre de conseiller, tel que défini à l'article 5 de la même loi, alors qu'ils ne détiennent pas d'inscription à ce titre auprès de l'Autorité. À ce titre, ils diffuseraient auprès des épargnants des renseignements de nature à influencer leurs décisions d'investissement et en retirer un avantage distinct. De plus, par leurs activités, ils tenteraient d'influencer ou de tenter d'influencer le cours de valeurs par des pratiques répréhensibles. Comme l'a dit plus directement l'enquêteur de l'Autorité, les intimés tenteraient de générer un intérêt sur des titres pour mieux se débarrasser de leurs propres actions[1].

---

[1].  On réfère généralement à ce procédé comme le « *pump and dump* », qui est défini comme suit : « A scheme that attempts to boost the price of a stock through recommendations based on false, misleading or greatly exaggerated statements. The perpetrators of this scheme, who already have an established position in the company's stock, sell their positions after the hype has led to a higher share price. This practice is illegal based on securities law and can lead to heavy fines. The victims of this scheme will often lose a considerable amount of their investment as the stock often falls back down after the process is complete. Traditionally, this type of scheme was done through cold calling, but with the advent of the internet this illegal practice has become even more prevalent. Pump and dump schemes usually target micro- and small-cap stocks, as they are the easiest to manipulate. Due to the small float of these types of stocks it does not take a lot of new

L'Autorité a plaidé que le Bureau devrait rendre une décision *ex parte*, sans permettre aux intimés de se faire entendre. C'est qu'une cour américaine a prononcé des décisions, dont il est fait état dans la demande de l'Autorité, qui doivent entraîner une réaction simultanée de notre tribunal, afin que les intérêts des épargnants soient protégés mais également que les profits des opérations présumément illégales des intimés soient mis à l'abri de toute tentative de retraits hâtifs.

Le Bureau note qu'en l'espèce une décision rendue *ex parte* est effectivement nécessaire, notamment pour assurer la protection des investisseurs, la confiance envers l'intégrité des marchés financiers et leur bon fonctionnement, au Québec, comme aux États-Unis. Par conséquent, en vertu de l'article 115.9 de la *Loi sur l'Autorité des marchés financiers*, le Bureau estime qu'il existe des motifs impérieux de prononcer à l'encontre des intimés les ordonnance de blocage, d'interdiction d'opération sur valeurs et d'interdiction d'exercer l'activité de conseiller.

## LA DÉCISION

Après avoir pris connaissance de la demande de l'Autorité, du témoignage de ses enquêteurs, des documents déposés en preuve à l'appui de cette demande et des arguments de la procureure de la demanderesse, tels que tout cela fut présenté au tribunal au cours de l'audience du 25 juin 2010, le Bureau de décision et de révision, en vertu des articles 249, 265 et 266 de la *Loi sur les valeurs mobilières* et des articles 93, 94 et 115.9 de la *Loi sur l'Autorité des marchés financiers* prononce les ordonnances suivantes :

1) ORDONNANCE DE BLOCAGE EN VERTU DE L'ARTICLE 249 DE LA *LOI SUR LES VALEURS MOBILIÈRES* ET DES ARTICLES 93, 94 ET 115.9 DE LA *LOI SUR L'AUTORITÉ DES MARCHÉS FINANCIERS* :

   **IL ORDONNE** à Valeurs mobilières Demers, de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants : ██FD4A (CAN) et ██DD4B (US), au nom de Downshire Capital inc.;

   **IL ORDONNE** à Dundee Securities Corporation, de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants :

---

buyers to push a stock higher; Voir *Investopedia*, (http://www.investopedia.com/terms/p/pumpanddump.asp).

2010-024-001                                                   Page : 20

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Downshire Capital Inc. | ⬛VCBN et ⬛VCAN | 1 513 885,21$US et 69 654,79$ | Dundee Securities Corporation |
| Carol McKeown | ⬛91 AN et ⬛91 BN | Comptes inactifs pour le moment | Dundee Securities Corporation |

**IL ORDONNE** à Desjardins Valeurs mobilières, de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants : ⬛NHB0 et ⬛NHW1 au nom de Carol McKeown;

**IL ORDONNE** à TD Canada Trust, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Meadow Vista Financial Corp. | ⬛5416 et ⬛7730 | 796,72$ et 304 643,92US$ | TD Canada Trust (succursale 4772) |
| Downshire Capital inc. | ⬛1666 et ⬛5479 | 55 957,55$ et 331,65US$ | TD Canada Trust (succursale 4772) |
| McKeown/Ryan Principal Residence | ⬛8024 | 377,23$ | TD Canada Trust (succursale 4772) |

2010-024-001

| Carol McKeown | ███0815, ███7278 et ███4520 | 30 349,46$, 1 000 024,00$ et 18,96US$ | TD Canada Trust (succursale 4772) |
|---|---|---|---|

**IL ORDONNE** à TD Canada Trust, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4 de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle dans un ou des coffrets de sûreté, au nom ou pour le compte des intimés;

**IL ORDONNE** aux mises en cause Demers Valeurs Mobilières, Dundee Securities Corporation, Desjardins Valeurs Mobilières, TD Canada Trust, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4 de ne pas permettre l'ouverture de compte bancaire ou de compte de courtage au nom des intimés ou pour le compte de ceux-ci;

**IL ORDONNE** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. de ne pas, directement ou indirectement, retirer des fonds, titres ou autres biens, de comptes bancaires ou de comptes de courtage qu'ils détiennent, incluant, mais sans limiter la généralité de ce qui précède, les comptes suivants :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Downshire Capital inc. | ███DD4A (CAN) et ███DD4B (US) | Compte inactif pour le moment | Demers Valeurs Mobilières |
| Downshire Capital inc. | ███VCBN et ███VCAN | 1 513 885,21$US et 69 654,79$ | Dundee Securities Corporation |
| Carol McKeown | ███91 AN et ███91 BN | Comptes inactifs pour le moment | Dundee Securities Corporation |

2010-024-001

| Carol McKeown | ███NHB0 et ███NHW1 | À préciser | Desjardins Valeurs Mobilières |
|---|---|---|---|
| Meadow Vista Financial Corp. | ███5416 et ███7730 | 796,72$ et 304 643,92US$ | TD Canada Trust (succursale 4772) |
| Downshire Capital inc. | ███1666 et ███5479 | 55 957,55$ et 331,65US$ | TD Canada Trust (succursale 4772) |
| McKeown/Ryan Principal Residence | ███8024 | 377,23$ | TD Canada Trust (succursale 4772) |
| Carol McKeown | ███0815, ███7278 et ███4520 | 30 349,46$, 1 000 024,00$ et 18,96US$ | TD Canada Trust (succursale 4772) |

**IL ORDONNE** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. de ne pas, directement ou indirectement, se départir de fonds, titres ou autres bien en leur possession;

**IL ORDONNE** aux intimés McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust de ne pas, directement ou indirectement, se départir de fonds, titres ou autres bien en leur possession;

2) **INTERDICTION D'OPÉRATION SUR VALEURS ET D'EXERCER L'ACTIVITÉ DE CONSEILLER EN VERTU DES ARTICLES 265 ET 266 DE LA *LOI SUR LES VALEURS MOBILIÈRES* ET DES ARTICLES 93 ET 115.9 DE LA *LOI SUR L'AUTORITÉ DES MARCHÉS FINANCIERS* :**

**IL INTERDIT** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. toute activité, directement ou indirectement, en vue d'effectuer toute opération sur valeurs;

**IL INTERDIT** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. d'exercer l'activité de conseiller, telle que définie à l'article 5 de la *Loi sur les valeurs mobilières*;

2010-024-001

3)   MODE SPÉCIAL DE SIGNIFICATION DE LA DÉCISION EN VERTU DE L'ARTICLE 16 DU RÈGLEMENT SUR LES RÈGLES DE PROCÉDURE DU BUREAU DE DÉCISION ET DE RÉVISION

**IL AUTORISE** la signification de la présente décision aux intimés McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust à l'adresse suivante : 3011 rue Barat, Montréal (Québec) H3Y 2H4.

En application du second alinéa de l'article 115.9 de la *Loi sur l'Autorité des marchés financiers*, le Bureau informe les intimés qu'ils ont une période de quinze jours pour demander au Bureau de tenir une audience relative à la présente décision. Celle-ci se tiendra alors dans la salle d'audience *Paul Fortugno* qui est située au 500, boulevard René-Lévesque Ouest, bureau 16.40, à Montréal (Québec).

Il appartient alors aux intimés de communiquer avec le Secrétariat du Bureau, au 1-877-873-2211, afin d'informer le Bureau qu'ils entendent exercer leur droit d'être entendus.

Les intimés sont aussi invités à prendre note qu'une partie a le droit de se faire représenter par un avocat. Le Bureau informe également les personnes morales et les entités désirant être entendues dans le cadre du présent dossier qu'elles sont tenues de se faire représenter par avocat au cours d'une audience devant le Bureau.

Les ordonnances d'interdiction d'opération sur valeurs et d'interdiction d'exercer l'activité de conseiller entrent en vigueur à la date à laquelle elles sont prononcées et elles le resteront jusqu'à ce qu'elles soient modifiées ou abrogées.

Conformément au premier alinéa de l'article 250 de la *Loi sur les valeurs mobilières*, l'ordonnance de blocage entre en vigueur à la date à laquelle elle est prononcée et le restera pour une période de 120 jours, à moins qu'elle ne soit modifiée ou abrogée avant l'échéance de ce terme.

Fait à Montréal, le 25 juin 2010.

_(S) Alain Gélinas_
**Mᵉ Alain Gélinas, président**

_(S) Claude St Pierre_
**Mᵉ Claude St Pierre, vice-président**

**COPIE CONFORME**

**Cathy Jalbert, conseillère juridique**
**Bureau de décision et de révision**