**PROVINCE OF QUEBEC**
**MONTREAL**

**BUREAU DE DÉCISION ET DE RÉVISION**

**CASE NO.**

**AUTORITÉ DES MARCHÉS FINANCIERS,** 800 Square Victoria, 22nd floor, PO Box 246, Montreal, district of Montreal

**PLAINTIFF**

v.

**CAROL MCKEOWN,** 3011 rue Barat, Montreal (Quebec) H3Y 2H4

and

**DANIEL F. RYAN** 3011 rue Barat, Montreal (Quebec) H3Y 2H4

and

**DOWNSHIRE CAPITAL INC.,** a legal entity located at 3011 rue Barat, Montreal (Quebec) H3Y 2H4

and

**MEADOW VISTA FINANCIAL CORP.,** a legal entity incorporated under the laws of Wyoming, located at 2710 Thomes Ave., Cheyenne, WY 82001 USA

and

**MCKEON BABOON BUILDING FAMILY TRUST,** 3011 rue Barat, Montreal (Quebec) H3Y 2H4

and

**HERBERT BABOON BUILDING FAMILY TRUST**

and

**MCKEON BABOON BUSINESS FAMILY TRUST**

and

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

1

**MCKEOWN/RYAN PRINCIPAL RESIDENCE TRUST**, located at 3011 rue Barat, Montreal (Quebec) H3Y 2H4

**RESPONDENTS**

and

**DEMERS VALEURS MOBILIÈRES INC.**, 615 René-Lévesque Ouest, Suite 1120, Montreal (Quebec) H3B 1P5

and

**DUNDEE WEALTH MANAGEMENT**, 1 Place Ville-Marie, Suite 3601, Montreal (Quebec) H3B 3P2

and

**DESJARDINS VALEURS MOBILIÈRES**, 1170 rue Peel, Suite 300, Montreal (Quebec) H3B 0A9

and

**TD CANADA TRUST,** branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A4

**PARTIES JOINED TO THE PROCEEDINGS**

Request from the *Autorité des marches financiers* pursuant to articles 93, 94 and 115.9 of the *Act Respecting the Autorité des marchés financiers*, L.R.Q., c. A-33.2, articles 249, 265 and 266 of the *Securities Act*, L.R.Q., c. V-1.1 and article 16 of the *Regulations concerning the procedures of the Bureau de décision et de révision*, c. V-1.1, R.0.1.3

THE *AUTORITÉ DES MARCHÉS FINANCIERS* RESPECTFULLY SUBMITS WHAT FOLLOWS TO THE *BUREAU DE DÉCISION ET RÉVISION*:

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

## I.   INTRODUCTION

### A.  The *Autorité des marchés financiers*

1.    The plaintiff, the *Autorité des marchés financiers* "the "*Autorité*"), is the agency responsible for the application of the *Securities Act* ("Securities Act"), and it carries out the duties that are set forth in this Act in accordance with article 7 of the *Act respecting the Autorité des marchés financiers* ("AAMF").

2.    The facts contained in this request stem both from the investigation conducted by the *Autorité* and the investigation conducted by the U.S. Securities and Exchange Commission (the "SEC"), particularly with regard to the respondents.

3.    Thus, some of the alleged documents in support of this request are appended to proceedings instituted by the SEC against the respondents and entitled "Emergency Complaint for Injunctive and Other Relief" and "Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support," appended in support of this request under exhibit **D-1.**

### B.   The respondents

4.    Carol McKeown is director, president, secretary and treasurer of Downshire Capital Inc. ("Downshire").  She is also the majority shareholder, as is clear from the CIDREQ certificate appended in support of this request under exhibit **D-2.**

5.    Downshire is a legal entity that was incorporated on June 23, 2006 and that is located at 3011, rue Barat, Montreal, as indicated by the CIDREQ system certificate, exhibit D-2.

6.    This address is also the address at which Carol McKeown resides, as evidenced by a copy of her driver's license, appended in support of this request in tab 2 of exhibit D-1.

7.    According to its Internet site, Downshire's place of business is located at 1980 rue Sherbrooke Ouest, Suite 1110, Montreal, as is indicated by a copy of an excerpt of this site appended in support of this request under exhibit **D-3.**

8.    Carol McKeown opened a brokerage account in the name of Downshire with Wilson Davis and Company Investment in Salt Lake City, USA as indicated by the copy of the account opening forms appended to this request under tab 3 of exhibit D-1.

9.    Daniel F. Ryan is one of the directing minds of Downshire.  He sometimes presents himself as being a "managing partner" of Downshire or as a person having control over this company, as indicated in particular by the copy of the document entitled "The Term Sheet for Financing of China Voip & Digital Telecom Inc." (tab 11), as well as the copy of the affidavit of Andrew Garbarini (tab 9), appended to this request as tabs 9 and 11 of exhibit D-1.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

10.    Daniel F. Ryan also gave instructions to Downshire's brokers to carry out operations on the securities held by Downshire, as is clear from a copy of documents exchanged with these brokers appended to this request as tab 13 of exhibit D-1.

11.    Meadow Vista Financial Corp. ("Meadow") is an American company that was set up under the laws of the state of Wyoming, as indicated by a copy of the document entitled "Filing information" coming from the state of Wyoming, appended in support of this request in tab 4 of exhibit D-1.

12.    According to this same document, Carol McKeown is the president of Meadow, as witnessed by this document, tab 4 of exhibit D-1.

13.    The CIDREQ system certificate states that Carol McKeown is director, president and secretary of Meadow, as indicated by this certificate appended in support of this request under exhibit **D-4**.

14.    This statement also indicates that Meadow has a place of business at 1000 rue Sherbrooke Ouest, Montreal, province of Quebec, as indicated by this certificate, exhibit D-4.

15.    Carol McKeown opened two brokerage accounts in Meadow's name:

    a.    a first account with Oppenheimer in New York, USA, as is clear from the copy of the account opening form appended to this request in tab 1 of exhibit D-1; and

    b.    a second account with Wilson Davis & Company Investment, as is clear from the copy of the account opening form appended in support of this request in tab 5 of exhibit D-1.

16.    Daniel F. Ryan is authorized to buy or sell in one of the Meadow accounts. He instructed Meadow's brokers to carry out operations on the securities held by Meadow, as indicated by a copy of Meadow's account opening form and the copies of documents exchanged with the Meadow brokers appended to this request in tabs 12 and 13 of exhibit D-1.

17.    Carol McKeown is the owner of the trademark "PennyStockChaser" in Canada and in the United States, as evidenced in particular by the copy of a letter sent by the Speigel Sohmer law firm to the SEC appended in support of this request in tab 6 of exhibit D-1.

18.    Downshire has the right to use the trademark "PennyStockChaser" pursuant to a licensing agreement signed by Carol McKeown and Downshire, as evidenced by the letter sent by the Speigel Sohmer law firm to the SEC and the licensing agreement, tab 6 of exhibit D-1.

19.    In particular, the Internet site www.PennyStockChaser.com ("PSC") promotes stocks of companies listed on the stock exchange in cents, as is clear from a copy of an excerpt of the Internet site appended to this request under exhibit **D-5**.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

4

20.    More precisely, PSC's describes its goal as follows:

> "Our goal
>
> **PSC** aims to ease your investing endeavors by conducting thorough research on the stocks and their companies. It is our goal to ensure that all members are first to receive information on the best stock picks. **At PSC, our members' best interest is always our first priority!**"

21.    A press release was issued by PCS on April 14, 2009, that states that Carol McKeown is the owner of the Internet site PCS, as well as the person to contact in case of any questions concerning this press release. The address given in this release is 1980 rue Sherbrooke Ouest, Suite 1100, Montreal (Quebec) H3Y 2H4, as is clear from a copy of this press release appended to this request under tab 7 of exhibit D-1.

22.    Daniel F. Ryan exercises control over the PSC Internet site, having more particularly approached brokers in order to sign an agreement with them, as is clear more particularly from the copies of the affidavits of Michael Jacobs and Andrew Garbarini appended to this request in tabs 8 and 9 of exhibit D-1.

23.    Carol McKeown, Daniel F. Ryan, Downshire, Meadow and PSC are not registered with the *Autorité*;

## II.    THE FACTS

A.    Information received by the *Autorité* and steps taken to analyze the facts raised by the informant

24.    On October 19, 2009, the *Autorité* received information indicating the following facts:

a.    Downshire had deposited around 22 million shares of Biocentric in a brokerage account that it owned at Valeurs mobilières Demers;

b.    Roger E. Pawson transferred this block of shares to Daniel F. Ryan for services rendered;

c.    The informant had doubts concerning whether PSC had acted in concert with Biocentric in order to influence the value of the Biocentric share;

25.    After receiving this information, the *Autorité* took steps to verify the allegations contained in this statement. These steps revealed the following facts;

a.    Biocentric Energy Holdings Inc. ("Biocentric") is a company located in Santa Ana, California, which presents itself as specializing in the bio-energy field, as is clear from a copy of an excerpt of the Biocentric Internet site appended to this request under exhibit **D-6**.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

b.   Biocentric is not a reporting issuer in Quebec; its shares are quoted on the Pink Sheets under the symbol BEHL, as is clear from a copy of an excerpt of the Internet site www.otcmarkets.com appended to this request under exhibit **D-7**.

c.   According to Biocentric's unaudited income statements displayed on the Pink Sheets Internet site, from the company's start date until December 31, 2009, the company sold $2,800 (U.S currency) worth of products, as indicated by a copy of these financial statements appended to this request under exhibit **D-8**.

d.   Biocentric's balance sheet as of December 31, 2009 indicates US$ 421,433 in assets and US$ 96,806 in liabilities, giving a net book value of US$ 324,627, as witnessed by the copy of this balance sheet, exhibit D-8.

e.   During the period between January 1, 2009 and December 31, 2009, the Biocentric shares traded at between US 0.013 cent and US 15.5 cents per share, as witnessed by the graph below.

[See original for graph 1]

*Source: Pink Sheets*

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

f.   On September 7, 2009, PSC indicated at its Internet site that *"September is going to be a very good month for BEHL"*), as indicated by a copy of the relevant excerpt from the PCS Internet site, exhibit **D-9**.

g.   On September 9, 2009, Carol McKeown opened two brokerage accounts with Valeurs mobilières Demers, more precisely accounts numbered ▇▇DD4A (CAN) and ▇▇DD4B (US), as is clear from the copy of the account opening form appended to this request under exhibit **D-10**.

h.   On September 9, 2009, a Biocentric issued a press release through Marketwire, a communication firm based in Toronto, announcing a joint venture between Biocentric and Envirotek, a California company, as evidenced by a copy of this press release appended to this request under exhibit **D-11**.

i.   On September 12, 2009, PSC published an alert at its Internet site indicating that the price of the Biocentric share might *"...still have room to go,"* as indicated by a copy of the excerpt from the PSC Internet site appended in support of this request under exhibit **D-12**.

j.   On September 16, 2009, through Marketwire, Biocentric issued a press release informing the public about various updates made to its shareholders, as indicated by a copy of this press release appended to this request under exhibit **D-13**.

k.   On September 21, 2009, through Marketwire, Biocentric announced a merger with a company that it did not name (*"Biocentric has reached an agreement with a fully reporting company which will enable BioCentric to emerge as a fully reporting OTC Bulletin Board company,"* as witnessed by a copy of this press release appended to this request under exhibit **D-14**.

l.   No explanation was given concerning the financing of this merger and no concrete amount was advanced in this press release, as is clear from this press release, exhibit D-14.

m.   On September 22, 2009, 22,904,141 Biocentric shares were deposited in account No. ▇▇DD4B (US) held by Downshire at Valeurs mobilières Demers, as evidenced by a copy of an e-mail appended to this request under exhibit **D-15**.

n.   On September 23, 2009, Downshire sold 2,630,810 Biocentric shares for net proceeds of disposition of US$ 117,303.56 or proceeds of approximately 4.40 US cents per share, as witnessed by a copy of an account statement appended to this request under exhibit **D-16**.

o.   On September 24, 2009, PSC published an alert at its Internet site indicating that the BEHL share would increase further following the announcement of the merger between Biocentric and a company in Nevada whose name was not disclosed, as is clear from a

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

copy of the relevant excerpt from the PCS Internet site appended in support of this request under exhibit **D-17**.

p.   On the same day, PSC published a second alert at its Internet site concerning the BEHL shares. The title of the press release is "*BEHL, This is a company that is doing all the right things, WE THINK BEHL IS READY FOR LIFT-OFF, BEHL is a monster buy*" as is clear from the copy of the relevant except from the PSC Internet site appended to this request under exhibit **D-18**.

q.   Furthermore, this press release mentions that once the merger process has been established, the market makers will have to close their short positions in the stock, as is clear from the copy of the relevant excerpt from the PSC Internet site, exhibit D-18.

r.   Now, according to a warning at the Pink Sheets Internet site, there are no market makers for the Biocentric share, as indicated by the copy of the excerpt from the Internet site www.otcmarkets.com, exhibit D-7.

s.   On September 245, 2009, Downshire sold 4,157,415 Biocentric shares for net proceeds of disposition of US$ 201,944.96 or proceeds of approximately 4.86 US cents per share, as witnessed by the copy of the account statement, exhibit D-16.

t.   On September 25, 2009, through Marketwire, Biocentric issued a press release informing the public of the different updates made to its shareholders, as indicated by a copy of this press release appended to this request under exhibit **D-19**.

u.   On September 25, 2009, Downshire sold 2,585,569 Biocentric shares for net proceeds on disposition of US$ 125,658.65 or proceeds of approximately 4.86 US cents per share, as witnessed by the copy of the account statement, exhibit D-16.

v.   On September 27, 2009, PSC published an alert at its Internet site indicating that it had had discussions with Biocentric during which Biocentric indicated that it would issue two press releases during the week that could contain information about the merger and/or announcing new sales agreements, as witnessed by a copy of the relevant excerpt from the PSC Internet site appended in support of this request under exhibit **D-20**.

w.   On the same day, PSC published a second alert at its Internet site indicating that the shares of Biocentric and two other companies will be very profitable ("*BIG PROFITS WILL COME IN ALL THREE*") and once again confirmed that Biocentric would make two announcements during the week, as is clear from a copy of the relevant excerpt from the PSC Internet site appended in support of this request under exhibit **D-21**.

x.   Still on the same day, PSC published a third alert at its Internet site indicating that Biocentric should announce sensational news and that the price of the share could increase up to ten times. No specifics were given concerning the news, as is clear from

the relevant excerpt from the PSC Internet site appended in support of this request under exhibit **D-22**.

y.  On September 28, 2009, Downshire sold 2,000,000 Biocentric shares for net proceeds of disposition of US$ 102,184.92, or earnings per share of 5.11 US cents, as evidenced by the copy of the account statement, exhibit D-16.

z.  On September 29, 2009, through Marketwire, Biocentric issued a press release informing the public of the different updates made to its shareholders, as indicated by a copy of this press release appended to this request under exhibit **D-23**.

aa.  On September 29, 2009, Downshire sold 969,461 Biocentric shares for net proceeds of disposition of US$ 46,553.44 or proceeds of approximately 4.80 US cents per share, as witnessed by the copy of the account statement, exhibit D-16.

bb.  On October 1, 2009, through Marketwire, Biocentric issued a press release clarifying its future with respect to the environment "*"statement of clarification as to the company's path towards the Green Environment"*"), as witnessed by a copy of this press release appended to this request under exhibit **D-24**.

cc.  On October 1, 2009, PSC published an alert at its Internet site indicating that the Biocentric shares were worth more than the current price of 4.4 US cents per share. Furthermore, PSC also indicated that Biocentric had confirmed that it was going to announce important news the following day, as is clear from a copy of the relevant excerpt from the PSC Internet site appended in support of this request under exhibit **D-25**.

dd.  On October 1, 2009, PSC published a second alert at its Internet site reiterating that at 4.4 US cents per share, Biocentric's stock was undervalued, as witnessed by a copy of the relevant excerpt from the PSC Internet site appended in support of this request under exhibit **D-26**.

ee.  On October 1, 2009, Downshire sold 500,000 Biocentric shares for net proceeds of disposition of US$ 22,343.60 or proceeds of approximately 4.47 US cents per share, as witnessed by the copy of the account statement appended to this request under exhibit **D-27**.

ff.  On October 2, 2009, Biocentric issued a press release through Marketwire announcing various developments, as is clear from a copy of this press release appended to this request under exhibit **D-28**.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

gg.     The news did not have any positive impact on the Biocentric share. The stock closed at 4.05 US cents on October 2, although it had closed at 4.3 US cents the day before, i.e., on October 1. The following graph shows the price of the Biocentric share for the period from October 9 to October 14, 2009;

[See original for graph]

*Source: Bloomberg*

hh.     On October 2, 2009, Downshire sold 2,181,399 Biocentric shares for proceeds of disposition of US$ 95,573.92 or proceeds of approximately 4.38 US cents per share, as evidenced by the copy of the account statement, exhibit D-27.

ii.     On October 3, 2009, Downshire sold 3,769,470 Biocentric shares for net proceeds of disposition of US$ 153,044.95 or proceedings of approximately 4.06 US cents per share, as witnessed by the copy of the account statement, exhibit D-27.

jj.     On October 7, 2009, a press release was issued by Biocentric through Marketwire, stating that Emerginggreencompanies.com would take part in the "2009 Algae Biomass" summit, as is clear from a copy of this press release appended to this request under exhibit **D-29**.

kk.     On the same day, Biocentric issued a second press release announcing that the "200 Algae Biomass" summit would have a record number of presentations and speeches, as indicated by a copy of this press release appended to this request under exhibit **D-30**.

ll.     On October 13, 2009, a *"notice of outgoing transfer"* was sent by the Penson Canada financial services so that Valeurs mobilières could transfer all of Downshire's assets at Dundee Securities to account ███VCBN, as evidenced by a copy of this notice appended to this request under exhibit **D-31**.

mm.     On October 14, 2009, Biocentric announced, through Marketwire, that it had received US$ 500,000 for research purposes from a group of investors, without revealing the identity of the investors, as indicated by a copy of this press release appended to this request under exhibit **D-32**.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

nn.   On October 15, 2009, Biocentric announced, through Marketwire, that it had received an order to sell 2,000 kg of one of its algae-related products. The name of the clients or clients behind this order is not indicated. The amount of the order does not appear in the announcement either, as is clear from a copy of this press release appended to this request under exhibit **D-33**.

oo.   On November 6, 2009, the transfer of Downshire assets to account ████VCNB with Dundee Securities was confirmed, as indicated by a copy of the confirmation document appended to this request under exhibit **D-34**.

pp.   During the period from September 23 to October 5, 2009, Downshire sold 18,794,124 Biocentric shares for net proceeds of disposition of US$ 864,608.00, which represents net proceeds of disposition of 4.6 US cents per share.

qq.   The graph below shows the price of the Biocentric stock for the period from September 4 to November 9:

[See original for Graph 3]

   *Source: Bloomberg*

rr.   The net proceeds of disposition from the 18,794,124 Biocentric shares sold by Downshire represent a little more than twice the book value of Biocentric, which is US$ 324,627;

26.   These facts demonstrate that the PSC Internet site provided advice concerning the purchase of Biocentric shares.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

11

27. Furthermore, these facts demonstrate that Downshire was selling Biocentric shares even though the PSC Internet site was promoting the stock and more specifically, was recommending that investors buy Biocentric stock;

B. The investigation conducted by the SEC

28. As mentioned earlier, the SEC conducted an investigation that focused particularly on the respondents. This investigation demonstrated that the respondents implemented the following stratagem:

   a. Beginning in April 2009, Carol McKeown and Daniel F. Ryan published recommendations concerning various American micro capitalization ("microcap") companies at the PSC Internet site;

   b. Carol Mckeown, Daniel F. Ryan, Downshire or Meadow received shares from these companies in exchange for the recommendations published at the PSC Internet site;

   c. While the recommendations published at the PSC Internet site urged investors to buy the shares of any of these companies, Carol McKeown, Daniel F. Ryan, Downshire and/or Meadow were selling the shares of these companies thus profiting from the increase in the volume and the price of these shares;

   d. Carol McKeown and Daniel F. Ryan did not adequately disclose the fact that they were selling shares of these companies at the very same time as they were recommending at the PSC Internet site that investors buy shares of these companies;

   e. Carol McKeown and Daniel F. Ryan did not disclose, on certain occasions, the complete compensation that they received for the recommendations made at the PSC Internet site.

   as is clear in particular from exhibit D-1.

29. More specifically, the SEC investigation demonstrated that the stratagem explained in the preceding paragraph was used by Carol McKeown and Daniel F. Ryan with regard to the following 6 companies: Converge global Inc., Biocentric Energy Holdings Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind and Solar Inc., and MSE Enviro-Tech Corp., as is clear in particular from exhibit D-1.

30. Additionally, according to the information obtained by the SEC, the stratagem in place with respect to the companies Avro Energy Inc. and Bluewave Group Inc. was still being pursued on June 9, 2010.

31. The SEC's investigation also made it possible to demonstrate that the proceeds realized by the respondents in connection with this stratagem were transferred to Quebec into accounts held by the respondents, as explained below;

C. The SEC's request for assistance

32. On June 9, 2010, the *Autorité* received an urgent request for assistance from the SEC, as witnessed by a copy of this request for assistance appended to this request under exhibit **D-35**.

33.  As part of this request for assistance, the *Autorité* was advised that the SEC filed and submitted urgent proceedings entitled *"Emergency Complaint for Injunctive and Other Relief"* as well as proceedings entitled *"Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support"* (exhibit D-1) before the United States District Court of Southern District of Florida on June 23, 2010;

34.  Through the proceedings entitled *"Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support,"* the SEC is seeking to obtain the following orders:

   a.  *"An Ex Parte Temporary Restraining Order"*;

   b.  *"Freeze of Assets"*;

   c.  *"Sworn Accounting"*;

   d.  *"Order Prohibiting Destruction of Records and Expediting Discovery"*;

   e.  *"Repatriation Orders"*;

as is clear from exhibit D-1.

35.  On June 23, 2010, the Honorable James I. Cohn of the United States District Court of Southern District of Florida rendered two judgments in connection with this case, as is clear from a copy of these two judgments appended to this request under exhibit **D-36**.

36.  These two judgments contain the following orders with regard to the respondents:

   a.  A first order scheduling a hearing for July 6 in order to allow the respondents to demonstrate that the orders handed down against them should be lifted;

   b.  A second order entitled *"Temporary Restraining Order"* prohibiting the respondents from contravening certain provisions of U.S. law;

   c.  A third order entitled *"Asset Freeze,"* which is similar to a freeze order in Canada;

   d.  A fourth order entitled *"Accountings"* ordering Carol McKeown and Daniel F. Ryan in particular, within 5 days following service of the decision, to (i) *"make sworn accounting (...) of all funds, whether in the form of compensation, commission, income (including payments for assets, shares or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature)"* received by Carol McKeown and Daniel F. Ryan; (ii) *"make sworn accounting (...) of all assets, funds or other properties held by McKeown and Ryan, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value and disposition of each such asset, fund and other property;* and (iii) *"provide (...) a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposit of any kind)*

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

13

*in which they (whether solely or jointly) directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or right to exercise control."*

This fourth order also orders Downshire and Meadow to produce such sworn accountings aimed more particularly at disclosing all funds earned following the sale of shares of the following companies:  Converge Global Inc., Biocentric Energy Holding Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind & Solar Inc. and MSE Enviro-Tech Corp.

e.     A fifth order entitled *"Record Preservation"* ordering the respondents and their administrative, directors, agents, employees, attorneys, depositories, banks and *"those persons in active concert of participation with any one or more of them"* not to destroy the books, registers, correspondence, etc., related to the respondents.

f.     A sixth order entitled *"Expedited Discovery"* allowing interrogations to be held.

g.     A seventh order entitled *"Repatriation Order"* aimed at repatriating the funds to the United States.

as is clear from this judgment, exhibit D-36.

37.   Furthermore, in his second judgment, the Honorable James I. Cohn ordered the proceedings sealed for up to a maximum of 3 business days so that the SEC could deliver the judgments to the financial institutions concerned, as witnessed by this judgment, exhibit D-36.

38.   Thus, the proceedings will be sealed until Monday, June 28, 2010.

## III.    THE BANK ACCOUNTS

39.   The investigation conducted by the *Autorité* revealed that the respondents own the following accounts in the province of Quebec:

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Downshire | ██DD4A (CAN) and ██DD4B (US) | Account inactive for the time being | Demers Valeurs Mobilières |
| Downshire | ██VCBN and ██VCAN | US$ 1,513,885.21 and 69,654.79$ | Dundee Wealth Management |

| Carol McKeown | ███91 AN and ███91 BN | Accounts inactive for the time being | Dundee Wealth Management |
|---|---|---|---|
| Carol McKeown | ███NHB0 and ███NHW1 | 182$ and inactive account | Desjardins Valeurs Mobilières |
| Meadow | ███5416 and ███7730 | 796.72$ and US$ 304,643.92 | TD Canada Trust (branch 4772) |
| Downshire | ███1666 and ███5479 | 55,957.55$ and US$ 331,65 | TD Canada Trust (branch 4772) |
| McKeown/Ryan Principal Residence | ███1024 | 377.23$ | TD Canada Trust (branch 4772) |
| Carol McKeown | ███0815, ███7278 and ███4520 | 30,349.46$, 1,000,024.00$ and US$ 18.96 | TD Canada Trust (branch 4772) |

40.   Carl McKeown has a safe deposit box at the TD Canada Trust branch located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A4.

41.   The SEC investigation made it possible to demonstrate that the proceeds realized by the respondents in connection with this stratagem were transferred to Quebec, into certain of the accounts held by the respondents, as will be more fully explained during the hearing.

42.   Finally, assets that are at first sight being used by Carol McKeown seem to belong to the following trusts:  McKeon Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeon Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust.

## IV   FREEZE AND PROHIBITION

### A. Market manipulation

43.   In light of the facts mentioned earlier, the *Autorité* and the SEC have reasonable and probable cause to believe that the respondents are taking part, in various ways, in organized activities aimed at manipulating the price of different stocks and that they are benefiting from these organized activities to the detriment of investors.

44.   More particularly, these unfair and abusive acts cause injury to investors who proceed with stock trades based on the recommendations contained on the PSC Internet site.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

45.   These unfair and abusive acts also cause injury to the Canadian and American stock markets since they place their integrity into question and destroy the trust of all investors.

B.  Securities advisor activities

46.   None of the respondents is currently registered with the *Autorité* as a broker or securities advisor.

47.   Now, given the facts mentioned earlier, the *Autorité* has reasonable and probable cause to believe that the respondents are carrying on a securities advisor activity by placing alerts on line at the PSC Internet site containing recommendations regarding securities transactions without being registered in this capacity with the *Autorité*.

C.  The respondents' assets

48.   The *Autorité* and the SEC have reasonable and probable cause to believe that the respondents have transferred to financial institutions in the province of Quebec gains realized in violation of the Securities Act and/or the laws applicable in the United States, particularly into the accounts mentioned earlier.

D.  The orders requested

49.   The *Autorité* therefore requests, for the protection of investors, the integrity of the market and in the public interest that the *Bureau* render the prohibition orders sought in this request.

50.   The *Autorité* also asks, for the protection of investors and in the public interest, that the *Bureau* render the freeze orders sought in this request.

51.   Furthermore, the *Autorité* asks, in order to ensure that the freeze orders requested against the respondents are fully effective, that the freeze orders also be rendered against the following trusts: McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust.

**V.   URGENCY AND COMPELLING REASONS**

52.   The *Autorité* and the SEC have reasonable and probable cause to believe that the respondents' activities were continuing on June 9, 2010, particularly concerning the shares of the companies Avro Energy Inc. and Bluewave Group Inc.

53.   The PSC Internet site is still currently operational and accessible.

54.   Without an immediate decision from the *Bureau*, it is to be feared, among other things, that the respondents' activities will continue to the detriment of all investors.

55.   Furthermore, and since the proceedings filed by the SEC will be sealed until Monday, June 28, it is to be feared that the respondents will be advised of the existence of these proceedings and will

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

16

attempt to misappropriate, transfer or hide the sums held in the accounts mentioned above or their other assets.

56.    It is therefore urgent for the protection of the public and the integrity of the market that the *Bureau* render its decision without any prior hearing in accordance with article 115.9 of the *Act respecting the Autorité des marchés financiers*.

**AS A RESULT,** the *Autorité des marchés financiers* asks the *Bureau de décision et de révision*, pursuant to articles 249, 265 and 266 of the *Securities Act* and article 16 of the Regulations concerning the procedures of the *Bureau de décision et de révision*, c. V-1.1, R.0.1.3, to render the following orders:

## FREEZES

**ORDER** Valeurs mobilières Demers not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts: ███FD4A (CAN) and███DD4B (US) in the name of Downshire Capital Inc..

**ORDER**  Dundee Wealth Management not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts:

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Downshire Capital Inc. | ███VCBN and ███VCAN | US$ 1,513,885.21 and 69,654.79$ | Dundee Wealth Management |
| Carol McKeown | ███91 AN and ███91 BN | Accounts inactive for the time being | Dundee Wealth Management |

**ORDER** Desjardins Valeurs mobilières not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts: ███NHB0 and███NHW1 in the name of Carol McKeown.

**ORDER** TD Canada Trust, branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z not to release funds, securities or other assets that it has on deposit or of which it has custody or control in the name or on behalf of the respondents, particularly in the following accounts:

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Meadow Vista Financial Corp. | ██5416 and ██7730 | 796.72$ and US$ 304,643.92 | TD Canada Trust (branch 4772) |
| Downshire Capital Inc. | ██1666 and ██5479 | 55,957.55$ and US$ 331.65 | TD Canada Trust (branch 4772) |
| Carol McKeown | 3130815, 6267278 and 7124520 | 30,349.46$, 1,000,024$ and US$ 18.96 | TD Canada Trust (branch 4772) |

**ORDER** TD Canada Trust, branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A4 not to release funds, securities or other assets that it has on deposit or of which it has custody or control in any safe deposit boxes in the name or on behalf of the respondents.

**ORDER** the joined parties Demers Valeurs Mobilières, Dundee Securities Corporation, Desjardins Valeurs Mobilières, TD Canada Trust, branch 4772, located at 1289 avenue Greene, Westmount (Quebec) H3Z 2A2 not to allow the opening of any bank account or brokerage account in the name or on behalf of the respondents.

**ORDER** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital Inc. and Meadow Vista Financial Corp. not to directly or indirectly withdraw funds, securities or other assets from bank accounts or brokerage accounts that they hold, including, but without limiting the general nature of what precedes, the following accounts:

| Holder of the account(s) | Account Number(s) | Balance(s) | Financial Institution |
|---|---|---|---|
| Downshire Capital Inc. | ██DD4A (CAN) And ██DD4B (US) | Account inactive for the time being | Demers Valeurs Mobilières |
| Downshire Capital Inc. | ██VCBN and ██VCAN | US$ 1,513,885.21 And 69,654.79$ | Dundee Wealth Management |

CERTIFIED TRANSLATION PREPARED BY SEVEN LANGUAGES, INC.

18

| Carol McKeown | ███91 AN and ███91 BN | Accounts inactive for the time being | Dundee Wealth Management |
|---|---|---|---|
| Carol McKeown | ███NHB0 and ███NHW1 | Account inactive for the time being | Desjardins Valeurs Mobilières |
| Meadow Vista Financial Corp. | ███5416 and ███7730 | 796.72$ and US$ 304,643.92 | TD Canada Trust Branch 4772) |
| Downshire Capital Inc. | ███1666 and ███5479 | 55,957.55$ and US$ 331.65 | TD Canada Trust Branch 4772) |
| Caro. McKeown | ███0815, ███7278 and ███4520 | 30,349.46$ 1,000,024.00$ and US$ 18.96 | TD Canada Trust Branch 4772) |

**ORDER** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital inc. and Meadow Vista Financial Corp. not to directly or indirectly dispose of funds, securities or other assets in their possession.

**ORDER** the respondents McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust not to directly or indirectly dispose of funds, securities or other assets in their possession.

## PROHIBITIONS

**PROHIBIT** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital inc. and Meadow Vista Financial Corp. from any activity directly or indirectly in view of carrying out any stock trades.

**PROHIBIT** the respondents Carol McKeown, Daniel F. Ryan, Downshire Capital inc. and Meadow Vista Financial Corp. from operating as an advisor as defined in article 5 of the *Securities Act.*

## OTHER FINDINGS

**DECLARE** pursuant to article 115.9 of the *Act Respecting the Autorité des marchés financiers* that the decision of the *Bureau de décision et de révision* will take effect without any prior hearing and give the parties the opportunity to be heard within a period of fifteen (15) days;

**ORDER** that this request and the decision to be rendered will remain confidential until delivery of the decision begins.

## DELIVERY

**AUTHORIZE** delivery of the decision to be rendered in this case to the respondents McKeown Baboon Family Building Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust at the following address: 3011 rue Barat, Montreal (Quebec) H3Y 2H4.

Done in Montreal on June 25, 2010.

*(S) Girard et al.*
GIRARD ET AL.
Attorneys of the *Autorité des marches financiers*

**COPY CERTIFIED TRUE**
by        [Signature]

Bureau de decision et de
révision

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

## AFFIDAVIT

I, the undersigned Fannie Turcot, investigator, with the *Autorité des marchés financiers* working at 800, square Victoria, 23rd floor, in the city and district of Montreal, solemnly swear as follows:

1.  I am an investigator with the *Autorité des marchés financiers;*

2.  I am assigned to the investigation related to these proceedings;

3.  All of the facts alleged in the Request for freeze and prohibition orders are true.

IN WITNESS WHEREOF, I SIGNED IN MONTREAL, on this June 25, 2010

*(S)  Fannie Turcot*

Solemnly sworn before me in
Montreal on this June 25, 2010

*(S)  MJ Régimbald*

Commissioner of oaths for all the judicial
districts of Quebec

COPY CERTIFIED TRUE
by  [Signature]
Bureau de décision et de
révision

**CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.**

## AFFIDAVIT

I, the undersigned Neal Mukherjee, investigator, with the *Autorité des marchés financiers* working at 800, square Victoria, 23rd floor, in the city and district of Montreal, solemnly swear as follows:

1.  I am an investigator with the *Autorité des marchés financiers;*

2.  I am assigned to the investigation related to these proceedings;

3.  All of the facts alleged in the Request for freeze and prohibition orders are true.

IN WITNESS WHEREOF, I SIGNED IN MONTREAL, on this June 25, 2010

*(S)  Neal Mukherjee*

Solemnly sworn before me in
Montreal on this June 25, 2010

*(S)  MJ Régimbald*

Commissioner of oaths for all the judicial
districts of Quebec

COPY CERTIFIED TRUE
by  [Signature]
Bureau de décision et de
révision

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

22

# SEVEN LANGUAGES TRANSLATING SERVICES, INC.

### T R A N S L A T O R S  •  I N T E R P R E T E R S

Conferences • Depositions • Documents • Translations • Legal • Commercial • Medical • Technical • U.S. Court Certified Interpreters
Web site: www.sevenlanguages.com • E-mail: sevenlan@gate.net

## CERTIFICATE OF TRANSLATION

STATE OF FLORIDA           }
                           }
COUNTY OF MIAMI-DADE       }

BEFORE ME, on this day, personally appeared ELISE GICHON-STRAUSS on

behalf of SEVEN LANGUAGES TRANSLATING SERVICES, INC., who being

duly sworn, deposes and says that she is fully versed in both the FRENCH and

ENGLISH languages, is accredited by the American Translators Association; and

that to the best of her knowledge and belief, the translation attached hereto is a true

and accurate rendition of the original aforesaid, consisting of __22__ pages and

that this is the last of the attached.

_____
ELISE GICHON -STRAUSS

The foregoing instrument was acknowledged by me on this __1__ day of __July__, 20__10__
ELISE GICHON-STRAUSS personally appeared before me at the time of notarization.  She is
personally known to me and produced a driver's license as identification and she did take an oath.

_____
Natasha M. Sanchez, Notary Public
State of Florida at Large

**NATASHA M SANCHEZ**
MY COMMISSION # DD811182
EXPIRES August 03, 2012
(407) 398-0153          FloridaNotaryService.com

SPANISH
FRENCH
ITALIAN
HEBREW
CREOLE
DUTCH
PORTUGUESE
GERMAN
CHINESE
JAPANESE
RUSSIAN
SCANDINAVIAN
ASIAN
SLAVIC
& ALL OTHER
LANGUAGES

The utmost care has been taken to ensure the accuracy of all translations.  Seven Languages Translating Services and its employees shall not be liable for any damages due to negligence or error in typing or translation.

OFFICES IN MIAMI • FT. LAUDERDALE • ORLANDO • TOKYO
19 W. FLAGLER ST. • SUITE 806 • MIAMI, FLORIDA 33130
DADE (305) 374-6761 • 24 HR. FAX (305) 374-0339 • 1-800-374-6761

PROVINCE DE QUÉBEC
MONTRÉAL

BUREAU DE DÉCISION ET DE RÉVISION

DOSSIER N°

AUTORITÉ DES MARCHÉS FINANCIERS, 800
Square Victoria, 22ᵉ étage, C.P. 246, Montréal,
district de Montréal

**DEMANDERESSE**

c.

CAROL MCKEOWN, 3011 rue Barat, Montréal
(Québec) H3Y 2H4

et

DANIEL F. RYAN 3011 rue Barat, Montréal
(Québec) H3Y 2H4

et

DOWNSHIRE CAPITAL INC., personne morale
ayant son domicile au 3011 rue Barat, Montréal
(Québec) H3Y 2H4

et

MEADOW VISTA FINANCIAL CORP., personne
morale constituée en vertu des lois du Wyoming,
ayant son domicile au 2710 Thomes Ave,
Cheyenne, WY 82001 USA

et

MCKEON BABOON BUILDING FAMILY TRUST,
3011 rue Barat, Montréal (Québec) H3Y 2H4

et

HERBERT BABOON BUILDING FAMILY TRUST

et

MCKEON BABOON BUSINESS FAMILY TRUST

et

1

**MCKEOWN/RYAN PRINCIPAL RESIDENCE TRUST**, ayant son domicile au 3011 rue Barat, Montréal (Québec) H3Y 2H4

**INTIMÉS**

et

**DEMERS VALEURS MOBILIÈRES INC.**, 615 René-Lévesque Ouest, Bureau 1120, Montréal (Québec) H3B 1P5

et

**DUNDEE WEALTH MANAGEMENT**, 1 Place Ville-Marie, Bureau 3601, Montréal (Québec) H3B 3P2

et

**DESJARDINS VALEURS MOBILIÈRES**, 1170 rue Peel, Bureau 300, Montréal (Québec) H3B 0A9

et

**TD CANADA TRUST**, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4

**MIS EN CAUSE**

---

Demande de l'Autorité des marchés financiers en vertu des articles 93, 94 et 115.9 de la *Loi sur l'Autorité des marchés financiers*, L.R.Q., c. A-33.2, des articles 249, 265, 266 de la *Loi sur les valeurs mobilières*, L.R.Q., c. V-1.1, et de l'article 16 du *Règlement sur les procédures du Bureau de décision et de révision*, c. V-1.1, R.0.1.3

---

**L'AUTORITÉ DES MARCHÉS FINANCIERS SOUMET RESPECTUEUSEMENT CE QUI SUIT AU BUREAU DE DÉCISION ET RÉVISION :**

2

## I.    INTRODUCTION

### A.  L'Autorité des marchés financiers

1.    La demanderesse, l'Autorité des marchés financiers (l'« Autorité »), est l'organisme chargé de l'application de la *Loi sur les valeurs mobilières*, L.R.Q., c. V-1.1 (« LVM »), et elle exerce les fonctions qui y sont prévues conformément à l'article 7 de la *Loi sur l'Autorité des marchés financiers*, L.R.Q. c. V-33.2 (« LAMF »).

2.    Les faits contenus dans la présente demande proviennent à la fois de l'enquête menée par l'Autorité et de celle menée par la U.S. Securities and Exchange Commission (la « SEC »), à l'égard, notamment, des intimés.

3.    Ainsi, certaines des pièces alléguées au soutien de la présente demande sont jointes aux procédures entamées par la SEC contre les intimés et intitulées « Emergency Complaint for Injunctive and Other Relief » et « Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support », jointes au soutien de la présente demande sous la pièce D-1.

### B.  Les intimés

4.    Carol McKeown est administratrice, présidente, secrétaire et trésorière de Downshire Capital inc. (« Downshire »). Elle en est également l'actionnaire majoritaire, tel qu'il appert du relevé du système CIDREQ joint au soutien de la présente demande sous la pièce **D-2**.

5.    Downshire est une personne morale, qui a été constituée le 23 juin 2006, et qui a son domicile au 3011, rue Barat à Montréal, tel qu'il appert du relevé du système CIDREQ, pièce D-2.

6.    Cette adresse est également l'adresse à laquelle réside Carol McKeown, tel qu'il appert notamment d'une copie de son permis de conduite, jointe au soutien de la présente demande à l'onglet 2 de la pièce D-1.

7.    La place d'affaires de Downshire est, selon son site Internet, le 1980 rue Sherbrooke Ouest, bureau 1110, à Montréal, tel qu'il appert d'une copie d'un extrait dudit site jointe au soutien de la présente demande sous la pièce **D-3**.

8.    Carol McKeown a procédé à l'ouverture d'un compte de courtage au nom de Downshire auprès de Wilson Davis & Company Investment à Salt Lake City aux États-Unis, tel qu'il appert de la copie des formulaires d'ouverture de comptes jointe à la présente demande sous l'onglet 3 de la pièce D-1.

9.    Daniel F. Ryan est une des âmes dirigeantes de Downshire. Il se représente parfois comme étant un « managing partner » de Downshire ou encore, comme une personne ayant le contrôle sur cette compagnie, tel qu'il appert notamment de la copie du document intitulé « The Term Sheet for Financing of China Voip & Digital Telecom Inc. » (onglet 11), ainsi que de la copie de l'affidavit d'Andrew Garbarini (onglet 9), jointes à la présente demande à titre d'onglets 9 et 11 de la pièce D-1.

3

10. Daniel F. Ryan a également donné des instructions aux courtiers de Downshire pour que des opérations sur les titres détenus par Downshire soient faites, tel qu'il appert notamment de copie de documents échangés avec ces courtiers jointes à la présente demande à titre d'onglet 13 de la pièce D-1.

11. Meadow Vista Financial Corp (« Meadow ») est une compagnie américaine qui a été constituée en vertu des lois du Wyoming, tel qu'il appert d'une copie d'un document intitulé « Filing information » émanant de l'état du Wyoming, jointe au soutien de la présente demande à l'onglet 4 de la pièce D-1.

12. Selon ce même document, Carol McKeown est la présidente de Meadow, tel qu'il appert dudit document, onglet 4 de la pièce D-1.

13. Le relevé du système CIDREQ précise que Carol McKeown est administratrice, présidente et secrétaire de Meadow, tel qu'il appert dudit relevé joint au soutien de la présente demande sous la pièce D-4.

14. Ce relevé indique également que Meadow a une place d'affaires au 1000 rue Sherbrooke Ouest à Montréal dans la province de Québec, tel qu'il appert dudit relevé, pièce D-4.

15. Carol McKeown a notamment procédé à l'ouverture de deux comptes de courtage au nom de Meadow :

    a. un premier auprès de Oppenheimer à New York aux États-Unis, tel qu'il appert de la copie du formulaire d'ouverture de compte jointe au soutien de la présente demande à l'onglet 1 de la pièce D-1; et

    b. un deuxième auprès Wilson Davis & Company Investment tel qu'il appert de la copie du formulaire d'ouverture de compte jointe au soutien de la présente demande à l'onglet 5 de la pièce D-1.

16. Daniel F. Ryan est autorisé à transiger dans un des comptes de Meadow. Il a donné des instructions aux courtiers de Meadow pour que des opérations sur les titres détenus par cette dernière soient faites, tel qu'il appert notamment d'une copie du formulaire d'ouverture de compte de Meadow et de la copie de documents échangés avec les courtiers de Meadow jointes à la présente demande à titre d'onglets 12 et 13 de la pièce D-1.

17. Carol McKeown est la propriétaire de la marque de commerce « PennyStockChaser » au Canada et aux États-Unis, tel qu'il appert notamment de la copie d'une lettre adressée par les procureurs Spiegel Sohmer à la SEC jointe au soutien de la présente demande à l'onglet 6 de la pièce D-1.

18. Downshire a le droit d'utiliser la marque de commerce « PennyStockChaser », en vertu d'un contrat de licence intervenu entre Carol McKeown et Downshire, tel qu'il appert de la lettre adressée par les procureurs Spiegel Sohmer à la SEC et du contrat de licence, onglet 6 de la pièce D-1.

19. Le site Internet www.PennyStockChaser.com (« PSC »), fait notamment la promotion d'actions de sociétés cotées en bourse, en cents, tel qu'il appert d'une copie d'un extrait du site Internet jointe à la présente demande sous la pièce D-5.

4

20.  De façon plus précise, PSC décrit ainsi son objectif:

> « Our goal
>
> **PSC** aims to ease your investing endeavors by conducting thorough research on the stocks and their companies. It is our goal to ensure that all members are first to receive information on the best stock picks. **At PSC, our members' best interest is always our fist priority!** »

tel qu'il appert de la copie de l'extrait du site Internet, pièce D-5.

21.  Un communiqué de presse a été émis par PSC en date du 14 avril 2009, lequel précise que Carol McKeown est la propriétaire du site Internet PSC ainsi que la personne à contacter en cas de question sur ledit communiqué. L'adresse donnée à ce communiqué est le 1980 rue Sherbrooke Ouest, bureau 1100, Montréal (Québec) H3Y 2H4, tel qu'il appert d'une copie dudit communiqué de presse jointe à la présente demande sous l'onglet 7 de la pièce D-1.

22.  Daniel F. Ryan exerce un contrôle sur le site Internet PSC, ayant notamment approché des courtiers afin de signer une entente avec ces derniers, tel qu'il appert notamment des copies des affidavits de Michael Jacobs et Andrew Garbarini jointes à la présente demande aux onglets 8 et 9 de la pièce D-1.

23.  Carol McKeown, Daniel F. Ryan, Downshire, Meadow et PSC ne sont pas inscrits à l'Autorité.

## II.   LES FAITS

### A.  Dénonciation reçue par l'Autorité et démarches d'analyse des faits soulevés par la dénonciation

24.  Le 19 octobre 2009, l'Autorité a reçu une dénonciation indiquant les éléments factuels suivants :

   a.  Downshire avait déposé environ 22 millions d'actions de Biocentric dans un compte de courtage qu'elle possédait auprès de Valeurs mobilières Demers.

   b.  Roger E. Pawson aurait transféré ce bloc d'actions à Daniel F. Ryan pour services rendus.

   c.  Le dénonciateur entretenait des doutes sur le fait que PSC aurait agi de concert avec Biocentric afin d'influencer la valeur du titre de Biocentric.

25.  À la suite de la réception de cette dénonciation, l'Autorité a entrepris des démarches afin de vérifier les allégations de ladite déclaration. Ces démarches ont révélé les faits suivants :

   a.  Biocentric Energy Holdings inc. (« Biocentric ») est une compagnie située à Santa Ana en Californie qui se représente comme étant spécialisée dans le domaine de la bio-énergie, tel qu'il appert d'une copie d'un extrait du site Internet de Biocentric jointe à la présente demande sous la pièce **D-6**.

5

b.  Biocentric n'est pas un émetteur assujetti au Québec; ses actions sont cotées sur le Pink Sheets sous le symbole BEHL, tel qu'il appert d'une copie d'un extrait du site Internet www.otcmarkets.com jointe à la présente demande sous la pièce D-7.

c.  Selon les états de résultats non vérifiés de Biocentric, affichés sur le site Internet de Pink Sheets, de la date de début de la compagnie jusqu'au 31 décembre 2009, la compagnie a vendu, en devise US, 2 800 $ de produits, tel qu'il appert d'une copie de ces états de résultats jointe à la présente demande sous la pièce D-8.

d.  Le bilan de Biocentric au 31 décembre 2009, indique 421 433 $ US d'actif et 96 806 $ US de passif, donc une valeur comptable nette de 324 627 $ US, tel qu'il appert de la copie de ce bilan, pièce D-8.

e.  Au cours de la période entre 1er janvier 2009 et le 31 décembre 2009, les actions de Biocentric se sont négociées entre 0,013 cent et 15,5 cents US l'action, tel qu'il appert du graphique ci-bas :

Graphique 1



Source : Pink Sheets

f. Le 7 septembre 2009, PSC a indiqué, sur son site Internet, que le mois de septembre sera un très bon mois pour BEHL (« *September is going to be a very good month for BEHL* »), tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC, pièce **D-9**.

g. Le 9 septembre 2009, Carol McKeown a ouvert deux comptes de courtage auprès de Valeurs mobilières Demers, plus précisément, les comptes portant les numéros ▇▇DD4A (CAN) et ▇▇DD4B (US), tel qu'il appert de la copie du formulaire d'ouverture de comptes jointe à la présente demande sous la cote **D-10**.

h. Le 9 septembre 2009, un communiqué a été émis par Biocentric, par l'entremise de Marketwire, une firme de communication basée à Toronto, annonçant une coentreprise entre Biocentric et Envirotek, une compagnie de la Californie, tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-11**.

i. Le 12 septembre 2009, PSC a publié une alerte sur son site Internet indiquant que le cours du titre de Biocentric pouvait encore augmenter (« *...still have room to go* ») tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au soutien de la présente demande sous la pièce **D-12**.

j. Le 16 septembre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué informant le public au sujet de différentes mises à jour faites à ses actionnaires, tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-13**.

k. Le 21 septembre 2009, par l'entremise de Marketwire, Biocentric a annoncé une fusion avec une compagnie qu'elle n'a pas nommée (« *BioCentric has reached an agreement with a fully reporting company which will enable BioCentric to emerge as a fully reporting OTC Bulletin Board company.* »), tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-14**.

l. Aucune explication n'est fournie quant au financement de cette fusion et aucun montant concret n'est avancé dans ce communiqué, tel qu'il appert dudit communiqué, pièce **D-14**.

m. Le 22 septembre 2009, 22 904 141 actions de Biocentric ont été déposées dans le compte détenu par Downshire, auprès de Valeurs mobilières Demers, et portant le numéro ▇▇DD4B (US), tel qu'il appert d'une copie d'un courriel jointe à la présente demande sous la pièce **D-15**.

n. Le 23 septembre 2009, Downshire a vendu 2 630 810 actions de Biocentric pour un produit de disposition net de 117 303,56 $ US, soit un produit approximatif de 4,40 cents US par action, tel qu'il appert d'une copie d'un relevé de compte jointe à la présente demande sous la pièce **D-16**.

o. Le 24 septembre 2009, PSC a publié une alerte sur son site Internet indiquant que le titre de BEHL augmenterait davantage à la suite de l'annonce de la fusion entre Biocentric et une compagnie du Nevada, dont le nom n'a pas été dévoilé,

tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au support de la présente demande sous la pièce D-17.

p.  Le même jour, PSC a publié une deuxième alerte sur son site Internet portant sur l'achat des actions de BEHL. Le titre du communiqué est « *BEHL, This is a company that is doing all the right things, WE THINK BEHL IS READY FOR LIFT-OFF, BEHL is a monster buy* », tel qu'il appert de la copie de l'extrait pertinent du site Internet de PSC jointe à la présente demande sous la pièce **D-18**.

q.  De plus, ce communiqué mentionne qu'une fois le processus de fusion établi, les teneurs de marché devront fermer leurs positions à découvert sur l'action, tel qu'il appert de la copie de l'extrait pertinent du site Internet de PSC, pièce D-18.

r.  Or, selon un avertissement sur le site Internet de Pink Sheets, il n'y a pas de teneurs de marché pour le titre de Biocentric, tel qu'il appert de la copie de l'extrait du site Internet www.otcmarkets.com , pièce D-7.

s.  Le 24 septembre 2009, Downshire a vendu 4 157 415 actions de Biocentric pour un produit de disposition net de 201 944,96 $ US, soit un produit approximatif de 4,86 cents US l'action, tel qu'il appert de la copie du relevé de compte, pièce D-16.

t.  Le 25 septembre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué informant le public au sujet de différentes mises à jour faites à ses actionnaires, tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-19**.

u.  Le 25 septembre 2009, Downshire a vendu 2 585 569 actions de Biocentric pour un produit de disposition net de 125 658,65 $, soit un produit approximatif de 4,86 cents US l'action, tel qu'il appert de la copie du relevé de compte, pièce D-16.

v.  Le 27 septembre 2009, PSC a publié une alerte sur son site Internet indiquant avoir eu des discussions avec Biocentric au cours desquelles cette dernière a indiqué qu'elle émettrait deux communiqués au courant de la semaine, lesquels pourraient contenir de l'information au sujet de la fusion et/ou annonçant de nouvelles ententes de ventes, tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au support de la présente demande sous la pièce D-**20**.

w.  La même journée, PSC a publié une deuxième alerte sur son site Internet indiquant que les actions de Biocentric et deux autres compagnies seront très rentables (« *BIG PROFITS WILL COME IN ALL THREE* ») et a confirmé de nouveau que Biocentric ferait deux annonces au cours de la semaine, tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au support de la présente demande sous la pièce **D-21**.

x.  Toujours la même journée, PSC a publié une troisième alerte sur son site Internet indiquant que Biocentric devrait annoncer une nouvelle sensationnelle et que le cours du titre pourrait augmenter jusqu'à dix fois. Aucune précision n'est donnée

au sujet de la nouvelle, tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au support de la présente demande sous la pièce **D-22**.

y. Le 28 septembre 2009, Downshire a vendu 2 000 000 actions de Biocentric pour un produit de disposition net de 102 184,92 $ US, soit un produit par action de 5,11 cents US l'action, tel qu'il appert de la copie du relevé de compte, pièce **D-16**.

z. Le 29 septembre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué informant le public de différentes mises à jour faites à ses actionnaires, tel qu'il appert de tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-23**.

aa. Le 29 septembre 2009, Downshire a vendu 969 461 actions de Biocentric pour un produit de disposition net de 46 553,44 $ US, soit un produit approximatif de 4,80 cents US l'action, tel qu'il appert de la copie du relevé de compte, pièce **D-16**.

bb. Le 1er octobre 2009, par l'entremise de Marketwire, Biocentric a émis un communiqué clarifiant son avenir par rapport à l'environnement (« *statement of clarification as to the company's path towards the Green Environment* »), tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-24**.

cc. Le 1er octobre 2009, PSC a publié une alerte sur son site Internet indiquant que les actions de Biocentric valaient plus que le cours actuel de 4,4 cents US l'action. De plus, PSC indique également que Biocentric avait confirmé qu'elle allait annoncer une nouvelle importante le lendemain, tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au support de la présente demande sous la pièce **D-25**.

dd. Le 1er octobre 2009, PSC a publié une deuxième alerte sur son site Internet réitérant qu'à 4,4 cents US l'action, la valeur de Biocentric est sous-évaluée, tel qu'il appert d'une copie de l'extrait pertinent du site Internet de PSC jointe au support de la présente demande sous la pièce **D-26**.

ee. Le 1er octobre 2009, Downshire a vendu 500 000 actions de Biocentric pour un produit de disposition net de 22 343,60 $ US soit un produit approximatif de 4,47 cents US l'action, tel qu'il appert de la copie du relevé de compte, jointe à la présente demande sous la pièce **D-27**.

ff. Le 2 octobre 2009, Biocentric a émis un communiqué, par l'entremise de Marketwire, annonçant différents développements, tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce **D-28**.

gg.   La nouvelle n'a pas eu d'impact positif sur l'action de Biocentric. Le titre a clôturé à 4,05 cents US le 2 octobre, alors qu'il avait clôturé à 4,3 cents US la journée précédente, soit le 1er octobre. Le graphique ci-bas fait état du cours du titre de Biocentric pour la période du 9 octobre au 14 octobre 2009.



Source : Bloomberg

hh.   Le 2 octobre 2009, Downshire a vendu 2 181 399 actions de Biocentric pour un produit de disposition de 95 573,92 $ US, soit un produit approximatif de 4,38 cents US l'action, tel qu'il appert de la copie du relevé de compte, pièce D-27.

ii.   Le 3 octobre 2009, Downshire a vendu 3 769 470 actions de Biocentric pour un produit de disposition net de 153 044,95 $ US, soit un produit approximatif de 4,06 cents US par action, tel qu'il appert de la copie du relevé de compte, pièce D-27.

jj.   Le 7 octobre 2009, un communiqué a été émis par Biocentric, par l'entremise de Marketwire, précisant que Emerginggreencompanies.com participerait au sommet « 2009 Algae Biomass », tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce D-29.

kk.   Le jour même, Biocentric a émis un deuxième communiqué annonçant que le sommet « 2009 Algae Biomass », aurait un nombre record de présentations et de discours, tel qu'il appert tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce D-30.

ll.   Le 13 octobre 2009, un « un avis de transfert sortant » a été transmis par les Services financiers Penson Canada afin que Valeurs mobilières Demers transfère la totalité des actifs de Dowshire chez Dundee Securities, dans le compte ███VCBN, tel qu'il appert d'une copie de cet avis jointe à la présente demande sous la pièce D-31.

mm.   Le 14 octobre 2009, Biocentric a annoncé, par l'entremise de Marketwire, qu'elle avait reçu 500 000 $ US pour des fins de recherche d'un groupe d'investisseurs, sans par ailleurs dévoiler l'identité des investisseurs, tel q'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce D-32.

nn.   Le 15 octobre 2009, Biocentric a annoncé, par l'entremise de Marketwire, qu'elle avait reçu une commande pour la vente de 2 000 kg d'un de ses produits reliés aux algues. Le nom du ou des clients à l'origine de cette commande n'est pas identifié. La valeur de la commande n'apparaît pas non plus dans le communiqué, tel qu'il appert d'une copie de ce communiqué jointe à la présente demande sous la pièce D-33.

oo.   Le 6 novembre 2009, le transfert des actifs de Downshire vers le compte ▓▓▓▓▓VCBN auprès de Dundee Securities a été confirmé, tel qu'il appert d'une copie du document de confirmation jointe à la présente demande sous la pièce D-34.

pp.   Au cours de la période du 23 septembre au 5 octobre 2009, Downshire a vendu 18 794 124 actions de Biocentric, pour un produit de disposition net de 864 608,00 $ US ce qui représente un produit de disposition net de 4,6 cents US par action.

qq.   Le graphique ci-dessous démontre le cours du titre de Biocentric pour la période du 4 septembre au 9 novembre :

Graphique 3



Source : Bloomberg

rr.   Le produit de disposition net des 18 794 124 actions de Biocentric vendues par Downshire représente un peu plus que deux fois la valeur comptable de Biocentric qui est de 324 627 $ US.

26.   Ces faits démontrent que le site Internet PSC fournissait des conseils au sujet de l'achat des actions de Biocentric.

27. De plus, ces faits démontrant que Downshire vendait des actions de Biocentric alors que le site Internet de PSC faisait la promotion du titre et plus précisément, recommandait aux investisseurs d'acheter le titre de Biocentric.

B. L'enquête menée par la SEC

28. Tel que mentionné précédemment, la SEC a mené une enquête portant notamment sur les intimés. Cette enquête a démontré que les intimés ont mis sur pied le stratagème suivant :

  a. À compter d'avril 2009, Carol McKeown et Daniel F Ryan ont publié, sur le site Internet de PSC, des recommandations portant sur différentes sociétés américaines de micro capitalisation (« microcap »).

  b. Carol McKeown, Daniel F Ryan, Downshire ou Meadow ont reçu des actions de ces sociétés en contrepartie des recommandations publiées sur le site Internet de PSC.

  c. Alors que les recommandations publiées sur le site Internet de PSC incitaient (« urge ») les investisseurs à acheter les actions de l'une ou de l'autre de ces compagnies, Carol McKeown, Daniel F Ryan, Downshire et/ou Meadow vendaient les actions de ces sociétés profitant ainsi de l'augmentation du volume et du prix desdites actions.

  d. Carol McKeown et Daniel F Ryan n'ont pas dévoilé adéquatement le fait qu'ils vendent des actions de ces sociétés au moment même où ils recommandaient aux investisseurs, sur le site Internet de PSC, d'acheter des actions de ces sociétés.

  e. Carol McKeown et Daniel F Ryan n'ont pas dévoilé, à certaines occasions, la compensation complète qu'ils ont reçu pour les recommandations faites sur le site Internet de PSC.

tel qu'il appert notamment de la pièce D-1.

29. De façon plus précise, l'enquête de la SEC a démontré que le stratagème expliqué au paragraphe précédent a été utilisé par Carol McKeown et Daniel F Ryan à l'égard des 6 sociétés suivantes : Converge global Inc., Biocentric Energy Holdings Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind and Solar Inc. et MSE Enviro-Tech Corp., tel qu'il appert notamment de la pièce D-1.

30. D'ailleurs, selon l'information obtenue par la SEC, le stratagème en place à l'égard des sociétés Avro Energy Inc. et Bluewave Group Inc. se poursuivait en date du 9 juin 2010.

31. L'enquête de la SEC a également permis de démontrer que les produits réalisés par les intimés dans le cadre de ce stratagème ont été transférés au Québec, dans des comptes détenus par les intimés, tel qu'expliqué ci-après.

C. La demande d'assistance de la SEC

32. Le 10 juin 2010, l'Autorité a reçu une demande urgente d'assistance de la SEC, tel qu'il appert d'une copie de ladite demande d'assistance jointe à la présente demande sous la pièce **D-35**.

33. Dans le cadre de cette demande d'assistance, l'Autorité a été avisée que la SEC a déposé et présenté, de façon urgente, une procédure intitulée « *Emergency Complaint for Injunctive and Other Relief* » ainsi qu'une procédure intitulée « *Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support* » (pièce D-1) devant la United States District Court of Southern District of Florida le 23 juin 2010.

34. Par la procédure intitulée « *Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Other Relief and Memorandum of Law in Support* », la SEC cherche à obtenir les ordonnances suivantes :

    a. « *An Ex Parte Temporary Restraining Order* »;

    b. « *Freeze of Assets* »;

    c. « *Sworn Accounting* »

    d. « *Order Prohibiting Desctruction of Records and Expediting Discovery* »;

    e. « *Repatriation Orders* »

tel qu'il appert de la pièce D-1.

35. Le 23 juin 2010, l'honorable juge James I. Cohn de la United States District Court of Southern District of Florida a rendu deux jugements dans le cadre de ce dossier, tel qu'il appert d'une copie de ces deux jugements jointe à la présente requête sous la pièce **D-36**.

36. Ces deux jugements contiennent les ordonnances suivantes à l'égard des intimés:

    a. Une première ordonnance fixant une audition au 6 juillet afin de permettre aux intimés de démontrer que les ordonnances prononcées à leur égard devraient être levées.

    b. Une deuxième ordonnance intitulée « *Temporary Restraining Order* » interdisant aux intimés de contrevenir à certaines dispositions de la loi américaine.

    c. Une troisième ordonnance intitulée « *Asset Freeze* », laquelle est similaire à une ordonnance de blocage.

    d. Une quatrième ordonnance intitulée « *Accountings* » enjoignant notamment Carol McKeown et Daniel F. Ryan, dans les 5 jours suivant la signification de la décision, à (i) « *make sworn accounting (...) of all funds, whether in the form of compensation, commission, income (including payments for assets, shares or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature)* » reçus par Carol McKeown et Daniel F. Ryan; (ii) « *make sworn accounting (...) of all assets, funds, or other properties held by McKeown and Ryan, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value and disposition of each such asset, fund, and other property*; et (iii) « *provide (...) a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposit of any kind) in which*

13

*they (whether solely or jointly), directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or rigth to exercise control. »*

Cette quatrième ordonnance enjoint également Dowshire et Meadow à produire de telles déclarations sous serment visant notamment à divulguer tous les fonds réalisés suite à la vente des actions des sociétés suivantes : Converge Global Inc., Biocentric Energy Holding Inc., Bluewave Group Inc., Avro Energy Inc., Atlantic Wind & Solar Inc. et MSE Enviro-Tech Corp.

e. Une cinquième ordonnance intitulée « *Record Preservation* » enjoignant aux intimés et à leurs administrateurs, dirigeants, agents, employés, avocats, dépositaires, banques et « *those persons in active concert or participation with any one or more of them* » de ne pas notamment, détruire les livres, registres, correspondance, etc. relativement aux intimés.

f. Une sixième ordonnance intitulée « *Expedited Discovery* » permettant notamment la tenue d'interrogatoires.

g. Une septième ordonnance intitulée « *Repatriation Order* » visant le rapatriement des fonds vers les États-Unis.

tel qu'il appert dudit jugement, pièce D-36.

37. De plus, l'honorable juge James I. Cohn a, dans son deuxième jugement, ordonné que les procédures soient gardées sous scellé et ce, jusqu'à un maximum de 3 jours ouvrables afin que la SEC puisse procéder à la signification des jugements notamment aux institutions financières concernées, tel qu'il appert dudit jugement, pièce D-36.

38. Ainsi, les procédures seront gardées sous scellé jusqu'au lundi 28 juin 2010.

## III. LES COMPTES BANCAIRES

39. L'enquête de l'Autorité a révélé que les intimés possèdent les comptes suivants dans la province de Québec :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Downshire | ▆DD4A (CAN) et ▆DD4B (US) | Compte inactif pour le moment | Demers Valeurs Mobilières |
| Downshire | ▆VCBN et ▆VCAN | 1,513,885.21$US et 69,654.79$ | Dundee Wealth Management |

| Carol McKeown | ██91 AN et<br>██91 BN | Comptes inactifs pour le moment | Dundee Wealth Management |
|---|---|---|---|
| Carol McKeown | ██NHB0 et<br>██NHW1 | 182$ et compte inactif | Desjardins Valeurs Mobilières |
| Meadow | ██5416 et<br>██7730 | 796,72$ et 304 643,92US$ | TD Canada Trust (succursale 4772) |
| Downshire | ██1666 et<br>██5479 | 55 957,55$ et 331,65US$ | TD Canada Trust (succursale 4772) |
| Carol McKeown | ██0815,<br>██7278 et<br>██4520 | 30 349,46$,<br>1 000 024,00$ et 18,96US$ | TD Canada Trust (succursale 4772) |

40. Carol McKeown possède un coffret de sûreté à la succursale TD Canada Trust située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4.

41. L'enquête de la SEC a permis de démontrer que les produits réalisés par les intimés dans le cadre de ce stratagème ont été transférés au Québec, dans certains des comptes détenus par les intimés, tel qu'il sera plus amplement expliqué lors de l'audition.

42. Enfin, des actifs qui sont à première vue utilisés par Carol McKeown semblent appartenir aux fiducies suivantes : McKeon Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeon Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust.

## IV.   BLOCAGE ET INTERDICTION

### A.   Les activités de manipulations de marché

43. À la lumière des faits mentionnés précédemment, l'Autorité et la SEC ont des motifs raisonnables et probables de croire que les intimés participent, à différents titres, à des activités organisées visant la manipulation du cours de différents titres et qu'ils tirent profits de ces activités organisés, au détriment des investisseurs.

44. Ces actes déloyaux et abusifs causent notamment un préjudice aux investisseurs qui procèdent à des opérations sur les titres en se fondant sur les recommandations contenues sur le site Internet de PSC.

45. Ces actes déloyaux et abusifs causent également un préjudice aux marchés des valeurs canadiens et américains puisqu'ils mettent en cause leur intégrité et détruisent la confiance des épargnants dans leur ensemble.

B.  Activités de conseiller en valeurs

46. Aucun des intimés n'est présentement inscrit auprès de l'Autorité à titre de courtier ou de conseiller en valeurs.

47. Or, à la lumière des faits mentionnés précédemment, l'Autorité a des motifs raisonnables et probables de croire que les intimés exercent l'activité de conseiller en valeurs en participant à la mise en ligne, sur le site Internet de PSC, d'alertes contenant des recommandations portant sur des opérations sur valeurs et ce, sans être inscrits à ce titre auprès de l'Autorité.

C.  Les actifs des intimés

48. L'Autorité et la SEC ont des motifs raisonnables et probables de croire que les intimés ont transféré à des institutions financières dans la province de Québec des gains réalisés en contravention de la LVM et/ou de la législation applicable aux États-Unis, particulièrement dans les comptes mentionnés précédemment.

D.  Les ordonnances demandées

49. L'Autorité demande donc, pour la protection des épargnants, l'intégrité du marché et dans l'intérêt du public, que le Bureau prononce les ordonnances d'interdiction recherchées dans la présente demande.

50. L'Autorité demande également, pour la protection des épargnants et dans l'intérêt du public, que le Bureau prononce les ordonnances de blocage recherchées dans la présente demande.

51. De plus, l'Autorité demande, afin d'assurer que les ordonnances de blocage demandées à l'égard des intimés soient pleinement efficaces, que des ordonnances de blocage soient également prononcées à l'égard des fiducies suivantes: McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust.

V.  URGENCE ET MOTIFS IMPÉRIEUX

52. L'Autorité et la SEC ont des motifs raisonnables et probables de croire que les activités des intimés se poursuivaient en date du 9 juin 2010, notamment sur les actions des sociétés Avro Energy Inc. et Bluewave Group Inc.

53. Le site Internet de PSC est toujours opérationnel et accessible, en date des présentes.

54. Sans une décision immédiate du Bureau, il est à craindre, entre autres, que les activités des intimés se poursuivent au détriment de l'ensemble des épargnants.

55. De plus, et compte tenu que les procédures déposées par la SEC seront gardées sous scellé jusqu'au lundi 28 juin, il est à craindre que les intimés soient avisés de l'existence

desdites procédures et tentent de dilapider, transférer ou cacher les sommes détenues dans les comptes mentionnés ci-hauts ou leurs autres actifs.

56.   Il est donc impérieux pour la protection du public et l'intégrité du marché, que le Bureau rende sa décision sans audition préalable, conformément à l'article 115.9 de la LAMF.

**EN CONSÉQUENCE,** l'Autorité des marchés financiers demande au Bureau de décision et de révision, en vertu des articles 93, 94 et 115.9 de la *Loi sur l'Autorité des marchés financiers* et des articles 249, 265 et 266 de la *Loi sur les valeurs mobilières* et l'article 16 du Règlement sur les procédures du Bureau de décision et de révision, c. V-1.1, R.0.1.3, de rendre les conclusions suivantes :

**BLOCAGES**

**D'ORDONNER** à Valeurs mobilières Demers, de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants : ■■FD4A (CAN) et ■■DD4B (US), au nom de Downshire Capital inc.;

**D'ORDONNER** à Dundee Wealth Management, de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Downshire Capital Inc. | ■■VCBN et ■■VCAN | 1 513 885,21$US et 69 654,79$ | Dundee Wealth Management |
| Carol McKeown | ■■91 AN et ■■91 BN | Comptes inactifs pour le moment | Dundee Wealth Management |

**D'ORDONNER** à Desjardins Valeurs mobilières, de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants : ■■NHB0 et ■■NHW1 au nom de Carol McKeown;

**D'ORDONNER** à TD Canada Trust, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle au nom ou pour le compte des intimés, notamment dans les comptes suivants :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Meadow Vista Financial Corp. | ███5416 et ███7730 | 796,72$ et 304 643,92US$ | TD Canada Trust (succursale 4772) |
| Downshire Capital inc. | ███1666 et ███5479 | 55 957,55$ et 331,65US$ | TD Canada Trust (succursale 4772) |
| Carol McKeown | ███0815, ███7278 et ███4520 | 30 349,46$, 1 000 024,00$ et 18,96US$ | TD Canada Trust (succursale 4772) |

**D'ORDONNER** à TD Canada Trust, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4 de ne pas se départir de fonds, titres ou autres biens, qu'elle a en dépôt ou dont elle a la garde ou le contrôle dans un ou des coffrets de sûreté, au nom ou pour le compte des intimés.

**D'ORDONNER** aux mises en cause Demers Valeurs Mobilières, Dundee Wealth Management, Desjardins Valeurs Mobilières, TD Canada Trust, succursale 4772, située au 1289 avenue Greene, Westmount (Québec) H3Z 2A4 de ne pas permettre l'ouverture de compte bancaire ou de compte de courtage au nom des intimés ou pour le compte de ceux-ci;

**D'ORDONNER** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. de ne pas, directement ou indirectement, retirer des fonds, titres ou autres biens, de comptes bancaires ou de comptes de courtage qu'ils détiennent, incluant, mais sans limiter la généralité de ce qui précède, les comptes suivants :

| Détenteur du/des compte(s) | Numéro(s) du/des Compte(s) | Solde(s) | Institution financière |
|---|---|---|---|
| Downshire Capital inc. | ███DD4A (CAN) et ███DD4B (US) | Compte inactif pour le moment | Demers Valeurs Mobilières |
| Downshire Capital inc. | ███VCBN et ███VCAN | 1 513 885,21$US et 69 654,79$ | Dundee Wealth Management |

| Carol McKeown | ██91 AN et ██91 BN | Comptes inactifs pour le moment | Dundee Wealth Management |
|---|---|---|---|
| Carol McKeown | ██NHB0 et ██NHW1 | À préciser | Desjardins Valeurs Mobilières |
| Meadow Vista Financial Corp. | ██5416 et ██7730 | 796,72$ et 304 643,92US$ | TD Canada Trust (succursale 4772) |
| Downshire Capital inc. | ██1666 et ██5479 | 55 957,55$ et 331,65US$ | TD Canada Trust (succursale 4772) |
| Carol McKeown | ██0815, ██7278 et ██4520 | 30 349,46$, 1 000 024,00$ et 18,96US$ | TD Canada Trust (succursale 4772) |

**D'ORDONNER** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. de ne pas, directement ou indirectement, se départir de fonds, titres ou autres bien en leur possession;

**D'ORDONNER** aux intimés McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust de ne pas, directement ou indirectement, se départir de fonds, titres ou autres bien en leur possession;

## INTERDICTIONS

**D'INTERDIRE** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. toute activité, directement ou indirectement, en vue d'effectuer toute opération sur valeurs;

**D'INTERDIRE** aux intimés Carol McKeown, Daniel F. Ryan, Downshire Capital inc. et Meadow Vista Financial Corp. d'exercer l'activité de conseiller, telle que définie à l'article 5 de la LVM;

19

## AUTRES CONCLUSIONS

**DE DÉCLARER** en vertu de l'article 115.9 de la *Loi sur l'Autorité des marchés financiers* que la décision du Bureau de décision et de révision entre en vigueur sans audition préalable et donner aux parties l'occasion d'être entendues dans un délai de quinze (15) jours;

**D'ORDONNER** la confidentialité de la présente demande et de la décision à être rendue jusqu'au début de la signification.

## SINGIFICATION

**D'AUTORISER** la signification de la décision à être rendue dans le présent dossier aux intimés McKeown Baboon Building Family Trust, Herbert Baboon Building Family Trust, McKeown Baboon Business Family Trust, McKeown/Ryan Principal Residence Trust à l'adresse suivante : 3011 rue Barat, Montréal (Québec) H3Y 2H4

Fait à Montréal, le 25 juin  2010

_(S) Girard et al._

GIRARD ET AL.
Procureurs de l'Autorité des marchés financiers

COPIE CONFORME
par _____
Bureau de décision et de
révision

**AFFIDAVIT**

Je, soussignée, Fannie Turcot, enquêtrice à l'Autorité des marchés financiers exerçant ma profession au 800, square Victoria, 23ième étage, dans la ville et le district de Montréal, affirme solennellement ce qui suit :

1.  Je suis enquêtrice à l'Autorité des marchés financiers;

2.  Je suis assignée au dossier d'enquête faisant l'objet dans la présente procédure;

3.  Tous les faits allégués dans la Demande d'ordonnance de blocage et d'interdiction sont vrais.

EN FOI DE QUOI, J'AI SIGNÉ À MONTRÉAL,
ce 25 juin 2010

*(S) Fannie Turcot*

Affirmé solennellement devant moi à
Montréal, ce 25 juin 2010

*(S) MJ Régimbald*

Commissaire à l'assermentation pour tous les
districts judiciaires du Québec

COPIE CONFORME
par
Bureau de décision et de
révision

21

## AFFIDAVIT

Je, soussigné, Neal Mukherjee, enquêteur à l'Autorité des marchés financiers, exerçant ma profession au 800, square Victoria, 23$^{ième}$ étage, dans la ville et le district de Montréal, affirme solennellement ce qui suit :

4.  Je suis enquêteur à l'Autorité des marchés financiers;

5.  Je suis assignée au dossier d'enquête faisant l'objet dans la présente procédure;

6.  Tous les faits allégués dans la Demande d'ordonnance de blocage et d'interdiction sont vrais.

EN FOI DE QUOI, J'AI SIGNÉ À MONTRÉAL,
ce 25 juin 2010

(S) Neal Mukherjee
_____

Affirmé solennellement devant moi à
Montréal, ce 25 juin 2010

(S) MJ Régimbald
_____

Commissaire à l'assermentation pour tous les
districts judiciaires du Québec

COPIE CONFORME
par_____
Bureau de décision et de
révision

22