## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-80748-CIV-COHN

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| CAROL MCKEOWN, DANIEL F. RYAN, | ) |
| MEADOW VISTA FINANCIAL CORP., | ) |
| AND DOWNSHIRE CAPITAL INC., | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

### PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF AGAINST DEFENDANTS CAROL MCKEOWN, DANIEL F. RYAN, MEADOW VISTA FINANCIAL CORP., AND <u>DOWNSHIRE CAPITAL INC.</u>

Plaintiff Securities and Exchange Commission, pursuant to Federal Rule of Civil Procedure 55(b)(2), moves for entry of a default judgment of permanent injunction and other relief against Defendants Carol McKeown, Daniel F. Ryan, Meadow Vista Financial Corp., and Downshire Capital Inc. and states:

### I.  INTRODUCTION

The Commission filed this action alleging McKeown and Ryan used the website www.PennyStockChaser.com to tout dozens of U.S. companies while at the same time liquidating millions of shares of the same companies through their two corporations, Downshire Capital Inc., and Meadow Vista Financial Corp.  To compensate McKeown and Ryan for the PennyStockChaser website's touting, affiliates of the touted companies ("issuers") or third parties gave shares to Downshire and Meadow Vista.  Those companies then sold the shares on the open market while PennyStockChaser simultaneously predicted massive price increases for

the issuers, a practice known as "scalping."  Furthermore, on at least two occasions, McKeown and Ryan failed to fully disclose on PennyStockChaser.com the full amount of the stock they and their companies received in exchange for the touting.  As discussed below, the Commission has met the procedural requirements for entry of a default judgment, and the complaint establishes the Defendants' liability for violating the federal securities laws and the Commission's entitlement to its requested relief.

## II. HISTORY OF THE CASE

The Commission filed its emergency complaint on June 23, 2010 (D.E. 2) alleging, among other things, that McKeown, Ryan, Downshire and Meadow Vista violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a) and 15 U.S.C. § 77(q)(b)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 [15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5].   The complaint also alleged McKeown, Ryan, and Meadow Vista violated Section 17(b) of the Securities Act.   The Commission also sought and obtained a Temporary Restraining Order (D.E. 4 and 9) and later obtained a Preliminary Injunction against the Defendants (D.E. 19).  The Commission served the Defendants with the complaint and related documents on June 28, 2010 (D.E. 13-16).  Receiving no response from them, the Commission moved for a clerk's default on September 3, 2010 (D.E. 27).  The clerk entered the default on September 7, 2010 (D.E. 30).  Attached as Exhibit 1 and 2 are affidavits indicating McKeown and Ryan are not currently in the U.S. military.

## III.  MEMORANDUM OF LAW
### A.  Legal Standards

The factual allegations of a complaint are deemed admitted by the entry of a default. *Buchanan v. Bowman*, 820 F.2d 359, 360 (11th Cir. 1987); *Nishimatsu Construction Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  When a defendant fails to defend an

action and a default has been entered, his liability for violations of the federal securities laws as alleged in the complaint, and the propriety of the relief sought, is deemed established. *Buchanan*, 820 F.2d at 360; *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983); *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999). As discussed below, the factual allegations of the complaint support entry of a default judgment against the Defendants. Those allegations establish the Defendants' liability and the propriety of the relief we seek in this motion.

### B.  Factual Allegations of the Complaint Deemed Admitted Against the Defendants

McKeown and Ryan, who hold themselves out as husband and wife, used the website www.PennyStockChaser.com, to tout dozens of U.S. companies. Complaint at ¶2. Since no later than April 1, 2009, McKeown, Ryan, and Downshire have owned and operated PennyStockChaser.com. *Id*. at ¶17. Through the PennyStockChaser website, McKeown, Ryan, and Downshire touted penny stocks and invited the investing public to subscribe to receive daily stock alerts through e-mail, text messages, Facebook, and Twitter. *Id*. at ¶19. In 2009 alone, McKeown, Ryan, and Downshire used the website to alert the investing public to more than 65 penny stock recommendations. *Id*. at ¶20. At the same time, McKeown and Ryan liquidated millions of shares of the same companies through their two corporations, Downshire and Meadow Vista. *Id*. at ¶2.

McKeown is the owner and sole officer and director of Downshire, and the president and owner of Meadow Vista. Complaint at ¶7. She also owns the trade mark "PennyStockChaser" in the United States and Canada and licensed the trade mark to Downshire. *Id*. She and Ryan controlled PennyStockChaser. *Id*. Ryan entered into agreements on behalf of Downshire as its managing director, and conducted trading on behalf of Downshire and Meadow Vista. *Id*. at ¶8.

Ryan controlled the content of the website and negotiated and entered into contracts on its behalf.  *Id*. at ¶22.  He also solicited and paid a Florida-based broker-dealer to provide stock recommendations to publish on the website.  *Id*.

Downshire is a Quebec, Canada corporation headquartered in Montreal that purports to be a private investment banking group.  Complaint at ¶9.  It holds the license to use the trade mark "PennyStockChaser" in the United States and Canada, whose stated services include providing a website featuring stock market information.  *Id*.  Meadow Vista is a Wyoming corporation which purports to be an investment bank headquartered in Cheyenne, Wyoming.  *Id*. at ¶10.  Meadow Vista maintains brokerage accounts at a firm in Boca Raton, Florida, where the Defendants received, purchased, and sold shares of the companies touted on PennyStockChaser. *Id*. at ¶13.  McKeown signed the account opening forms for these accounts, and is listed as corporation owner on them.  *Id*.  McKeown and Ryan controlled and managed these brokerage accounts, including by regularly sending e-mails to brokers at the Boca Raton firm directing trading in these accounts.  *Id*.

As compensation for McKeown and Ryan's touting the issuers' stock, Downshire and Meadow Vista received shares of the issuers from issuers' affiliates or third parties, then sold them on the open market.  Complaint at ¶25.  The Defendants also purchased shares of the stock they touted on PennyStockChaser and sold them for profits after their promotional campaigns increased the stock prices.  *Id*.  The Defendants failed to adequately disclose they were simultaneously selling shares of the stocks they touted.  *Id*. at ¶26.  The PennyStockChaser website stated only that it "may be selling shares of stock at the same time the profile is being disseminated to potential investors; this should be viewed as a definite conflict of interest and as

such, the reader should take this into consideration."  *Id.*  In truth, the Defendants regularly sold massive quantities of the stock they touted on the website.  *Id.*

The complaint identifies at least six specific issuers the Defendants touted.  Complaint at ¶¶27-52.  From no later than May 11, 2009 until at least June 1, 2009, McKeown, Ryan, and Downshire used PennyStockChaser to promote the stock of Converge Global, Inc., a Utah corporation purportedly in the business of acquiring and developing properties whose stock is quoted on Pink OTC Markets Inc. (the "Pink Sheets") under the ticker symbol "CVRG."  *Id.* at ¶27.  Converge's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign.  *Id.* at ¶29.  For example, the week before the campaign began, Converge's average price per share ranged from 1.9 to 2.2 cents a share and the highest average trading volume was 311,160 shares.  *Id.*  However, between May 11 and 29, 2009, Converge's stock price was quoted as high as almost 4 cents a share, while its volume averaged up to 16,098,530 shares per day – more than 50 times the previous volume.  *Id.*  Between May 11, 2009 and July 6, 2009 – during and after touting Converge's stock on the website – McKeown and Ryan had Downshire sell almost 6.3 million shares of Converge stock for approximately $602,000 in net proceeds.  *Id.* at ¶30.

Similarly, in July 2009, McKeown, Ryan, and Downshire used PennyStockChaser to promote Biocentric Energy Holdings, Inc., a Florida corporation purportedly in the business of developing green energy technology whose stock is quoted on the Pink Sheets under the ticker symbol "BEHL."  Complaint at ¶31.  Biocentric's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign.  *Id.* at ¶33.  For example, during the week before the campaign began, Biocentric's stock price was quoted at less than a penny per share, and the trading volume peaked at 4.3 million shares per day, but during the two

weeks following the promotional campaign, Biocentric's stock price was quoted as high as 3 cents a share, and trading volume ranged from 10 million to 30 million shares per day. *Id*. Between July 13, 2009 and July 21, 2009, Ryan and McKeown had Downshire sell almost 24 million shares of Biocentric stock for net proceeds of $569,000. *Id*. at ¶34.

Again, from no later than April 7, 2010, the PennyStockChaser website touted the stock of Bluewave Group, Inc., a Nevada corporation headquartered in Fort Lauderdale, Florida, purportedly in the business of multi-media digital distribution whose securities are registered with the Commission and quoted on the Pink Sheets under the ticker symbol "BLEW." Complaint at ¶35.   Bluewave's trading volume increased significantly as a result of the Defendants' promotional campaign. *Id*. at ¶37.  Between January 1, 2010 and April 15, 2010, immediately prior to the campaign, trading was almost non-existent with a total of only 57,100 shares traded. *Id*.  By contrast, in the days following the promotional campaign, trading volume was almost two million shares *per day*. *Id*. at ¶38.  On March 19, 2010, a month prior to the promotional campaign, Meadow Vista received 1,000,000 shares of Bluewave. *Id*. at ¶39.  As the touting started, Meadow Vista sold 400,000 shares between April 16, 2010 and April 19, 2010 for net proceeds of approximately $184,000. *Id*. at ¶39.

Around the same time, starting no later than April 20, 2010, PennyStockChaser touted the stock of Avro Energy, Inc., a Nevada Corporation purportedly in the business of acquiring and developing oil and natural gas properties whose stock is registered with the Commission and are quoted on the Pink Sheets under the ticker symbol "AVOE".  Complaint at ¶40.  Avro's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. *Id*. at ¶42.  In the two weeks prior to the campaign, Avro's highest closing price was slightly less than a penny a share, and its highest trading volume was 42,300 shares per day. *Id*.

In contrast, from April 19 to 29, 2010, Avro's average daily stock price ranged from 1.5 to 3.2 cents per share, and its average trading volume reached more than 3 million shares per day. *Id*. On April 19, 2010, the day before PennyStockChaser began touting Avro stock, Meadow Vista bought 220,000 shares of Avro stock at prices of nine-tenths of a cent to 1.2 cents per share. *Id*. at ¶43. The following day, while PennyStockChaser touted it was buying Avro stock, Meadow Vista sold the shares for almost 2 cents a share, making a profit of $16,000. *Id*.

In the same way, from no later than October 2009 through at least January 2010, the PennyStockChaser website promoted Atlantic Wind & Solar, Inc., a West Virginia corporation headquartered in Toronto, Canada purportedly in the business of developing solar energy products whose securities are quoted on the Pink Sheets under the ticker symbol "AWSL." Complaint at ¶44. Atlantic's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. *Id*. at ¶46. Atlantic's closing stock price went from 70 cents per share on July 22, 2009 to $4.84 per share on October 22, 2009. *Id*. Days later, Atlantic's closing stock price decreased to $2.70 per share. *Id*. Atlantic's daily trading volume also increased, ranging from 13,812 shares on July 22, 2009 to more than 1 million shares on October 22, 2009. *Id*. Between September 1, 2009 and January 27, 2010, Meadow Vista received 430,000 shares of Atlantic. It sold 360,000 shares for between $1.49 and $3.37 per share for approximately $780,600 in net proceeds. *Id*. at ¶47.

Yet again, in October 2009, the PennyStockChaser website touted MSE Enviro-Tech Corp., a Delaware corporation headquartered in Miami, Florida and purportedly in the business of developing fire suppressant technology whose securities are quoted on the Pink Sheets under the ticker symbol "MEVT." Complaint at ¶48. MSE's stock price and trading volume increased significantly as a result of the Defendants' promotional campaign. *Id*. at ¶51. The week before

7

the touting, MSE's stock closed at prices between 35 and 38 cents per share, and the average daily trading volume was 26,600 shares per day.  *Id*.  The same day the website began touting MSE's stock, the share price increased to a high of $1.30 and closed at 99 cents per share, with a volume of more than 1.5 million shares traded.  *Id*.  After the touting ended, MSE's share price decreased and closed at 30 cents per share on November 3, 2009.  *Id*.  From October 22, 2009 until November 12, 2009, Meadow Vista sold 533,334 shares of MSE stock for approximately $240,000.  *Id*. at ¶52.

In addition, on at least two occasions, McKeown and Ryan failed to fully disclose on PennyStockChaser the full amount of the stock they and their companies received in exchange for the touting.  Complaint at ¶¶4 and 53.  For example, from September 2009 until January 2010, the website said PennyStockChaser had received 140,000 shares of Atlantic's stock from a third party.  *Id*. at ¶54.  In reality, an Atlantic affiliate had transferred 430,000 shares of Atlantic stock to Meadow Vista in exchange for touting Atlantic's stock on the website.  *Id*.  Furthermore, the PennyStockChaser website stated it received 350,000 shares of MSE's stock from a third party.  *Id*. at ¶55.  In truth, an MSE affiliate transferred 483,334 shares of MSE's stock to Meadow Vista on October 21, 2009 in exchange for touting MSE's stock on the website.  *Id*.

### C.  The Defendants Violated The Federal Securities Laws

Through their conduct, McKeown, Ryan, Downshire, and Meadow Vista violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a) and 15 U.S.C. § 77(q)(b)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 [15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5].  McKeown, Ryan, and Meadow Vista also violated Section 17(b) of the Securities Act.  Unless the Court permanently enjoins them, they are reasonably likely to continue to violate these provisions.  Complaint at ¶6.

### 1. Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act

Section 17(a) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5, which proscribe fraudulent conduct in connection with the purchase or sale of securities, prohibit essentially the same type of conduct. *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *SEC v. Unique Financial Concepts, Inc.,* 119 F. Supp. 2d 1332, 1339 (S.D. Fla. 1998). To establish a violation, the Commission must show: (1) a misrepresentation or omission (2) that is material (3) in the offer of or in connection with the purchase or sale of a security (4) made with scienter (5) in interstate commerce. *SEC v. Chemical Trust,* 2000 WL 33231600 at *9 (S.D. Fla. Dec. 19, 2000); *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).[1]

### a. The Defendants' Misrepresentations and Omissions

The Defendants made material misrepresentations and omissions to investors through PennyStockChaser in two ways. First, they did not disclose their almost simultaneous sales of issuers the website promoted. Second, they did not disclose in some cases the full amount of compensation they received for their touting.

### i. Failure To Disclose Sales

It is well established that the practice of scalping – recommending the purchase of a stock while immediately selling the stock without adequately disclosing the sales or the intent to sell – constitutes fraud and violates Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 181 (1963); *SEC v. Blavin,* 760 F.2d 706, 711-12 (6th Cir. 1985); *SEC v. Huttoe*, 1998 WL 34078092 at *4 (D.D.C. Sept. 14, 1998).

---

[1]   Scienter is only required for Exchange Act Section 10(b) and Securities Act Section 17(a)(1). Violations of Sections 17(a)(2) and (3) of the Securities Act do not require a finding of scienter. *Aaron v. SEC*, 446 U.S. 680, 697 (1980). Violations of these sections may be established by showing negligence. *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3rd Cir. 1997).

The fraud lies not in the practice of selling stocks contrary to recommendations, but in the failure to disclose the sales to potential investors. *SEC v. Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *29 (M.D. Fla. March 28, 2003).

As described above, McKeown and Ryan used the PennyStockChaser website to hype dozens of microcap issuers to drive up the stock price, while they simultaneously dumped their shares to take advantage of the price increase without disclosing their sales. The PennyStockChaser website stated that it "*may* be selling shares of stock at the same time the profile is being disseminated to potential investors" (emphasis added). Complaint at ¶26. However, courts have held that disclosing only *potential* sales in this fashion is not sufficient to avoid liability for scalping under Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5. *Blavin*, 760 F.2d at 709-11 (newsletter publisher liable under Section 10(b) and Rule 10b-5 for scalping even though he disclosed he "may trade for his own account" in the recommended securities); *SEC v. Gane*, 2005 WL 90154 at *8, *16 (S.D. Fla. Jan. 4, 2005) (holding scalper liable under Exchange Act Section 10(b) and Rule 10b-5 despite disclaimers "affiliates, and/or officers, directors and employees *may* have stock positions in [the recommended company] and that they *may* buy or sell shares") (emphasis in original).

McKeown and Ryan consistently dumped most or all of their shares of the issuers featured on their website, often at prices far below the target price their website set for the issuers. Complaint at ¶¶27-52. They often sold shares the same day or within a few days of touting the issuers. *Id*. Their disclosure that they "may" sell shares constituted a misrepresentation in violation of Sections 17(a) and 10(b).

### *ii.  Failure to Fully Disclose Compensation*

The Defendants also failed to fully disclose all the compensation they received for touting

stocks on the PennyStockChaser website.  As described above, they disclosed receipt of only 140,000 shares of Atlantic stock between September 2009 and January 2010.  Complaint at ¶54.  In reality, an Atlantic affiliate transferred more than 430,000 shares to Meadow Vista in exchange for the touting.  *Id*.  Similarly, the Defendants disclosed the receipt of 350,000 shares of MSE stock from a third party, when, in reality they received more than 480,000 shares from an Atlantic affiliate.  *Id*. at ¶55.  Failing to accurately and fully disclose all compensation received for touting stock constitutes fraud in violation of Sections 17(a) and 10(b).  *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *25-26 (failure of defendants to reveal to brokers and investors they were paid for promotional articles was material omitted fact); *Huttoe*, 1998 WL 34078092 at *4 (failure to reveal "paid promotional nature" of newsletter articles was a material omitted fact).  Accordingly, because McKeown and Ryan did not reveal their full compensation on the PennyStockChaser website, they made a second type of misrepresentation and omission.

### *b. The Defendants' Misrepresentations and Omissions were Material*

The test for materiality in the securities fraud context is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1327 (11th Cir. 1982).  Under that standard, the Defendants' false statements and omissions were material.  Certainly a reasonable investor would want to know the person telling him or her to buy a stock in fact holds millions of shares of the same stock and intends to sell the minute other investors start buying.  *Huttoe*, 1998 34078092 WL at *4 ("there is a substantial likelihood that a reasonable investor would consider the motivation of the person recommending the purchase of a stock a significant factor in making an investment decision").  *See also Blavin*, 760 F.2d at 711 (investment advisory service's failure to state it was expressly trading in recommended stocks was material).

### c.  The "In Connection With" Requirement

Because the Defendants made their misrepresentations and omissions in connection with the offer, purchase, and sale of the stocks they touted, bought and sold, their acts meet the "in connection with" requirement of Section 10(b) and Rule 10b-5.  *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (courts should interpret the "in connection with" requirement broadly to effectuate the remedial purpose of the federal securities laws); *Hasho*, 784 F. Supp. at 1106 ("any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5").

### d. The Defendants Acted With Scienter

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  The Commission may establish scienter for violations of Section 17(a) and 10(b) by showing that defendants made representations to investors "without basis and in reckless disregard for their truth or falsity."  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10 (D.D.C. 1998).  The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness.  *Carriba Air*, 681 F.2d at 1324.  The evidence establishes the Defendants acted with a high degree of scienter. McKeown and Ryan had PennyStockChaser disclose they "may" sell shares, yet they were fully aware they were doing far more than that.  They knew they were actually selling large quantities of the issuers' shares they were promoting, often at the same time they were urging investors to buy the shares.  Thus, they have displayed scienter under the securities laws.  *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *31-32 (defendants' repeated pattern of buying the stock of 14 client companies over two years, promoting the companies, and selling the stock at a profit was, at a minimum, severely reckless and showed they acted with scienter); *Blavin*, 760

F.2d at 712 ("at a minimum, Blavin recklessly failed to disclose that he was trading in stocks his newsletter recommended" and thus acted with scienter).

### *e.  Interstate Commerce*

The Defendants used interstate commerce to buy and sell the shares of stocks they own. Complaint at ¶16.  They e-mailed brokers throughout the country to direct trading in U.S. stocks, and their e-mails resulted in the use of commerce to trade.  *Id*. at ¶13.  They also used the Internet, Facebook, and Twitter to contact investors throughout the country.  *Id*. at ¶19.

For all the foregoing reasons, the Commission has established a *prima facie* case that the Defendants violated Section 17(a) of the Securities Act and Exchange Act Section 10(b) and Exchange Act Rule 10b-5.

## 2.  Section 17(b) of the Securities Act

Section 17(b) of the Securities Act makes it unlawful for any person:

> To publish … or circulate any notice, circular, advertisement, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly from an issuer … without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

In short, Section 17(b) requires stock promoters to completely and accurately disclose their compensation.  *SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001).  This includes any type of compensation and the amount.  *Id.*; *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *34-35; *Huttoe*, 1998 WL 34078092 at *9.  Scienter is not required to establish a violation of the statute.  *SEC v. Liberty Capital Group*, 75 F. Supp. 2d 1160, 1163 (W.D. Wash. 1999); *Corporate Relations*, 2003 U.S. Dist. Lexis 24925 at *35.

Meadow Vista, McKeown and Ryan received stock-based compensation from affiliates of Atlantic and MSE for promoting those companies' stock.  Complaint at ¶¶47, 54 and 55.  This

type of promotion falls within the ambit of Section 17(b). *U.S. v. Wenger*, 292 F. Supp. 2d 1296 (D. Utah 2003) (upholding verdict against stock promoter on Section 17(b) charges in connection with failure to disclose compensation during radio programs touting various stocks). Because McKeown and Ryan did not disclose the full amount of the compensation they received for touting Atlantic and MSE, they violated Section 17(b) of the Securities Act.

### D.  Permanent Injunctive Relief Is Warranted Against the Defendants

The Commission is entitled to injunctive relief when it establishes (1) a violation of the federal securities laws, and (2) a reasonable likelihood of future violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004); *SEC v. Unique Financial Concepts,* 196 F.3d 1195 at 1199 n.2 (11th Cir. 1999). The Commission has already established the first prong by showing the Defendants violated the federal securities laws. In determining whether a defendant is reasonably likely to continue to violate the securities laws, courts consider the following factors:

(1)     the egregiousness of the defendant's actions;

(2)     the isolated or recurrent nature of the violations;

(3)     the degree of scienter involved;

(4)     the sincerity of the defendant's assurances against future violations;

(5)     the defendant's recognition of the wrongful nature of his conduct; and

(6)     the likelihood that the defendant's occupation will present opportunities for future violations.

*Carriba Air*, 681 F.2d at 1322, *citing SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978); *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984).

In this case, each of the factors set forth above weighs in favor of the Court entering a permanent injunction. First, the conduct of McKeown and Ryan and their companies was

egregious.  They hyped the stock of microcap U.S. companies with questionable projections and statements so they could persuade unsuspecting investors to buy the stock, all so they could make a profit at the expense of investors who later suffered losses when the stocks of the issuers they promoted crashed.  Second, the conduct is hardly isolated; it was recurrent for more than a year.  During that time, McKeown and Ryan promoted at least 65 stocks.

Third, McKeown and Ryan demonstrated a high degree of scienter.  They knowingly failed to disclose they were selling large amount of issuers' stocks for huge profits while at the same time urging investors to buy the stock.  It is hard to imagine someone displaying a higher degree of scienter than someone who knowingly profits at the expense of others' losses.  As to the fourth and fifth factors, the Defendants have not responded to this lawsuit.  Given their failure to appear in this action, the Court cannot have any assurances that they will avoid future misconduct.  Similarly, there is no way to know what the Defendants will be doing in the future; therefore, it is entirely possible their future occupation will provide the opportunity to reoffend if the Court does not enjoin them.  As a result, the Defendants' conduct warrants the Court entering a permanent injunction against them.

## E.  Penny Stock Bar

Pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. §78u(d)(6), and Section 20(g) of the Securities Act, 15 U.S.C. §77t(g), the Court may permanently bar McKeown and Ryan from participating in any offering of any penny stock.  Section 21(d)(6) of the Exchange Act and Section 20(g) of the Securities Act permit a federal court to impose a penny stock bar against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock.

During the relevant period, the securities the Defendants touted qualified as penny stocks

because they did not meet any of the exceptions from the definition of a penny stock, as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.  The securities were equity securities: (1) that were not an "NMS stock" as defined in 17 C.F.R. §242.600(b)(47); (2) that traded below five dollars per share during the relevant period; (3) whose issuer had net tangible assets and average revenue below the threshold of Rule 3a51-1(g)(1); and (4) did not meet any of the other exceptions from the definition of "penny stock" contained in Rule 3a51-1 of the Exchange Act.  Complaint at ¶¶29, 33, 42, 43, 46, 47, and 51.  McKeown and Ryan participated in an offering of a penny stock because they engaged in activities for the purpose of issuing, trading, and/or inducing or attempting to induce the purchase or sale of numerous securities.  Specifically, McKeown and Ryan used a website they controlled to tout microcap companies, while at the same time clandestinely selling millions of shares of the same companies to profit from the demand they helped create through their touting.  *Id*. at ¶1.

### F.  <u>Disgorgement</u>

Disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws.  *SEC v. Blatt*, 583 F.2d at 1335; *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Blavin*, 760 F.2d at 713; *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), *cert. denied*, 486 U.S. 1014 (1988); *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1103-1104 (2d Cir. 1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").  Where, as here, the fraud is "pervasive," the Court should order all profits stemming from the scheme to be disgorged.  *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986), *cert. denied*, 479 U.S. 853 (1986).  Courts are empowered to order wrongdoers to disgorge the amount of their profits from the wrongdoing.  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005).  "The District Court has broad discretion not only in determining

whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).

The SEC is entitled to disgorgement "upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).   The Commission's burden for showing "the amount of assets subject to disgorgement . . . is light  . . .. Exactitude is not a requirement.'" *ETS Payphones, Inc.,* 408 F.3d at 735.   In addition, the Defendants should be jointly and severally liable for disgorgement of ill-gotten gains.   Where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of securities laws, they have been held jointly and severally liable for disgorgement of illegally obtained proceeds.  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010), *citing SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998).

## 1.  Amount of Disgorgement

In support of this motion, the Commission submits: (1) two declarations of Timothy J. Galdencio, a certified public accountant in the Commission's Miami Regional Office (attached as Exhibit 3 and 4)[2]; and (2) the Commission's prejudgment interest calculation (attached as Exhibit 5).   Ultimately, the exhibits establish the Defendants received proceeds of at least $3,719,543.  *See* Galdencio Decs., Exhibit 3 and 4.

As indicated in his declarations, Mr. Galdencio reviewed and analyzed the trading by Meadow Vista and Downshire in the stock of Atlantic Wind & Solar, Avro Energy, Bluewave Group, MSE Enviro-Tech Corp., Biocentric Energy Holdings, and Converge Global, to determine the amount of proceeds the Defendants received.   Mr. Galdencio's declarations contain tables which detail, among other things, the number of shares transferred in, shares sold,

---

[2] Mr. Galdencio's Declarations were first filed as Exhibits 23 and 35 to the Commission's Emergency Motion for Temporary Restraining Order.  *See* D.E. 4-3 (Emergency Motion) and 18-2 (Notice of filing additional evidence).

the proceeds from sales, and the net proceeds (sales proceeds less cost of purchases).  In total, Mr. Galdencio's review and analysis of the trading records of Meadow Vista and Downshire shows that they received proceeds of at least $3,719,543.  *See* Exhibit 4, pg. 2.  Mr. Galdencio's declarations enable the Commission to more than meet its burden to show a reasonable approximation of the ill-gotten gains received by the Defendants.  Therefore, the Court should order the Defendants to disgorge its ill-gotten gains of $3,719,543, plus pre-judgment interest.

## 2.   Prejudgment Interest

In addition to disgorgement, the Defendants should pay prejudgment interest because they have enjoyed access to the fraudulently raised funds over a period of time.  To require the Defendants to pay prejudgment interest is consistent with the equitable purpose of the remedy of disgorgement.  *Hughes Capital Corp.*, 917 F. Supp. at 1090.  A defendant's wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness.  *SEC v. Tome*, 638 F. Supp. at 639.   The Commission calculated prejudgment interest in accordance with the delinquent tax rate established by the Internal Revenue Service, 26 U.S.C. § 6621(a)(2), and assessed on a quarterly basis, from June 23, 2010, the date of entry of the Temporary Restraining Order to January 5, 2011, the date of this motion.  Based on the principal amount of $3,719,543 in ill-gotten gains for which the Defendants are responsible, and applying the applicable prejudgment interest rate, results in a total prejudgment interest amount of $74,762.81.  Thus, Defendants' total disgorgement and prejudgment interest obligation is $3,794,305.81.   The Commission has attached its Prejudgment Interest Report as Exhibit 5.

## G.   Repatriation Order

The Commission previously requested and obtained a repatriation order (D.E. 9 and 19).  The Commission requests the repatriation order remain in effect and incorporated in the default

judgment against the Defendants.  This Court has the power to order the Defendants to cause funds over which they have control to be transferred from foreign accounts to the United States. *Bank of Crete v. Koskotas,* No. 88 Civ. 8412, 1989 U.S. Dist. Lexis 4289 (S.D.N.Y. April 14, 1989) (court held it had the authority to compel the transfer of assets in a case where the defendants were likely to circumvent a judgment against them by dissipating or concealing funds they controlled).  Here, the Defendants' extensive business dealings in the United States and Canada justify an order that they repatriate any funds transferred outside of the United States. Because it may be impossible to preserve these funds unless they are repatriated, an order seeking repatriation of the funds realized from Defendants' fraudulent activity is appropriate.

## H.  Asset Freeze

The Commission previously requested and obtained a freeze of the Defendants' assets (D.E. 9 and 19).  The Commission requests the asset freeze remain in effect and incorporated in the default judgment against the Defendants until further motion of the Commission directing turnover of the frozen assets to satisfy disgorgement.  Pursuant to their general equity powers, federal courts may order ancillary relief to effectuate the purposes of the federal securities laws, both to preserve defendants' assets and ensure that wrongdoers do not profit from their unlawful conduct.  *See, e.g., Unifund SAL*, 910 F.2d at 1041; *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *Manor Nursing Centers,* 458 F.2d at 1103-04.  It is well recognized an asset freeze is sometimes necessary to ensure a future disgorgement order will not be rendered meaningless. *Manor Nursing Centers,* 458 F.2d at 1106; *United States v. Cannistraro*, 694 F. Supp. 62, 71-72 (D.N.J. 1988), *aff'd in part, vacated in part*, 871 F.2d 1210 (3d Cir. 1989); *SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987).  When there are concerns that defendants might dissipate assets, or transfer or secret assets beyond the jurisdiction of the Court, this Court need

only find some basis for inferring a violation of the federal securities laws in order to impose a freeze.  *Unifund SAL*, 910 F.2d at 1041-42; *SEC v. Tyler*, 2002 U.S. Dist. Lexis 2952 (N.D. Tex. February 22, 2002); *SEC v. Comcoa*, Ltd., 887 F. Supp. 1521, 1524 (S.D. Fla. 1995); *SEC v. Margolin*, 1992 U.S. Dist. Lexis 14872 at 19-20 (S.D.N.Y. Sept. 30, 1992); *SEC v. Grossman*, 1987 U.S. Dist. Lexis 1666 at *35-36 (S.D.N.Y. Feb 17, 1987).    Here,    the    Commission requests that the freeze order remain in effect until further motion by the Commission addressing distribution of the assets.

## I.  Civil Penalty

The Commission also seeks a civil penalty against the Defendants.  Under Section 20(d) of the Securities Act, 15 U.S.C. §77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. §78u(d), the Court may impose a civil penalty against the Defendants.  The purposes of civil penalties are to punish the individual violator as well as deter future violations.  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998).  At this time, undersigned counsel does not have authority from the five-member Commission to recommend a specific penalty amount.  The Commission respectfully requests the Court give undersigned counsel an additional 120 days to obtain authority for a specific penalty amount against the Defendants.

## IV.  CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission's Motion for Entry of a Default Judgment of Permanent Injunction and Other Relief Against Defendants Carol McKeown, Daniel F. Ryan, Meadow Vista Financial Corp., and Downshire Capital Inc., permanently enjoining each of them from future violations of the federal securities laws and for other and further relief as noted above.  For the Court's convenience, proposed default judgments are provided.

January 5, 2011                    By:     s/Christine Nestor
                                           Christine Nestor
                                           Senior Trial Counsel
                                           Florida Bar No. 597211
                                           nestorc@sec.gov
                                           Direct Dial:  (305) 982-6367

                                           Attorney for Plaintiff
                                           **SECURITIES AND EXCHANGE COMMISSION**
                                           801 Brickell Avenue, Suite 1800
                                           Miami, Florida  33131
                                           Telephone: (305) 982-6300
                                           Facsimile:   (305) 536-4154

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on January 5, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                   By:     s/Christine Nestor
                                           Christine Nestor

## <u>SERVICE LIST</u>

Securities and Exchange Commission v. Carol McKeown, et al.
Case No. 10-CV-80748-COHN
United States District Court, Southern District of Florida

Olivier J. Brault
Frederic Allali
666 Sherbrooke ouest, Suite 1200
Montreal, Quebec, Canada, H3A 1E7
Telephone: 514-281-6600
Fax: 514-281-3010
E-mail: obrault@allali.ca
fallali@allali.ca
*Canadian Counsel for Defendants*
*Service by Email and Facsimile*

Carol McKeown
3011 Barat
Montreal, Quebec, Canada H3Y 2H4
Service by Mail

Daniel F. Ryan
3011 Barat
Montreal, Quebec, Canada H3Y 2H4
Service by Mail

Meadow Vista Financial Corp.
c/o Wyoming Corporate Service, Inc., Registered Agent
2710 Thomes Ave.
Cheyenne, WY 82001
Service by Mail

Downshire Capital Inc.
1980 Sherbrooke Street West, Suite 1110
Montreal, Quebec, Canada H3H 1E8
Service by Mail